1  **LON B. ISAACSON ASSOCIATES**
   An Affiliation Including A
2  Professional Law Corporation
      Lon B. Isaacson, Esq. (SBN 64838)
3      Christopher C. Cianci, Esq. (SBN 266174)
   3435 Wilshire Blvd., Suite 2910
4  Los Angeles, California 90010-2015
   Telephone Number: (213) 487-7200
5  Fax Number:        (213) 383-2884
   Email:        lon.isaacson@gmail.com
6        chris@lbilaw.com
   Office:        maria@lbilaw.com
7        delyn@lbilaw.com

8  **Attorneys for Plaintiffs GERALD HOFFARTH;** *et al.*
9



CLERK U.S. DISTRICT COURT
FILED
JUN 1 3 2011
CENTRAL DISTRICT OF CALIFORNIA
BY
DEPUTY

10            **UNITED STATES DISTRICT COURT**
11    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
12

13  GERALD HOFFARTH, an
    individual; DEANNA
14  HOFFARTH, an individual;
    TADASHI ARAKI, an individual;
15  SACHIKO ARAKI, an individual;
    EDWIN BERGHOLDT, an
16  individual; WILMA A. BLIVEN,
    an individual; RAPHAEL
17  BRANCA, an individual;
    CAROLINE L. BURNES, an
18  individual; RAYMOND CLARK,
    an individual; NANCI CLARK, an
19  individual; BARBARA
    CLARK-LEAHY, an individual;
20  SCOTT COHEN, an individual;
    GLORIA COPPOLA, an
21  individual; MARIAN CREASY
    VOSBURGH, an individual on
22  behalf of herself and the CREASY
    FAMILY REVOCABLE LIVING
23  TRUST; PAULINE BEACH, an
    individual on behalf of the
24  CREASY FAMILY
    REVOCABLE LIVING TRUST;
25  LANA CRUZ, an individual;
    ESTELLE DEUTCH, individually
26  and as the successor in interest of

|   |   |
|---|---|
| ) | **Case No. SACV11-00336 R (RZx)** |
| ) |   |
| ) | **FIRST AMENDED COMPLAINT** |
| ) | **FOR DAMAGES FOR:** |
| ) |   |
| ) | 1. Fraud |
| ) | 2. Negligent Misrepresentation, and |
| ) |    Aiding and Abetting Negligent |
| ) |    Misrepresentation |
| ) | 3. Negligence |
| ) | 4. Aiding and Abetting Fraud |
| ) | 5. Breach of Fiduciary Duty, and |
| ) |    Aiding and Abetting Breach of |
| ) |    Fiduciary Duty |
| ) | 6. Breach of the Insurance |
| ) |    Guarantee Contract |
| ) | 7. Violation of California |
| ) |    Corporations Code § 25110 |
| ) | 8. Violation of California |
| ) |    Corporations Code § 25401 |
| ) | 9. Holder's Action |
| ) | 10. Aiding and Abetting Violation of |
| ) |    California Business & |
| ) |    Professions Code § 17200 et seq. |
| ) | 11. Aiding and Abetting Conversion |
| ) | 12. Financial Elder Abuse |

27
                                        **1**
28  ─────────────────────────────────────────────
          **FIRST AMENDED COMPLAINT FOR DAMAGES**

MARVIN DEUTCH, deceased;
ESTATE OF MARVIN DEUTCH;
BRIAN S. EVANS, an individual;
T. RICHARD EVANS, an
individual; STANLEY C.
FORREST, an individual;
BARBARA A. FORREST, an
individual; BILL
FRANKHOUSER, an individual;
ZELMA FRANKHOUSER, an
individual; BRUCE FRANZ, an
individual; NANCY FRANZ, an
individual; ALAN H. FRAZIER,
an individual; MARILYN J.
FRAZIER, an individual;
DONALD M. FUJINAGA, an
individual; RUTH L. FUJINAGA,
an individual; LAWRENCE
GENTILE, an individual; GENE
T. GREEN, an individual;
ROBERT E. GRIER, an
individual; GERALD HALL, an
individual; MARY HALL, an
individual; JERRY W. HAYNES,
an individual; ALAN HEINOLD,
an individual; ERIN HEINHOLD,
an individual; ROBERT
HICKAM, an individual;
SHIRLEY HICKAM, an
individual; KEVIN HOFFARTH,
an individual; COCHRAN
HOGAN, an individual;
DOROTHIE HOGAN, an
individual; ANNE HULBERT, an
individual; CANDEE A.
JOHNSON, an individual; LILLY
KATO, an individual on behalf of
deceased ROY KATO; ESTATE
OF ROY KATO; KIYOSHI
KAWAMOTO, an individual;
SUEKO KAWAMOTO, an
individual; HAROLD KRAFT, an
individual; DORIS KRAFT, an
individual; CHRISTINE LEWIS,
as the successor in interest of
AILEEN LEWIS, deceased;
ESTATE OF AILEEN LEWIS;
NORMAN LIETER, an individual;
IVY LIETER, an individual;
MEGAN LOVELACE, an
individual; PHILLIP LOVELACE,

13.   Violations of RICO, 18 U.S.C. §
      1962(C)
14.   Sale of Unregistered Securities
15.   Unjust Enrichment

**DEMAND FOR JURY TRIAL ON
ALL CAUSES OF ACTION**

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1   an individual; DAVID LUSHER,

2   an individual; MARY LUSHER,
    an individual; LEONARD

3   MAINS, an individual; HOWARD
    MATSUMURA, an individual;

4   EARLINE D. MCWILLIAMS, an
    individual; RONALD C.

5   MEDDINGS, an individual;
    ELEANOR KAY MEEK, as the

6   successor in interest of HAROLD
    MEEK, deceased; ESTATE OF

7   HAROLD MEEK; PARI
    MENDES, an individual on behalf

8   of herself and on behalf of the
    MENDES FAMILY TRUST;

9   RICARDO MENDES, an
    individual on behalf of the

10  MENDES FAMILY TRUST;
    AMY MOY, an individual;

11  MAXIM MOYAL, an individual;
    HISAKO NAKAMOTO,

12  individually and as the successor
    in interest of BEN NAKAMOTO,

13  deceased; ESTATE OF BEN
    NAKAMOTO; JOSE OLIVAR, an

14  individual; NANCY OLIVAR, an
    individual; ROSEMARIE

15  PADULA, an individual;
    MARION PEPINO, an individual;

16  CARL PYTLINSKI, an individual;
    VINCENT ROBBINS, an

17  individual; VIRGINIA ROBBINS,
    an individual; MICHAEL

18  RUSSON, an individual; TONY
    RUSSON, an individual; VENILE

19  RUSSON, an individual;
    DOROTHY SAMUELS, an

20  individual; RAYMOND A.
    SIRSTAD, an individual;

21  REBECCA R. SIRSTAD, an
    individual; GEORGE WADA, an

22  individual; MARY WADA, an
    individual; GREGORY K.

23  WADA, an individual; JUDY L.
    M. WADA, an individual;

24  MONTE G. WADA, an individual;
    DAVID S. WEIL, an individual;

25  GRACE K. WEIL, an individual;
    JEFFREY WHITE, an individual;

26  WILLIAM WHITE, an individual;
    JUDITH WHITE, an individual;

27

28

**3**

**FIRST AMENDED COMPLAINT FOR DAMAGES**

ALAN S. WIENER, an individual;
NANCY R. WIENER, an
individual; EDDIS ALLEN
WILLIAMS, an individual;
SHIZUKO YOSHIMOTO, an
individual; ALICE YOSHIMURA,
an individual; WILHELM
ZINDRIC, an individual; FRIEDA
ZINDRIC, an individual;

       Plaintiffs,

       vs.

DIVERSIFIED LENDING
GROUP, INC., a California
corporation; BRUCE FRED
FRIEDMAN, an individual;
APPLIED EQUITIES, INC., a
California corporation and wholly
owned subsidiary of DLG; DIANE
MARIE CANO, an individual;
KAREN O'CALLAGHAN, an
individual; SHIRLEY HOWARD,
an individual; KEVIN KELLER,
an individual; BRIAN NATHAN
GLEDHILL, an individual;
STEPHANIE IZEN, an individual;
JACKSON NATIONAL LIFE
INSURANCE COMPANY, a
Michigan corporation;
AMERICAN NATIONAL
INSURANCE COMPANY, a
Texas corporation; YOUR
PLATINUM DISTRIBUTORS,
INSURANCE MARKETING CO.,
a dissolved Texas corporation;
TOTAL FINANCIAL &
INSURANCE SERVICES, INC., a
California corporation; MARTIN
GREENBERG, an individual;
RICHARD FINKELSTEIN, an
individual; RICK WALTERS, an
individual; STRATEGIC
BENEFITS PLANNING GROUP,
INC., dba SBPG INSURANCE
SERVICES, a California
corporation; ERIC CANNON, an
individual; RAY AREVALO, an
individual; KAREN G. BURHOE,
an individual; POLYCOMP

**4**

**FIRST AMENDED COMPLAINT FOR DAMAGES**

ADMINISTRATIVE SERVICES,
INC., a California corporation;
CINDY BALTIMORE, an
individual; AMERICAN
BENEFIT CONCEPTS, INC., a
Michigan corporation; TRAVIS
M. OLIVER, an individual;
METLIFE, INC., a Delaware
corporation; WALNUT STREET
SECURITIES, INC., a New York
corporation and a subsidiary of
METLIFE, INC.; JOHN T.
GASPER, III, an individual; JIM
CARTER, an individual;
STATEWIDE FINANCIAL, an
unknown California entity;
LINCOLN FINANCIAL
ADVISORS CORPORATION, an
Indiana corporation; DAAT
ASSET MANAGEMENT, a
California corporation; ADAM
HOWARD MARKOWITZ, an
individual; LIGHTHOUSE
CAPITAL CORPORATION, a
California corporation;
AFFILIATED WEALTH
RESOURCES, INC., a suspended
California corporation; GLENN
DUGGINS, an individual; STATE
WIDE FINANCIAL &
INSURANCE SERVICES, an
unknown Texas entity; DANE R.
CARTER, an individual;
RUSSELL JALBERT, an
individual; EUGENE
WITTSTOCK, an individual;
JALBERT FINANCIAL GROUP,
LLC, a Michigan limited liability
group; WITTSTOCK
FINANCIAL & ASSOCIATES, an
unknown Michigan entity; TERRY
LEE MADISON, an individual;
NANCY L. REED, an individual;
ESTATE PLANNING
SOLUTIONS NETWORK, LLC, a
Massachusetts limited liability
company; BRUCE PLOTNICK, an
individual; MIKE D. GARDNER,
an individual; GARDNER
INSURANCE AGENCY, INC., an
Arkansas corporation; VICTOR

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**5**

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1  FRANCISCO, an individual;
2  CORZAN CAPITAL
   MANAGEMENT, LLC, a Nevada
3  limited liability company;
   STEVEN JOSEPH CORZAN, an
4  individual; FISH TAX
   ADVISORY GROUP, LLC, a
5  New Jersey corporation; JOHN P.
   FISH, an individual; DENNIS
6  ALLEN LAWTON, an individual;
   DLI ASSOCIATES, an unknown
7  California entity; PRB
   FINANCIAL, INC., a California
8  corporation; MANULIFE
   FINANCIAL CORPORATION, a
9  Canadian corporation; JOHN
   HANCOCK FINANCIAL
10 SERVICES, INC., a wholly-owned
   subsidiary of MANULIFE
11 FINANCIAL CORPORATION;
   KEMO BARROW, an individual;
12 MASSACHUSETTS MUTUAL
   LIFE INSURANCE COMPANY,
13 a Massachusetts company;
   ESTATE OF JOHN TALMAGE;
14 AMERICORP FUNDING, INC., a
   California corporation; MICHAEL
15 BAKER, an individual; KELLY
   HORNBAKER, an individual;
16 PERLOW PLANNING
   COMPANY, INC., a dissolved
17 New York corporation; JOSEPH
   PERLOW, an individual; GRACE
18 & PORTA INSURANCE
   AGENCY, INC., a Michigan
19 corporation; EDWARD W.
   GRACE, JR, an individual; ROES
20 1-10;

21        Defendants.

22

23        COME NOW, Plaintiffs, GERALD HOFFARTH, et al. ("Plaintiffs") for

24 themselves and complain to recover their damages and losses, as follows:

25

26              **NATURE OF ACTION**

27        1.    This is an action is brought against DIVERSIFIED LENDING GROUP,

28 INC. ("DLG"), BRUCE FRED FRIEDMAN ("BRUCE FRED FRIEDMAN" or

---

"BRUCE FRIEDMAN" or "FRIEDMAN"), APPLIED EQUITIES, INC. ("AEI"), other executives, officers, and agents of DLG and AEI, JACKSON NATIONAL LIFE INSURANCE COMPANY ("JACKSON NATIONAL"), AMERICAN NATIONAL INSURANCE COMPANY ("AMERICAN NATIONAL"), insurance sales agents, brokers, financial advisers, and companies, and ROES 1 through 10 who and which assisted DLG and others in:

  a. Committing a long-running and massive Ponzi Scheme fraud;

  b. Converting for their personal use and benefit a gargantuan quantity of funds purportedly "loaned" to DLG to buy "scratch and dented" commercial real estate, which was not bought;

  c. Engaging in deceptive, manipulative, and unfair business practices, all for the nefarious purpose of stealing money; and

  d. Preying on innocent, elderly citizens who by virtue of their advanced age and the natural infirmities of that advanced age were most vulnerable and, with their innocent families, most deeply harmed at the end of their lives by the theft of their life savings.

  2. Said Defendants participated in a massive, fraudulent Ponzi Scheme of financial elder abuse run by DLG, AEI, BRUCE FRED FRIEDMAN, a convicted Felon, and their co-conspirators, agents, partners, co-venturers, co-defendants, subsidiaries and affiliates.

  3. The DLG Ponzi Scheme was fueled by sales people who took part in and profited from the fraud by attracting new investor monies. These sales people lent their own financial credibility to FRIEDMAN and DLG, giving DLG a sense of legitimacy that innocent investors relied on in giving their money to DLG. Many of these sales people profited greatly at the expense of said investors.

  4. These sales persons advocated that their clients and advisees, Plaintiffs herein, purchase DLG notes without conducting even the most brief and shallow "due

1  diligence" about BRUCE FRED FRIEDMAN. Their failure to investigate resulted
2  in their failure to discover that BRUCE FRED FRIEDMAN had previously been
3  convicted in California of Grand Theft, a serious felony, and had served significant
4  imprisonment time in a California State Penitentiary, which he followed by filing
5  personal bankruptcy (liquidation) under Chapter 7 of Title 11 of the United States
6  Code ("straight bankruptcy"). Their advice to invest in DLG notes was made without
7  fulfilling their duty of due care to determine if DLG and its founder, officers, and
8  executives were sufficiently morally worthy to be trusted with investing elderly
9  citizens' money, and such advice was negligently rendered due to their failure to
10 discover that the "cover story" told by FRIEDMAN and his co-defendants was
11 concocted out of whole cloth and did not have a shred of truth to it. Instead of buying
12 "scratched and dented" but sound commercial realty, which FRIEDMAN and DLG
13 represented would bring income vastly more than was needed to meet the obligations
14 of DLG to the many creditors who lent money to DLG at 9% or 12% interest per
15 annum, DLG and FRIEDMAN merely used the money raised from new investors to
16 fund a kingly lifestyle and to pay back earlier investors with later investors'
17 investments. Had these sales people conducted a thorough and careful investigation
18 before recommending to their clients that they buy DLG notes, these sales persons
19 would have discovered that the insurance and guarantee which FRIEDMAN and DLG
20 touted as making their loan impregnably secure was non-existent, and would have
21 steered their clients from investing and losing their money. These sales people
22 breached their duty of diligence and care. That breach of duty was the proximate
23 cause of the losses and damages suffered by the afflicted Plaintiffs.

24      5.    This case is related to the following pending civil recovery actions which
25 are known by plaintiffs upon the filing of this Complaint:

26            a.    an individual action filed in the Central District of California,
27                  Martin L. Markowitz, et al. v. Diversified Lending Group, Inc., et
28                  al., assigned Case No. 2:09-483;

b.    a complaint brought by David A. Gill, solely in his capacity as Receiver in the SEC case, filed in the Central District of California, assigned Case No. 2:10-1554;

c.    an individual action filed in the Middle District of Florida, Kenneth Mirfield, etc. v. Jackson National Life Insurance Company, et al., assigned Case No. 6:09-1905; and

d.    an individual action filed in the Western District of Michigan, Kraig S. Ivie v. Diversified Lending Group, Inc., et al., assigned Case No. 1:09-751.

6.    This action is brought by approximately fifty named Plaintiffs with over $16,000,000 (16 million dollars US) in combined damages who each lost money entrusted to DLG, BRUCE FRED FRIEDMAN, AEI and others. Said lost money was purportedly guaranteed against loss and was represented to be insured by JACKSON NATIONAL and/or AMERICAN NATIONAL. After DLG's and BRUCE FRED FRIEDMAN'S massive multi-year fraud was uncovered, DLG, AEI and BRUCE FRED FRIEDMAN were forced into receivership and the liquidation of their "findable" assets on March 10, 2009, following the Securities & Exchange Commission's ("SEC") complaint filed on March 4, 2009.

7.    The SEC complaint filed March 4, 2009 against DLG, BRUCE FRED FRIEDMAN, and AEI in the United States District Court, Central District, Case No. 09-01533 ("the SEC case"), resulted in BRUCE FRED FRIEDMAN allegedly immediately agreeing voluntarily to liquidation and receivership. Los Angeles Attorney David A. Gill was appointed Interim and then immediately thereafter Permanent Receiver. An Order was obtained by the Receiver in the SEC case that no actions could be prosecuted against DLG, BRUCE FRED FRIEDMAN, and AEI that would interfere with the Receiver's efforts. Thus, while DLG, BRUCE FRED FRIEDMAN, and AEI are named Defendants in this civil action, until the Court in the SEC case lifts or modifies its "Stay of Prosecution" Order, the within prosecution

1  of civil claims against DLG, BRUCE FRED FRIEDMAN, and AEI, outside the scope
2  of the claims prosecuted by the Receiver, will be stayed. The parties who are named
3  as Defendants herein who are adjudicated to fall within the scope of the Stay Order
4  of the Federal District Court, shall have this within civil action stayed until and unless
5  relief from such Stay Order is granted by the United States District Court.  Such
6  parties are named in order that the within civil action, outside the scope of the
7  Receiver's pending action, shall be permitted to proceed when the Court so allows.

## JURISDICTION AND VENUE

10  8.      Jurisdiction is conferred on this Court pursuant to 18 U.S.C. § 1964, for
11  the cause of action alleging violation of the federal RICO statute, 18 U.S.C. §
12  1962(C).

13  9.      Supplemental jurisdiction over all other state causes of action alleged
14  herein is conferred on this Court pursuant to 28 U.S.C. § 1367, as the causes of action
15  are so related to claims within the Court's original jurisdiction that they form part of
16  the same case or controversy under Article III of the United States Constitution.

17  10.     Venue is invoked pursuant to 28 U.S.C. § 1391.

## PLAINTIFFS

20  11.     Plaintiff TADASHI and SACHIKO ARAKI (the "ARAKIS") are
21  individuals residing in Selma, Fresno County, California, are over the age of 65, and
22  as a result of the solicitation and representations of Defendants, deposited
23  approximately $200,000.00 into DLG that was represented to return a guaranteed
24  interest rate of 9% per annum for a five-year period, and which was represented to be
25  100% insured and guaranteed by a collateral assignment issued by Defendant
26  JACKSON NATIONAL, and deposited approximately $200,000.00 into DLG that
27  was represented to return a guaranteed interest rate of 12% per annum for a five-year
28  period.  The insurance agent who sold the ARAKIS the aforesaid DLG investment

1  was RON CARTER, who at all relevant times was principal of CAL-STATE
2  INSURANCE INC. The agency which worked on the ARAKIS' DLG account and
3  with RON CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP,
4  INC. Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC. held the funds
5  of and administered the ARAKIS' DLG account.

6      12.    Plaintiff EDWIN BERGHOLDT ("BERGHOLDT") is an individual
7  residing in Visalia, Tulare County, California, is over the age of 65, and as a result
8  of the solicitation and representations of Defendants, deposited approximately
9  $33,246.00 into DLG that was represented to return a guaranteed interest rate of 9%
10 per annum for a five-year period, and which was represented to be 100% insured and
11 guaranteed by a collateral assignment issued by Defendant JACKSON NATIONAL.
12 BERGHOLDT transferred his individual retirement account ("IRA") to DLG. The
13 beneficiaries of BERGHOLDT's IRA were his sons, ROBERT E. BERGHOLDT
14 (50% share) and WILLIAM M. BERGHOLDT (50% share). The insurance agent
15 who sold BERGHOLDT the aforesaid DLG investment was HAL CARTER, who, at
16 all relevant times, was principal of HAL CARTER INSURANCE SERVICES. The
17 agency which worked on BERGHOLDT's DLG account and with HAL CARTER was
18 Defendant STRATEGIC BENEFITS PLANNING GROUP, INC.    Defendant
19 POLYCOMP ADMINISTRATIVE SERVICES, INC. held the funds of and
20 administered BERGHOLDT's DLG account. BERGHOLDT used as income the
21 received interest from the DLG/POLYCOMP account on a semi-annual basis. Said
22 interest payments were necessary supplements to his Social Security checks. Since
23 his payments have been discontinued, BERGHOLDT was forced to cash out his life
24 insurance policy, which has caused him great anxiety and stress.

25     13.    Plaintiff WILMA A. BLIVEN ("BLIVEN") is an individual residing in
26 Quincy, Adams County, Illinois, is over the age of 65, and as a result of the
27 solicitation and representations of Defendants, deposited approximately $148,990.93
28 into DLG that was represented to return a guaranteed interest rate of 12% per annum

1  for a five-year period. BLIVEN's investment was for an IRA. The beneficiaries of
2  her IRA were her daughter BARBARA LOVELACE (34%), her daughter CAROL
3  S. CALKINS (33%), and her son JOHN T. BLIVEN (33%). The insurance agent who
4  sold BLIVEN the aforesaid DLG investment was Defendant TRAVIS M. OLIVER,
5  who was associated with Defendant AMERICAN BENEFIT CONCEPTS, INC. as
6  an insurance producer agent.    Defendant POLYCOMP ADMINISTRATIVE
7  SERVICES, INC. held the funds of and administered BLIVEN's DLG account. Since
8  loss of her funds, BLIVEN is left to fully rely on her daughter, CAROL S. CALKINS,
9  to care for her, as BLIVEN is now unable to afford professional nursing care.
10  BLIVEN has suffered from and still suffers from feelings of extreme anxiety and fear
11  about her livelihood and how she is to care for herself in the future.

12      14.    Plaintiff RAPHAEL BRANCA ("BRANCA") is an individual residing
13  in Delran, Burlington County, New Jersey, and as a result of the solicitation and
14  representations of Defendants, deposited approximately $200,000.00 into DLG that
15  was represented to return a guaranteed interest rate of 9% per annum for a five-year
16  period, and which was represented to be 100% insured and guaranteed by a collateral
17  assignment issued by Defendant JACKSON NATIONAL and/or AMERICAN
18  NATIONAL. The insurance agent who sold BRANCA the aforesaid DLG investment
19  was Defendant JOHN T. GASPER, III, who at all relevant times, was a principal of
20  and/or employed by/with Defendant WALNUT STREET SECURITIES, INC., a
21  subsidiary of Defendant METLIFE, INC.

22      15.    Plaintiff CAROLINE L. BURNES ("BURNES") is an individual residing
23  in Westminster, Orange County, California, and as a result of the solicitation and
24  representations of Defendants, deposited approximately $168,000.00 into DLG that
25  was represented to return a guaranteed interest rate of 9% per annum for a five-year
26  period, and which was represented to be 100% insured and guaranteed by a collateral
27  assignment issued by Defendant JACKSON NATIONAL.

28      16.    Plaintiffs RAYMOND CLARK and NANCI CLARK (the "CLARKS")

1    are individuals residing in Laguna Beach, Orange County, California, and as a result

2    of the solicitation and representations of Defendants, deposited approximately

3    $85,740.00 into DLG that was represented to return a guaranteed interest rate of 12%

4    per annum for a five-year period. The CLARKS had one account, for which their

5    daughter, LISA ROUSKE, was beneficiary, in which they invested $68,390.00, and

6    NANCI CLARK opened a second account, an IRA which was administered by

7    Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC. and in which

8    $17,350.00 was invested. The insurance agent who sold the CLARKS the aforesaid

9    DLG investment was ROBERT BUKACEK. As a result of the conduct of

10    Defendants, the CLARKS have lost their life savings, are unable to retire as planned,

11    despite it becoming ever more physically difficult for them to continue to work, are

12    strained in their marriage to one another, and have suffered and continue to suffer

13    feelings of anxiety, fear, and sadness.

14        17.     Plaintiff BARBARA CLARK-LEAHY ("CLARK-LEAHY") is an

15    individual residing in Morro Bay, San Luis Obispo County, California, is over the age

16    of 65, and as a result of the solicitation and representations of Defendants, deposited

17    approximately $170,000.00 into DLG that was represented to return a guaranteed

18    interest rate of 9% per annum for a five-year period, and which was represented to be

19    100% insured and guaranteed by a collateral assignment issued by Defendant

20    JACKSON NATIONAL, and deposited approximately $706,040.00 into DLG that

21    was represented to return a guaranteed interest rate of 12% per annum for a five-year

22    period. CLARK-LEAHY's investment was for an IRA. The beneficiaries of her IRA

23    were her brother VERNON CLARK (1/3 share), her brother BILLY CLARK (1/3

24    share), and her sister BONNIE SIBLEY (1/3 share). The insurance agent who sold

25    CLARK-LEAHY the aforesaid DLG investment was JIM CARTER, who at all

26    relevant times, was a principal of STATEWIDE FINANCIAL. The agency which

27    worked on CLARK-LEAHY's DLG account and with JIM CARTER was Defendant

28    STRATEGIC BENEFITS PLANNING GROUP, INC. Defendant POLYCOMP

1   ADMINISTRATIVE SERVICES, INC. held the funds of and administered
2   CLARK-LEAHY's DLG account.

3       18.     Plaintiff SCOTT COHEN ("COHEN") is an individual residing in West
4   Hills, Los Angeles County, California, and as a result of the solicitation and
5   representations of Defendants, deposited approximately $106,232.23 into DLG that
6   was represented to return a guaranteed interest rate of 9% per annum for a five-year
7   period, and which was represented to be 100% insured and guaranteed by a collateral
8   assignment issued by Defendant AMERICAN NATIONAL.  COHEN had one
9   account, for which his daughter ASHLEY COHEN (50% share) and his daughter
10  NICOLE COHEN (50% share) were beneficiaries, in which he invested $50,000, and
11  had a second account, an IRA which was administered by Defendant POLYCOMP
12  ADMINISTRATIVE SERVICES, INC. and in which $56,232.23 was invested. The
13  insurance agent who sold COHEN the aforesaid DLG investment was his deceased
14  father MARVIN H. COHEN with PROGRESSIVE PLANNING INC.  The agency
15  which worked on COHEN's DLG account(s) and with MARVIN H. COHEN was
16  Defendant STRATEGIC BENEFITS PLANNING GROUP, INC. COHEN lost funds
17  that were intended for his daughter's college education and his own retirement, and
18  has suffered and still suffers from feelings of extreme anxiety and fear, and
19  sleeplessness, and worries how he is going to regain the funds to send his daughter
20  to college and to retire.

21      19.     Plaintiff GLORIA COPPOLA ("COPPOLA") is an individual residing
22  in Visalia, Tulare County, California, is over the age of 65, and as a result of the
23  solicitation and representations of Defendants, deposited approximately $67,101.85
24  into DLG that was represented to return a guaranteed interest rate of 9% per annum
25  for a five-year period, and which was represented to be 100% insured and guaranteed
26  by a collateral assignment issued by Defendant JACKSON NATIONAL.
27  COPPOLA's investment was for an IRA. The beneficiaries of her IRA were her
28  nephew PAUL R. BOURGET (50% share) and her friend CATHERINE M. ADKINS

1 │ (50% share). The insurance agent who sold COPPOLA the aforesaid DLG
2 │ investment was HAL CARTER, who, at all relevant times, was principal of HAL
3 │ CARTER INSURANCE SERVICES. The agency which worked on COPPOLA's
4 │ DLG account and with HAL CARTER was Defendant STRATEGIC BENEFITS
5 │ PLANNING GROUP, INC.    Defendant POLYCOMP ADMINISTRATIVE
6 │ SERVICES, INC. held the funds of and administered COPPOLA's DLG account.

7 │     20.    Plaintiff MARIAN CREASY VOSBURGH ("MARIAN VOSBURGH"),
8 │ on behalf of herself and the CREASY FAMILY REVOCABLE LIVING TRUST
9 │ ("CREASY FAMILY TRUST"), and Plaintiff PAULINE BEACH ("PAULINE
10 │ BEACH"), on behalf of the CREASY FAMILY TRUST, are individuals over the age
11 │ of 65; Plaintiff MARIAN VOSBURGH is an individual residing in San Luis Obispo,
12 │ San Luis Obispo County, California; and Plaintiff PAULINE BEACH is an individual
13 │ residing in Fort Bragg, Mendocino County, California. As a result of the solicitation
14 │ and representations of Defendants, their mother ROSE CREASY, on behalf of the
15 │ CREASY FAMILY TRUST, and MARIAN VOSBURGH deposited approximately
16 │ $645,290.60 into DLG that was represented to return a guaranteed interest rate of 9%
17 │ per annum for a five-year period, and which was represented to be 100% insured and
18 │ guaranteed by a collateral assignment issued by Defendant JACKSON NATIONAL.
19 │ ROSE CREASY died on March 11, 2008. The beneficiaries of the CREASY
20 │ FAMILY TRUST, and inheritors of the investment, were her daughters MARIAN
21 │ VOSBURGH and PAULINE BEACH. MARIAN VOSBURGH and PAULINE
22 │ BEACH thus jointly owned an account with DLG, for which MARIAN's husband
23 │ ROBERT I. VOSBURGH was beneficiary, and in which $213,500.00 was invested.
24 │ MARIAN VOSBURGH separately owned an account with DLG, for which her
25 │ husband ROBERT I. VOSBURGH (50% share) and her sister PAULINE BEACH
26 │ (50% share) were beneficiaries, and in which $300,000 was invested. The insurance
27 │ agent who sold ROSE CREASY and MARIAN VOSBURGH the aforesaid DLG
28 │ investment was JIM CARTER, who at all relevant times, was principal of

1   STATEWIDE FINANCIAL.  The agency which worked on ROSE CREASY and
2   MARIAN VOSBURGH's DLG account(s) and with JIM CARTER was Defendant
3   STRATEGIC BENEFITS PLANNING GROUP, INC.  Defendant POLYCOMP
4   ADMINISTRATIVE SERVICES, INC. held the funds of and administered MARIAN
5   VOSBURGH's DLG account.

6       21.   Plaintiff LANA CRUZ ("CRUZ") is an individual residing in Madera,
7   Madera County, California, and as a result of the solicitation and representations of
8   Defendants, deposited approximately $35,000 into DLG that was represented to
9   return a guaranteed interest rate of 9% per annum for a five-year period, and which
10  was represented to be 100% insured and guaranteed by a collateral assignment issued
11  by Defendant JACKSON NATIONAL. CRUZ had one DLG account, for which her
12  husband VINCENT CRUZ was primary beneficiary and her daughter SASHA K.
13  HATANAKA was contingent beneficiary. The insurance agent who sold CRUZ the
14  aforesaid DLG investment was RON CARTER, who at all relevant times was
15  principal of CAL-STATE INSURANCE INC. The agency which worked on CRUZ's
16  DLG account and with RON CARTER was Defendant STRATEGIC BENEFITS
17  PLANNING GROUP, INC.

18      22.   Plaintiffs ESTATE OF MARVIN DEUTCH and ESTELLE DEUTCH
19  ("ESTELLE DEUTCH"), on behalf of herself and her decedent-husband MARVIN
20  DEUTCH ("MARVIN DEUTCH") as his successor-in-interest, is an individual
21  residing in Wellington, Palm Beach County, Florida, and is over the age of 65. As
22  a result of the solicitation and representations of Defendants, MARVIN and
23  ESTELLE DEUTCH deposited approximately $224,110.00 into DLG that was
24  represented to return a guaranteed interest rate of 12% per annum for a five-year
25  period. MARVIN DEUTCH owned a DLG account, for which his wife ESTELLE
26  DEUTCH was sole beneficiary, and in which MARVIN DEUTCH invested
27  $149,110.00. ESTELLE DEUTCH owned a DLG account, for which her husband
28  MARVIN DEUTCH was beneficiary, and in which ESTELLE DEUTCH invested

1   $75,000.00. The insurance agent who sold MARVIN and ESTELLE DEUTCH the
2   aforesaid DLG investment was Defendant ADAM HOWARD MARKOWITZ, who,
3   at all relevant times, was employed by SAGEMARK CONSULTING, a division of
4   Defendant LINCOLN FINANCIAL ADVISORS CORPORATION. The anxiety and
5   stress of losing his investment funds aggravated MARVIN DEUTCH's health
6   conditions, and the loss of her funds caused ESTELLE DEUTCH great anxiety,
7   stress, and fear and aggravated her feelings of intense loss and depression when her
8   husband died of ill health.

9       23.    Plaintiff BRIAN S. EVANS ("BRIAN EVANS") is an individual
10  residing in Valrico, Nassau County, Florida, and as a result of the solicitation and
11  representations of Defendants, deposited approximately $50,000.00 into DLG that
12  was represented to return a guaranteed interest rate of 12% per annum for a five-year
13  period. BRIAN EVANS' wife NATALIE EVANS was primary beneficiary on the
14  account, and BRIAN EVANS' father T. RICHARD EVANS was contingent
15  beneficiary on the account. The insurance agent who sold BRIAN EVANS the
16  aforesaid DLG investment was Defendant GLENN DUGGINS, who, at all relevant
17  times, was registered with Defendant LIGHTHOUSE CAPITAL CORPORATION
18  and employed with/by Defendant AFFILIATED WEALTH RESOURCES, INC. The
19  loss of investment funds has put a significant strain on BRIAN EVANS' marriage,
20  and resulted in EVANS' difficulty paying his mortgage, utility bills, his daughter's
21  medical bills, his wife's school tuition, and school debt.

22      24.    Plaintiff T. RICHARD EVANS ("T. RICHARD EVANS") is an
23  individual residing in Carlsbad, San Diego County, California, is over the age of 65,
24  and as a result of the solicitation and representations of Defendants, deposited
25  approximately $370,000.00 into DLG that was represented to return a guaranteed
26  interest rate of 12% per annum for a five-year period. T. RICHARD EVANS
27  deposited $270,000 in one account with DLG, under which his son BRIAN EVANS
28  and his son KEVIN T. EVANS were beneficiaries. Defendant POLYCOMP

1  ADMINISTRATIVE SERVICES, INC. held the funds of and administered T.
2  RICHARD EVANS' DLG account. T. RICHARD EVANS also deposited $100,000
3  into another DLG account, under which his son BRIAN EVANS and his son KEVIN
4  T. EVANS were also beneficiaries. The insurance agent who sold T. RICHARD
5  EVANS the aforesaid DLG investments was Defendant GLENN DUGGINS, who,
6  at all relevant times, was registered with Defendant LIGHTHOUSE CAPITAL
7  CORPORATION and employed with/by Defendant AFFILIATED WEALTH
8  RESOURCES, INC.

9      25.    Plaintiffs STANLEY C. FORREST and BARBARA A. FORREST (the
10  "FORRESTS") are individuals residing in Georgetown, Williamson County, Texas;
11  STANLEY FORREST is over the age of 65; and as a result of the solicitation and
12  representations of Defendants, the FORRESTS deposited approximately $80,000 into
13  DLG that was represented to return a guaranteed interest rate of 9% per annum for a
14  five-year period, and which was represented to be 100% insured and guaranteed by
15  a collateral assignment issued by Defendant JACKSON NATIONAL and/or
16  Defendant AMERICAN NATIONAL.   The insurance agents who sold the
17  FORRESTS the aforesaid DLG investment was Defendant DANE R. CARTER, who,
18  at all relevant times, was employed with/by Defendant STATE WIDE FINANCIAL
19  & INSURANCE SERVICES, and Defendant JIM CARTER, who at all relevant
20  times, was principal of Defendant STATEWIDE FINANCIAL. The agency which
21  worked on the FORRESTS' DLG account and with DANE R. CARTER and JIM
22  CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC. The
23  loss of funds has caused the FORRESTS great distress and unnerve, and has forced
24  BARBARA to continue working instead of caring for her ill husband, STANLEY
25  FORREST.

26      26.    Plaintiffs    BILL    and    ZELMA    FRANKHOUSERS    (the
27  "FRANKHOUSERS") are individuals residing in Bakersfield, Kern County,
28  California, and as a result of the solicitation and representations of Defendants,

1  deposited approximately $139,886.00 into DLG that was represented to return a
2  guaranteed interest rate of 9% per annum for a five-year period, and which was
3  represented to be 100% insured and guaranteed by a collateral assignment issued by
4  Defendant JACKSON NATIONAL. BILL FRANKHOUSER owned a DLG account,
5  for which his wife ZELMA FRANKHOUSER was sole beneficiary, and in which
6  BILL FRANKHOUSER invested $124,862.00. ZELMA FRANKHOUSER owned
7  a DLG account, for which her husband BILL FRANKHOUSER was beneficiary, and
8  in which ZELMA FRANKHOUSER invested $15,024.00. The insurance agent who
9  sold BILL and ZELMA FRANKHOUSER the aforesaid DLG investment was RON
10  and JIM CARTER, who at all relevant times were principals of CAL-STATE
11  INSURANCE INC. and STATEWIDE FINANCIAL, respectively. The agency which
12  worked on BILL and ZELMA FRANKHOUSER's DLG account(s) and with RON
13  and JIM CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP,
14  INC. Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC. held the funds
15  of and administered the FRANKHOUSERS' DLG account(s). The loss of investment
16  funds resulted in a dramatic decrease in their credit rate, cancellations by credit card
17  companies of their credit card accounts, a dramatic decrease in their ability to pay
18  bills, their buying power frozen due to poor credit rating, a dramatic increase in
19  problems with their health and well-being, and a loss of income.

20       27.     Plaintiffs BRUCE and NANCY FRANZ (the "FRANZES") are
21  individuals residing in Commerce Charter Township, Oakland County, Michigan, and
22  as a result of the solicitation and representations of Defendants, deposited
23  approximately $234,821.85 into DLG that was represented to return a guaranteed
24  interest rate of 12% per annum for a five-year period. The insurance agents who sold
25  the FRANZES the aforesaid DLG investment was Defendants RUSSELL JALBERT,
26  who, at all relevant times, was principal of and employed with/by Defendant
27  JALBERT FINANCIAL GROUP, LLC, and EUGENE WITTSTOCK, who, at all
28  relevant times, was principal of and employed with/by Defendants JALBERT

1 FINANCIAL GROUP, LLC and WITTSTOCK FINANCIAL & ASSOCIATES. The
2 FRANZES have entered into confidential settlement agreements with Defendants
3 RUSSELL JALBERT; JALBERT FINANCIAL GROUP, LLC; and EUGENE
4 WITTSTOCK in resolution of a lawsuit against said Defendants in Oakland County
5 Circuit Court, captioned Badia v. Jalbert Financial Group, LLC, 09-102485-CZ. The
6 FRANZES are therefore excluded from and do not seek recovery from these
7 particular Defendants. The loss of investment funds has caused the FRANZES
8 feelings of depression, anxiety, and stress, and has interfered with their ability to
9 sleep. They further are having trouble making payments on their home mortgage.

10    28.    Plaintiffs ALLEN HOWARD FRAZIER and MARILYN JOYCE
11 FRAZIER (the "FRAZIERS") are individuals residing in Niles, Berrien County,
12 Michigan, are over the age of 65, and as a result of the solicitation and representations
13 of Defendants, deposited approximately $67,055.00 into DLG that was represented
14 to return a guaranteed interest rate of 12% per annum for a five-year period. The
15 beneficiaries on their DLG account were MICHAEL ALLEN FRAZIER (50% share)
16 and MARIA RODRIGEZ (50% share). The insurance agent who sold the FRAZIERS
17 the aforesaid DLG investment were Defendants TERRY LEE MADISON and
18 NANCY L. REED, agents associated with Defendant AMERICAN BENEFIT
19 CONCEPTS, INC.

20    29.    Plaintiffs DONALD M. FUJINAGA and RUTH L. FUJINAGA (the
21 "FUJINAGAS") are individuals residing in Cutler, Tulare County, California;
22 DONALD is over the age of 65; and as a result of the solicitation and representations
23 of Defendants, the FUJINAGAS deposited approximately $115,000.00 into DLG that
24 was represented to return a guaranteed interest rate of 12% per annum for a five-year
25 period.    The beneficiaries on their DLG account were their son LANCE F.
26 FUJINAGA (50% share) and their son DEREK F. FUJINAGA (50% share). The
27 insurance agents who sold the FUJINAGAS the aforesaid DLG investment was HAL
28 and RON CARTER, who at all relevant times, were principals of HAL CARTER

1   INSURANCE SERVICES and CAL-STATE INSURANCE INC., respectively.  The
2   agency which worked on the FUJINAGAS' DLG account and with HAL and RON
3   CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC.
4   Because of the loss of funds, the FUJINAGAS have been afflicted with sleeplessness,
5   anxiety, fear, increasing and unsustainable debt, and marital strain.

6        30.    Plaintiff LAWRENCE GENTILE ("GENTILE") is an individual residing
7   in Torrance, Los Angeles County, California, is over the age of 65, and as a result of
8   the solicitation and representations of Defendants, deposited approximately
9   $400,000.00 into DLG that was represented to return a guaranteed interest rate of
10  12% per annum for a five-year period. The beneficiary on his account was his wife
11  DIANE GENTILE. The insurance agent who sold GENTILE the aforesaid DLG
12  investments was Defendant RAY AREVALO, who, at all relevant times, was
13  employed with/by Defendant STRATEGIC BENEFITS PLANNING GROUP, INC.

14       31.    Plaintiff GENE T. GREEN ("GREEN") is an individual residing in
15  Nipomo, San Luis Obispo County, California, and as a result of the solicitation and
16  representations of Defendants, deposited approximately $50,000.00 into DLG that
17  was represented to return a guaranteed interest rate of 12% per annum for a five-year
18  period. His niece CONNIE MCALEXANDER was sole beneficiary to GREEN's
19  DLG account. The agency that worked on GREEN's DLG account was Defendant
20  STRATEGIC BENEFITS PLANNING GROUP, INC.

21       32.    Plaintiff ROBERT E. GRIER ("GRIER") is an individual residing in
22  Farmington Hills, Oakland County, Michigan, and as a result of the solicitation and
23  representations of Defendants, deposited approximately $160,181.00 into DLG that
24  was represented to return a guaranteed interest rate of 12% per annum for a five-year
25  period. The insurance agents who sold GRIER the aforesaid DLG investment was
26  Defendants RUSSELL JALBERT, who, at all relevant times, was principal of and
27  employed with/by Defendant JALBERT FINANCIAL GROUP, LLC, and EUGENE
28  WITTSTOCK, who, at all relevant times, was principal of and employed with/by

1 Defendants JALBERT FINANCIAL GROUP, LLC and WITTSTOCK FINANCIAL
2 & ASSOCIATES. The loss of investment has caused GRIER and his wife to
3 postpone retirement, and has produced in GRIER feelings of anxiety, fear, and
4 extreme stress.

5     33.    Plaintiffs GERALD and MARY HALL (the "HALLS") are individuals
6 residing in Natick, Middlesex County, Massachusetts, are over the age of 65, and as
7 a result of the solicitation and representations of Defendants, deposited approximately
8 $107,000 into DLG that was represented to return a guaranteed interest rate of 12%
9 per annum for a five-year period. Their daughter LYNNE ANNE HALL was sole
10 beneficiary to the HALLS' DLG account. The insurance agent who sold the HALLS
11 the aforesaid DLG investment was Defendant BRUCE PLOTNICK, who, at all
12 relevant times, was principal and employed with/by Defendant ESTATE PLANNING
13 SOLUTIONS NETWORK, LLC. The agency that worked on the HALLS' DLG
14 account was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC. The
15 loss of investment has produced in the HALLS feelings of anxiety, fear, depression,
16 and extreme stress.

17     34.    Plaintiff JERRY W. HAYNES ("HAYNES") is an individual residing in
18 Wynne, Cross County, Arkansas, and as a result of the solicitation and
19 representations of Defendants, deposited approximately $141,000 into DLG that was
20 represented to return a guaranteed interest rate of 12% per annum for a five-year
21 period. The insurance agent who sold HAYNES the aforesaid DLG investment was
22 Defendant MIKE D. GARDNER, who, at all relevant times, was principal and
23 employed with/by Defendant GARDNER INSURANCE AGENCY, INC. As a result
24 of the loss of investment funds, HAYNES was forced to file for bankruptcy. The loss
25 has placed a strain on his marriage. HAYNES is unable to provide for his family,
26 cannot get the medical assistance that he needs, and cannot better his situation
27 because he remains disabled and unable to work.

28     35.    Plaintiff ALAN HEINOLD and ERIN HEINHOLD (the "HEINOLDS")

1  are individuals residing in Westford, Middlesex County, Massachusetts, and as a
2  result of the solicitation and representations of Defendants, deposited approximately
3  $361,600 into DLG that was represented to return a guaranteed interest rate of 12%
4  per annum for a five-year period. ERIN HEINHOLD owned a DLG account in which
5  she invested approximately $75,000 at 12%, and under which her husband ALAN
6  HEINHOLD was sole beneficiary. ALAN HEINFOLD owned a DLG account in
7  which he invested approximately $236,600 at 12%, and under which his wife ERIN
8  HEINHOLD was sole beneficiary. ALAN and ERIN HEINHOLD jointly owned
9  another DLG account in which they invested approximately $50,000 at 12%, and
10 under which the beneficiaries were their daughter ANNIKA J. HEINHOLD (33.33%),
11 their daughter LILIA C. HEINHOLD (33.33%), and their daughter KARINA M.
12 HEINHOLD (33.33%). The insurance agent who sold the HEINHOLDS the
13 aforesaid DLG investment was Defendant BRUCE PLOTNICK, who, at all relevant
14 times, was principal and employed with/by Defendant ESTATE PLANNING
15 SOLUTIONS NETWORK, LLC. The agency that worked on the HEINHOLDS'
16 DLG account was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC.

17      36.   Plaintiffs ROBERT and SHIRLEY HICKAM (the "HICKAMS") are
18 individuals residing in Exeter, Tulare County, California, are over the age of 65, and
19 as a result of the solicitation and representations of Defendants, deposited
20 approximately $300,000.60 into DLG that was represented to return a guaranteed
21 interest rate of 9% per annum for a five-year period, and which was represented to be
22 100% insured and guaranteed by a collateral assignment issued by Defendant
23 JACKSON NATIONAL and/or AMERICAN NATIONAL, and deposited
24 approximately $396,000.00 into DLG that was represented to return a guaranteed
25 interest rate of 12% per annum for a five-year period. The HICKAMS owned a DLG
26 account for which there was a joint tenancy with rights of survivorship, and in which
27 the HICKAMS invested $300,000.60, at 9%. The HICKAMS owned another DLG
28 account for which there was a joint tenancy with rights of survivorship, and in which

1  the HICKAMS invested $100,000.00, at 12%. ROBERT HICKAM had another DLG
2  account for which SHIRLEY HICKAM was primary beneficiary and the "HICKAM
3  FAMILY REVOCABLE TRUST OF DECEMBER 1, 1995" was contingent
4  beneficiary, and in which ROBERT HICKAM invested $152,538.00 at 12%. The
5  insurance agents who sold the HICKAMS the aforesaid DLG investment were HAL
6  and RON CARTER, who at all relevant times, were principals of HAL CARTER
7  INSURANCE SERVICES and CAL-STATE INSURANCE INC., respectively. The
8  agency which worked on the HICKAMS' DLG account(s) and with HAL and RON
9  CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC.
10 Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC. held the funds of
11 and administered the HICKAMS' DLG account(s).

12     37.    Plaintiffs GERALD and DEANNA HOFFARTH (the "HOFFARTHS")
13 are individuals residing in Gold River, Sacramento County, California, and are over
14 the age of 65. As a result of the solicitation and representations of Defendants,
15 GERALD HOFFARTH deposited approximately $685,000 into DLG that was
16 represented to return a guaranteed interest rate of 9% per annum for a five-year
17 period, and which was represented to be 100% insured and guaranteed by a collateral
18 assignment issued by Defendant JACKSON NATIONAL. DEANNA was beneficiary
19 to this account. GERALD also deposited approximately $800,000.00 into DLG that
20 was represented to return a guaranteed interest rate of 12% per annum for a five-year
21 period.    DEANNA deposited approximately $42,164.00 into DLG that was
22 represented to return a guaranteed interest rate of 12% per annum for a five-year
23 period. GERALD was beneficiary to this account. The insurance agents who sold
24 the HOFFARTHS the aforesaid DLG investment were RON and JIM CARTER, who
25 at all relevant times, were principals of CAL-STATE INSURANCE INC. and
26 STATEWIDE FINANCIAL, respectively.    The agency which worked on the
27 HOFFARTHS' DLG account(s) and with RON and JIM CARTER was Defendant
28 STRATEGIC BENEFITS PLANNING GROUP, INC.    Defendant POLYCOMP

FIRST AMENDED COMPLAINT FOR DAMAGES

1 | ADMINISTRATIVE SERVICES, INC. held the funds of and administered the
2 | HOFFARTHS' DLG account(s).

3 |     38.    Plaintiff KEVIN HOFFARTH ("KEVIN HOFFARTH") is an individual
4 | residing in South Lake Tahoe, El Dorado County, California, and as a result of the
5 | solicitation and representations of Defendants, deposited approximately $31,743.46
6 | into DLG that was represented to return a guaranteed interest rate of 12% per annum
7 | for a five-year period. His wife CHRISTA HOFFARTH was beneficiary to the
8 | account. The insurance agents who sold KEVIN HOFFARTH the aforesaid DLG
9 | investment were RON and JIM CARTER, who at all relevant times, were principals
10 | of CAL-STATE INSURANCE INC. and STATEWIDE FINANCIAL, respectively.
11 | The agency which worked on KEVIN HOFFARTH's DLG account(s) and with RON
12 | and JIM CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP,
13 | INC. Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC. held the funds
14 | of and administered KEVIN HOFFARTH's DLG account. The loss of investment has
15 | caused substantial stress in KEVIN HOFFARTH's life, and health issues.

16 |     39.    Plaintiffs COCHRAN and DOROTHIE HOGAN (the "HOGANS") are
17 | individuals residing in Los Osos, San Luis Obispo County, California, and are over
18 | the age of 65. As a result of the solicitation and representations of Defendants,
19 | COCHRAN HOGAN deposited approximately $50,000 into DLG that was
20 | represented to return a guaranteed interest rate of 9% per annum for a five-year
21 | period, and which was represented to be 100% insured and guaranteed by a collateral
22 | assignment issued by Defendant JACKSON NATIONAL. His wife DOROTHIE was
23 | primary beneficiary, and his daughter PATRICIA S. HOGAN-JONES was contingent
24 | beneficiary. DOROTHIE HOGAN also deposited approximately $50,000 into DLG
25 | that was represented to return a guaranteed interest rate of 9% per annum for a
26 | five-year period, and which was represented to be 100% insured and guaranteed by
27 | a collateral assignment issued by Defendant JACKSON NATIONAL. Her husband
28 | COCHRAN was primary beneficiary, and her daughter PAULA JEAN

1  BURROUGHS was contingent beneficiary.  The insurance agent who sold the
2  HOGANS the aforesaid DLG investment was JIM CARTER, who at all relevant
3  times, was a principal of STATEWIDE FINANCIAL. The agency which worked on
4  their DLG account(s) and with JIM CARTER was Defendant STRATEGIC
5  BENEFITS PLANNING GROUP, INC.

6      40.    Plaintiff ANNE HULBERT ("HULBERT") is an individual residing in
7  Glendale, Maricopa County, Arizona, and as a result of the solicitation and
8  representations of Defendants, deposited approximately $142,000.00 into DLG that
9  was represented to return a guaranteed interest rate of 9% per annum for a five-year
10 period, and which was represented to be 100% insured and guaranteed by a collateral
11 assignment issued by Defendant JACKSON NATIONAL and/or AMERICAN
12 NATIONAL. The insurance brokerage company who sold HULBERT the aforesaid
13 DLG investment was Defendant AMERICAN BENEFIT CONCEPTS, INC.

14     41.    Plaintiff CANDEE A. JOHNSON ("JOHNSON") is an individual
15 residing in Brea, Orange County, California, and as a result of the solicitation and
16 representations of Defendants, deposited approximately $50,000.00 into DLG that
17 was represented to return a guaranteed interest rate of 12% per annum for a five-year
18 period. The beneficiaries on the account are her children, MINDY JOHNSON (50%
19 share) and TRAVIS JOHNSON (50% share).   The individual who persuaded
20 JOHNSON to invest with DLG was JON GARNETT. The loss of investment has
21 caused JOHNSON to have feelings of extreme stress and anxiety, and loss of sleep.

22     42.    Plaintiffs ESTATE OF ROY KATO and LILLY KATO ("LILLY
23 KATO"), on behalf of ROY KATO ("ROY KATO"), deceased, as his successor-in-
24 interest, is an individual residing in Fowler, Fresno County, California.  As a result
25 of the solicitation and representations of Defendants, ROY KATO deposited
26 approximately $222,357.00 into DLG that was represented to return a guaranteed
27 interest rate of 9% per annum for a five-year period, and which was represented to be
28 100% insured and guaranteed by a collateral assignment issued by Defendant

1 | JACKSON NATIONAL and/or AMERICAN NATIONAL.

2 |     43.    Plaintiffs KIYOSHI and SUEKO KAWAMOTO (the "KAWAMOTOS")

3 | are individuals residing in Reedley, Fresno County, California, and are over the age

4 | of 65. As a result of the solicitation and representations of Defendants, KIYOSHI

5 | KAWAMOTO deposited approximately $22,831.00 into DLG that was represented

6 | to return a guaranteed interest rate of 9% per annum for a five-year period, and which

7 | was represented to be 100% insured and guaranteed by a collateral assignment issued

8 | by Defendant JACKSON NATIONAL and/or AMERICAN NATIONAL. His wife

9 | SUEKO was beneficiary to his account.    SUEKO KAWAMOTO deposited

10 | approximately $80,350.00 into DLG that was represented to return a guaranteed

11 | interest rate of 9% per annum for a five-year period, and which was represented to be

12 | 100% insured and guaranteed by a collateral assignment issued by Defendant

13 | JACKSON NATIONAL and/or AMERICAN NATIONAL. Her husband KIYOSHI

14 | was beneficiary to her account. The insurance agent who sold the KAWAMOTOS

15 | the aforesaid DLG investment was RON CARTER, who at all relevant times was a

16 | principal of CAL-STATE INSURANCE INC. The agency which worked on the

17 | KAWAMOTOS' DLG account(s) and with RON CARTER was Defendant

18 | STRATEGIC BENEFITS PLANNING GROUP, INC. Defendant POLYCOMP

19 | ADMINISTRATIVE SERVICES, INC. held the funds of and administered the

20 | KAWAMOTOS' DLG account. The loss of investment has had a devastating effect

21 | on their well-being. KIYOSHI has difficulty affording the medicine(s) he needs to

22 | maintain his health. Both KIYOSHI and SUEKO have suffered severe emotional

23 | distress, sleeplessness, and declined health.

24 |     44.    Plaintiffs HAROLD and DORIS KRAFT (the "KRAFTS") are

25 | individuals residing in Arroyo Grande, San Luis Obispo County, California, are over

26 | the age of 65, and as a result of the solicitation and representations of Defendants,

27 | deposited approximately $50,000 into DLG that was represented to return a

28 | guaranteed interest rate of 9% per annum for a five-year period, and which was

1  represented to be 100% insured and guaranteed by a collateral assignment issued by

2  Defendant JACKSON NATIONAL. The insurance agent who sold the KRAFTS the

3  aforesaid DLG investment was JIM CARTER, who at all relevant times was a

4  principal of STATEWIDE FINANCIAL. The agency which worked on the KRAFTS'

5  DLG account(s) and with JIM CARTER was Defendant STRATEGIC BENEFITS

6  PLANNING GROUP, INC. The loss of funds has resulted in the KRAFTS' loss of

7  ability to use those funds for necessary medical procedures.

8       45.    Plaintiffs ESTATE OF AILEEN LEWIS and CHRISTINE LEWIS

9  ("CHRISTINE LEWIS"), on behalf of decedent-mother AILEEN LEWIS ("AILEEN

10  LEWIS") as her successor-in-interest, is an individual residing in Los Angeles, Los

11  Angeles County, California. As a result of the solicitation and representations of

12  Defendants, AILEEN LEWIS deposited approximately $222,357.00 into DLG that

13  was represented to return a guaranteed interest rate of 9% per annum for a five-year

14  period, and which was represented to be 100% insured and guaranteed by a collateral

15  assignment issued by Defendant JACKSON NATIONAL and/or AMERICAN

16  NATIONAL. The insurance agent who sold AILEEN LEWIS the aforesaid DLG

17  investment was Defendant VICTOR FRANCISCO.

18       46.    Plaintiffs NORMAN and IVY LIETER (the "LIETERS") are individuals

19  residing in Flushing, Queens County, New York, are over the age of 65, and as a

20  result of the solicitation and representations of Defendants, deposited approximately

21  $50,000.00 into DLG that was represented to return a guaranteed interest rate of 12%

22  per annum for a five-year period. The beneficiaries of their account were their

23  daughter CARRIE STONE (50% share) and ADAM LEITER (50% share). The

24  insurance agent who sold the LEITERS the aforesaid DLG investment was Defendant

25  ADAM MARKOWITZ. The loss of investment has caused the LEITERS extreme

26  stress and anxiety.

27       47.    Plaintiff MEGAN LOVELACE ("MEGAN LOVELACE") is an

28  individual residing in Quincy, Adams County, Illinois, and as a result of the

solicitation and representations of Defendants, deposited approximately $367,229.59 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period.  The insurance agent who sold MEGAN LOVELACE the aforesaid DLG investment was Defendant TRAVIS M. OLIVER, who was associated with Defendant AMERICAN BENEFIT CONCEPTS, INC. as an insurance producer agent.  The loss of funds has been devastating for MEGAN LOVELACE.  As a teenager, MEGAN was involved in a car accident with a drunk driver and was left paralyzed as a result of the accident.  Much of the invested amount was from insurance for her accident.  Loss of such funds has left MEGAN financially deprived, unable to afford medical expenses, living expenses, and other expenses, depressed, anxious, with feelings of increasing desperation and insecurity, and utterly distraught by the acts and misdeeds of Defendants.

48.  Plaintiff PHILLIP LOVELACE ("PHILLIP LOVELACE") is an individual residing in Quincy, Adams County, Illinois, is over the age of 65, and as a result of the solicitation and representations of Defendants, deposited approximately $170,335.00 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period.  The beneficiary to PHILLIP LOVELACE's DLG account was his daughter MEGAN LOVELACE. The insurance agent who sold PHILLIP LOVELACE the aforesaid DLG investment was Defendant TRAVIS M. OLIVER, who was associated with Defendant AMERICAN BENEFIT CONCEPTS, INC. as an insurance producer agent.

49.  Plaintiffs DAIVD and MARY LUSHAR (the "LUSHARS") are individuals residing in Torrance, Los Angeles County, California, and as a result of the solicitation and representations of Defendants, deposited approximately $175,000.00 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period. The insurance agent who sold the LUSHARS the aforesaid DLG investment was Defendant STEVEN JOSEPH CORZAN, who, at all relevant times, was principal of and employed by Defendant CORZAN CAPITAL

1  MANAGEMENT, LLC. Defendant POLYCOMP ADMINISTRATIVE SERVICES,
2  INC. held the funds of and administered the LUSHERS' DLG account(s). The loss
3  of investment has affected the LUSHARS financially, physically, and emotionally.
4  They are unable to pay for their daughter's college education, and have no security
5  of investment for their retirement.   The LUSHARS now have feelings of extreme
6  stress and anxiety, which have manifested themselves physically.

7      50.    Plaintiff LEONARD MAINS ("MAINS") is an individual residing in
8  Laurel Springs, Camden County, New Jersey, is over the age of 65, and as a result of
9  the solicitation and representations of Defendants, deposited approximately
10  $48,500.00 into DLG that was represented to return a guaranteed interest rate of 12%
11  per annum for a five-year period. The beneficiary to MAINS' DLG account was his
12  spouse D. MARLENE MAINS. The insurance agent who sold MAINS the aforesaid
13  DLG investment was Defendant JOHN P. FISH, who, at all relevant times, was
14  principal of and employed by FISH TAX ADVISORY GROUP, INC. An agent who
15  also worked on MAINS' DLG account(s) was Defendant DENNIS LAWTON, who
16  at all relevant times was a principal of and employed by DLI ASSOCIATES and PRB
17  FINANCIAL, INC. Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC.
18  held the funds of and administered MAINS' DLG account(s). The loss of investment
19  has caused MAINS great financial hardship.

20      51.    Plaintiff HOWARD MATSUMURA ("MATSUMURA") is an individual
21  residing in Fowler, Fresno County, California, and is over the age of 65. As a result
22  of the solicitation and representations of Defendants, MATSUMURA deposited
23  approximately $473,551.00 into DLG that was represented to return a guaranteed
24  interest rate of 9% per annum for a five-year period, and which was represented to be
25  100% insured and guaranteed by a collateral assignment issued by Defendant
26  JACKSON NATIONAL. The beneficiary of this DLG account was his wife EIKO
27  MATSUMURA.   Also as a result of the solicitation and representations of
28  Defendants, MATSUMURA deposited approximately $263,500.00 into DLG that

1   was represented to return a guaranteed interest rate of 12% per annum for a five-year
2   period. The insurance agent who sold MATSUMURA the aforesaid DLG investment
3   was RON CARTER, who at all relevant times was a principal of CAL-STATE
4   INSURANCE INC. The agency which worked on MATSUMURA's DLG account(s)
5   and with RON CARTER was Defendant STRATEGIC BENEFITS PLANNING
6   GROUP, INC. The loss of investment has caused MATSUMURA financial ruin and
7   has resulted in a decline in MATSUMURA's physical health and state of well-being.

8          52.    Plaintiff EARLINE D. MCWILLIAMS ("MCWILLIAMS") is an
9   individual residing in Atlanta, Fulton County, Georgia, and as a result of the
10  solicitation and representations of Defendants, deposited approximately $625,000.00
11  into DLG that was represented to return a guaranteed interest rate of 12% per annum
12  for a five-year period. The insurance agents who sold the MCWILLIAMS the
13  aforesaid DLG investment was Defendant EUGENE WITTSTOCK, who, at all
14  relevant times, was a principal of and employed with/by Defendants JALBERT
15  FINANCIAL GROUP, LLC and WITTSTOCK FINANCIAL & ASSOCIATES, and
16  Defendant KEMO BARROW, who at all relevant times, was a principal of and/or
17  employed by Defendants WITTSTOCK FINANCIAL & ASSOCIATES and JOHN
18  HANCOCK FINANCIAL SERVICES, INC., a wholly-owned subsidiary of
19  Defendant MANULIFE FINANCIAL CORPORATION. As a result of the loss of
20  investment and expected interest, MCWILLIAMS has suffered and continues to
21  suffer feelings of extreme distress, anxiety, and anger.

22         53.    Plaintiff RONALD C. MEDDINGS ("MEDDINGS") is an individual
23  residing in La Palma, Orange County, California, is over the age of 65, and as a result
24  of the solicitation and representations of Defendants, deposited approximately
25  $50,000.00 into DLG that was represented to return a guaranteed interest rate of 9%
26  per annum for a five-year period, and which was represented to be 100% insured and
27  guaranteed by a collateral assignment issued by Defendant JACKSON NATIONAL.
28  The insurance agent who sold the MEDDINGS the aforesaid DLG investment was

LEONARD LLOYD KIRSHNER, who at all relevant times, was a principal of and employed by KIRSHNER FINANCIAL. The loss of investment resulted in extremes stress and sleeplessness for MEDDINGS.

54.     Plaintiffs ESTATE OF HAROLD MEEK and ELEANOR KAY MEEK ("ELEANOR MEEK"), on behalf of decedent-husband HAROLD MEEK ("HAROLD MEEK") as his successor-in-interest, is an individual residing in Badger, Tulare County, California.  As a result of the solicitation and representations of Defendants, HAROLD MEEK deposited approximately $47,462.00 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period.  The primary beneficiary on his DLG account was his wife ELEANOR MEEK, and the contingent beneficiary was his son EDWARD BRIAN MEEK.  The insurance agents who sold MEEK the aforesaid DLG investment were RON, JIM, and HAL CARTER, who at all relevant times were principals of CAL-STATE INSURANCE INC., STATEWIDE FINANCIAL, and HAL CARTER INSURANCE SERVICES.  The agency which worked on the MEEK DLG account and with the CARTERS was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC.

55.     Plaintiffs PARI MENDES ("PARI MENDES"), on behalf of herself and the MENDES FAMILY TRUST ("MENDES FAMILY TRUST"), and RICARDO MENDES ("RICARDO MENDES"), on behalf of the MENDES FAMILY TRUST, (all hereinafter designated as the "MENDES FAMILY") are individuals residing in Simi Valley, Ventura County, California.  RICARDO MENDES is over the age of 65.  As a result of the solicitation and representations of Defendants, the MENDES FAMILY TRUST and PARI MENDES, as trustee of the MENDES FAMILY TRUST, deposited approximately $56,000.00 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period.  The MENDES FAMILY TRUST was beneficiary on this account.  The insurance agent who sold the MENDES FAMILY the aforesaid DLG investment was SCOTT THOMAS BRANDT, who at all relevant times was a principal of and/or was employed by

1  WESTBRIDGE FINANCIAL & INSURANCE SERVICES, INC.  The loss of
2  investment has been financially distressing for both RICARDO and PARI MENDES,
3  and has caused feelings of significant stress and anxiety.

4          56.     Plaintiff AMY MOY ("MOY") is an individual residing in Montebello,
5  Los Angeles County, California. As a result of the solicitation and representations
6  of Defendants, MOY deposited approximately $695,000.00 into one account with
7  DLG that was represented to return a guaranteed interest rate of 12% per annum for
8  a five-year period.  Her father JOHN MOY and mother EILEEN MOY were
9  beneficiaries to this account.   MOY also, as a result of the solicitation and
10 representations of Defendants, deposited approximately $9,308.00 into another
11 account with DLG that was represented to return a guaranteed interest rate of 12% per
12 annum for a five-year period.  Her brother BENNY MOY was beneficiary to this
13 account.  The insurance agent who sold MOY the aforesaid DLG investment was
14 Defendant STEVEN JOSEPH CORZAN, who at all relevant times was a principal of
15 and/or was employed by Defendant CORZAN CAPITAL MANAGEMENT, LLC.
16 Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC. held the funds of
17 and administered MOY's second DLG account. The financial loss has caused MOY
18 great emotional pain and sleeplessness.  MOY required hospitalization as a result of
19 feelings of depression from this loss.  MOY lost two properties due to this loss; is
20 behind on mortgage payments on other properties; has had to do modifications for
21 these mortgages, which have cost a significant amount of attorneys' fees; has
22 accumulated massive credit card debt; and has had her perfect credit ruined.

23         57.     Plaintiff MAXIM MOYAL ("MOYAL") is an individual residing in San
24 Diego, San Diego County, California, and as a result of the solicitation and
25 representations of Defendants, deposited approximately $50,000.00 into DLG that
26 was represented to return a guaranteed interest rate of 9% per annum for a five-year
27 period, and which was represented to be 100% insured and guaranteed by a collateral
28 assignment issued by Defendant JACKSON NATIONAL. The insurance agent who

1    sold MOYAL the aforesaid DLG investment was ELY KAVON, who at all relevant
2    times was a principal of and/or was employed by Defendant MASSACHUSETTS
3    MUTUAL LIFE INSURANCE COMPANY. The loss of investment has caused
4    MOYAL and his family great stress and anxiety, and has caused significant strain and
5    damage to MOYAL's marriage.

6       58.    Plaintiffs ESTATE OF BEN NAKAMOTO and HISAKO NAKAMOTO
7    ("HISAKO NAKAMOTO"), on behalf of herself and decedent-husband BEN
8    NAKAMOTO ("BEN NAKAMOTO") as his successor-in-interest, is an individual
9    residing in Sanger, Fresno County, California, is over the age of 65, and as a result
10    of the solicitation and representations of Defendants, deposited approximately
11    $60,000.00 into DLG that was represented to return a guaranteed interest rate of 9%
12    per annum for a five-year period, and which was represented to be 100% insured and
13    guaranteed by a collateral assignment issued by Defendant JACKSON NATIONAL
14    and/or AMERICAN NATIONAL. Their daughter SUSAN YOSHIMURA was the
15    beneficiary to their account. The insurance agent who sold the NAKAMOTOS the
16    aforesaid DLG investment was RON CARTER, who at all relevant times was a
17    principal of CAL-STATE INSURANCE INC. The agency which worked on the
18    NAKAMOTOS'DLG account and with RON CARTER was Defendant STRATEGIC
19    BENEFITS PLANNING GROUP, INC. The loss of investment has caused the
20    NAKAMOTOS great stress and anxiety, and has resulted in sleeplessness and
21    financial worry.

22       59.    Plaintiff JOSE and NANCY OLIVAR (the "OLIVARS") are individuals
23    residing in Fullerton, Orange County, California, and as a result of the solicitation
24    and representations of Defendants, deposited approximately $50,000.00 into DLG
25    that was represented to return a guaranteed interest rate of 12% per annum for a
26    five-year period. The insurance agent who sold the OLIVARS the aforesaid DLG
27    investment was JOHN GARNANT.

28       60.    Plaintiff ROSEMARIE PADULA ("PADULA") is an individual residing

in Kalamazoo, Kalamazoo County, Michigan, and as a result of the solicitation and representations of Defendants, deposited approximately $33,169.00 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period. Her daughter RENEE PADULA (50% share) and her daughter MICHELE NIEBOER (50% share) were beneficiaries to PADULA's DLG account. The insurance agent who sold PADULA the aforesaid DLG investment was JOHN TALMAGE, who at all relevant times was a principal of and/or employed by Defendant AMERICAN BENEFIT CONCEPTS, INC. Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC. held the funds of and administered PADULA's DLG account. The loss of funds caused in PADULA feelings of depression and anxiety, and continued financial hardship.

61.    Plaintiff MARION PEPINO ("PEPINO") is an individual residing in Dover, Kent County, Delaware, is over the age of 65, and, as a result of the solicitation and representations of Defendants, deposited approximately $101,000.00 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period. The beneficiaries to PEPINO's DLG account were her daughter TRACY HARSKI (50%) and her son JEREMIAH MICHAEL DONVAN (50%). The insurance agent who sold PEPINO the aforesaid DLG investment was Defendant JOHN P. FISH, who, at all relevant times, was principal of and employed by Defendant FISH TAX ADVISORY GROUP, INC. An agent who also worked on PEPINO's DLG account(s) was Defendant DENNIS LAWTON, who at all relevant times was a principal of and employed by Defendants DLI ASSOCIATES and PRB FINANCIAL, INC.

62.    Plaintiff CARL PYTLINSKI ("PYTLINSKI") is an individual residing in Altadena, Los Angeles County, California, is over the age of 65, and as a result of the solicitation and representations of Defendants, deposited approximately $200,000.00 into DLG that was represented to return a guaranteed interest rate of 9% per annum for a five-year period, and which was represented to be 100% insured and

1 | guaranteed by a collateral assignment issued by Defendant JACKSON NATIONAL
2 | and/or AMERICAN NATIONAL. The beneficiaries to PYTLINSKI's account were
3 | his son KENNETH S. PYTLINSKI (50% share) and his son KEITH A. PYTLINSKI
4 | (50% share).   The insurance agent who sold PYTLINSKI the aforesaid DLG
5 | investment was DAVE CARLSON, who at all relevant times was a principal of
6 | and/or employed by CARLSON FINANCIAL SERVICES, a registered representative
7 | of and offering securities through Defendant LIGHTHOUSE CAPITAL
8 | CORPORATION. The loss of investment has caused PYTLINSKI great stress,
9 | anxiety, agitation, sleeplessness, familial strain, and depression.

10 |     63.    Plaintiffs VINCENT and VIRGINIA ROBBINS (the "ROBBINS") are
11 | individuals residing in Santa Barbara, Santa Barbara County, California, are over the
12 | age of 65, and as a result of the solicitation and representations of Defendants,
13 | deposited approximately $615,725.86 into DLG that was represented to return a
14 | guaranteed interest rate of 12% per annum for a five-year period.   Defendants
15 | MICHAEL BAKER,  who at all relevant times was a principal of and/or employed
16 | by Defendant AMERICORP FUNDING, INC., KELLY HORNBAKER, and ERIC
17 | CANNON, who at all relevant times was a principal of and/or employed by
18 | Defendant STRATEGIC BENEFITS PLANNING GROUP, INC., sold the ROBBINS
19 | the aforesaid DLG investment.   Defendant POLYCOMP ADMINISTRATIVE
20 | SERVICES, INC. held the funds of and administered the ROBBINS' DLG account.
21 | The loss of investment and expected interest caused great damage and harm to the
22 | ROBBINS. They depended upon payments for the mortgage on their home, which
23 | is now in foreclosure. They are unable to provide for their family and cannot afford
24 | their own medical expenses.

25 |     64.    Plaintiff MICHAEL RUSSON ("MICHAEL RUSSON") is an individual
26 | residing in Alpine, Utah County, Utah, and as a result of the solicitation and
27 | representations of Defendants, deposited approximately $742,463.58 into DLG that
28 | was represented to return a guaranteed interest rate of 9% per annum for a five-year

1   period, and which was represented to be 100% insured and guaranteed by a collateral
2   assignment issued by Defendant JACKSON NATIONAL and/or AMERICAN
3   NATIONAL.   MICHAEL RUSSON also, as a result of the solicitation and
4   representations of Defendants, deposited approximately $679,058.35 into DLG that
5   was represented to return a guaranteed interest rate of 12% per annum for a five-year
6   period. Defendant BRUCE FRIEDMAN sold the DLG investment to MICHAEL
7   RUSSON.   The loss of the investment was immensely damaging to MICHAEL
8   RUSSON and his family.  He was forced to relocate his home, sell his California
9   business, and lost all monies and assets that he had prior to making the investment.
10  The loss has caused MICHAEL RUSSON great stress, anxiety, anger, and depression.

11          65.     Plaintiff TONY RUSSON ("TONY RUSSON") is an individual residing
12  in Northridge, Los Angeles County, California, and as a result of the solicitation and
13  representations of Defendants, deposited approximately $889,308.32 into DLG that
14  was represented to return a guaranteed interest rate of 9% per annum for a five-year
15  period, and which was represented to be 100% insured and guaranteed by a collateral
16  assignment issued by Defendant JACKSON NATIONAL and/or AMERICAN
17  NATIONAL. TONY RUSSON also, as a result of the solicitation and representations
18  of Defendants, deposited approximately $982,500.00 into DLG that was represented
19  to return a guaranteed interest rate of 12% per annum for a five-year period.
20  Defendant BRUCE FRIEDMAN sold the DLG investment to TONY RUSSON. The
21  loss of investment has caused TONY RUSSON great financial and emotional distress,
22  given the huge loss of investment, the loss of his employment, where he worked for
23  over 30 years, and the loss of his health.  The financial loss has caused TONY
24  RUSSON to have feelings of depression, high blood pressure, sleeplessness, and a
25  loss of focus and drive.

26          66.     Plaintiff VENILE RUSSON ("VENILE RUSSON") is an individual
27  residing in Northridge, Los Angeles County, California, is over the age of 65, and as
28  a result of the solicitation and representations of Defendants, deposited approximately

1   $1,591,448.54 into DLG that was represented to return a guaranteed interest rate of
2   9% per annum for a five-year period, and which was represented to be 100% insured
3   and guaranteed by a collateral assignment issued by Defendant JACKSON
4   NATIONAL and/or AMERICAN NATIONAL. Defendant BRUCE FRIEDMAN
5   sold the DLG investment to VENILE RUSSON. The loss of investment has caused
6   a great financial, emotional, and physical crisis in VENILE RUSSON's life. VENILE
7   RUSSON's financial plan for the rest of his life has had to be significantly altered, his
8   standard of living lowered in his old age, emotional stress leading to a heart attack
9   and blood pressure problems, sleeplessness, and strain and damage to his
10  relationships with family members.

11      67.    Plaintiff DOROTHY L. SAMUELS ("SAMUELS"), on behalf of herself
12  and the SAMUELS LIVING TRUST, dated November 13, 1995, is an individual
13  residing in Visalia, Tulare County, California, is over the age of 65, and as a result
14  of the solicitation and representations of Defendants, deposited approximately
15  $59,309.81 into DLG that was represented to return a guaranteed interest rate of 9%
16  per annum for a five-year period, and which was represented to be 100% insured and
17  guaranteed by a collateral assignment issued by Defendant JACKSON NATIONAL
18  and/or AMERICAN NATIONAL. The beneficiary of the account is in accordance
19  with the SAMUELS LIVING TRUST. The insurance agent who sold SAMUELS the
20  aforesaid DLG investment was HAL CARTER, who, at all relevant times, was
21  principal of HAL CARTER INSURANCE SERVICES. The agency which worked
22  on SAMUELS' DLG account and with HAL CARTER was Defendant STRATEGIC
23  BENEFITS PLANNING GROUP, INC. Due to the loss of her investment and
24  expected interest, SAMUELS was unable to use the funds to assist her grandson, who
25  was severely injured in a motorcycle accident and who needed the funds to
26  supplement his income and pay for medical expenses. The loss caused SAMUELS
27  a great deal of anguish and stress.

28      68.    Plaintiffs RAYMOND A. SIRSTAD and REBECCA R. SIRSTAD (the

1  "SIRSTADS") are individuals residing in Vancouver, Clark County, Washington, are
2  over the age of 65, and as a result of the solicitation and representations of
3  Defendants, deposited approximately $200,000.00 into DLG that was represented to
4  return a guaranteed interest rate of 12% per annum for a five-year period.

5       69.    Plaintiffs GEORGE and MARY WADA (the "WADAS") are individuals
6  residing in Reedley, Fresno County, California, are over the age of 65, and as a result
7  of the solicitation and representations of Defendants, deposited combined
8  approximately $200,000 into DLG that was represented to return a guaranteed interest
9  rate of 9% per annum for a five-year period, and which was represented to be 100%
10 insured and guaranteed by a collateral assignment issued by Defendant JACKSON
11 NATIONAL, and deposited combined approximately $245,000 into DLG that was
12 represented to return a guaranteed interest rate of 12% per annum for a five-year
13 period. GEORGE WADA invested in and owned an account with DLG, in which he
14 initially invested $142,722.59, at 9%, and under which his wife MARY WADA was
15 sole beneficiary.  MARY WADA invested in and owned an account with DLG, in
16 which she initially invested $57,003.98, at 9%, and under which her husband
17 GEORGE WADA was sole beneficiary.  MARY WADA invested in and owned
18 another account with DLG, in which she initially invested $243,585.03, at 12%, and
19 under which her husband GEORGE WADA was sole beneficiary.  The insurance
20 agent who sold the WADAS the aforesaid DLG investments was RON CARTER,
21 who at all relevant times was a principal of CAL-STATE INSURANCE INC.  The
22 agency which worked on the WADAS' DLG account and with RON CARTER was
23 Defendant STRATEGIC BENEFITS PLANNING GROUP, INC.    Defendant
24 POLYCOMP ADMINISTRATIVE SERVICES, INC. held the funds of and
25 administered the WADAS' DLG accounts. As a result of the loss of investment and
26 expected interest, the WADAS have suffered and continue to suffer feelings of
27 anxiety, stress, and fear for the future, because their inability to now pay for their own
28 care and health costs.

70.     Plaintiff GREGORY K. WADA ("GREG WADA") is an individual residing in Reedley, Fresno County, California, and as a result of the solicitation and representations of Defendants, deposited approximately $200,000 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period. His son RYAN TAYLOR WADA MORTAR was sole beneficiary to GREG WADA's DLG account. The insurance agent who sold GREG WADA the aforesaid DLG investments was RON CARTER, who at all relevant times was a principal of CAL-STATE INSURANCE INC. The agency which worked on GREG WADA's DLG account and with RON CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC. As a result of the loss of investment and expected interest, GREG WADA has suffered and continues to suffer feelings of anxiety, stress, and fear for the future, particularly regarding the care and health of his elderly parents.

71.     Plaintiff JUDY L.M. WADA ("JUDY WADA") is an individual residing in Bishop, Inyo County, California, and as a result of the solicitation and representations of Defendants, deposited approximately $200,000 into DLG that was represented to return a guaranteed interest rate of 12% per annum for a five-year period. Her brother MONTE G. WADA (50%) and her brother GREGORY K. WADA (50%) were beneficiaries to JUDY WADA's DLG account. The insurance agent who sold JUDY WADA the aforesaid DLG investments was RON CARTER, who at all relevant times was a principal of CAL-STATE INSURANCE INC. The agency which worked on JUDY WADA's DLG account and with RON CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC. As a result of the loss of investment and expected interest, JUDY WADA has suffered and continues to suffer feelings of anxiety, stress, and fear for the future, particularly regarding the care and health of her elderly parents.

72.     Plaintiff MONTE G. WADA ("MONTE WADA") is an individual residing in Fresno, Fresno County, California, and as a result of the solicitation and

1  representations of Defendants, deposited approximately $54,000 into DLG that was
2  represented to return a guaranteed interest rate of 12% per annum for a five-year
3  period. His daughter KASEY M.K. WADA (50%) and his son JASON T.K. WADA
4  (50%) were beneficiaries to MONTE WADA's DLG account. The insurance agent
5  who sold MONTE WADA the aforesaid DLG investments was RON CARTER, who
6  at all relevant times was a principal of CAL-STATE INSURANCE INC. The agency
7  which worked on MONTE WADA's DLG account and with RON CARTER was
8  Defendant STRATEGIC BENEFITS PLANNING GROUP, INC. As a result of the
9  loss of investment and expected interest, MONTE WADA has suffered and continues
10  to suffer feelings of anxiety, stress, and fear for the future, particularly regarding the
11  care and health of his elderly parents.

12      73.    Plaintiffs DAVID S. WEIL and GRACE K. WEIL (the "WEILS") are
13  individuals residing in New York City, New York County, New York, are over the
14  age of 65, and as a result of the solicitation and representations of Defendants,
15  deposited approximately $100,000 into DLG that was represented to return a
16  guaranteed interest rate of 9% per annum for a five-year period, and which was
17  represented to be 100% insured and guaranteed by a collateral assignment issued by
18  Defendant JACKSON NATIONAL and/or AMERICAN NATIONAL. The insurance
19  agent who sold the WEILS the aforesaid DLG investment was Defendant JOSEPH
20  PERLOW, who, at all relevant times, was principal of and employed by Defendant
21  PERLOW PLANNING COMPANY, INC.

22      74.    Plaintiff JEFFREY WHITE ("JEFF WHITE") is an individual residing
23  in Los Angeles, Los Angeles County, California, and as a result of the solicitation and
24  representations of Defendants, deposited approximately $170,000 into DLG that was
25  represented to return a guaranteed interest rate of 12% per annum for a five-year
26  period. The insurance agents who sold JEFF WHITE the aforesaid DLG investment
27  was MILTON LEONARD BELFER, who, at all relevant times, was principal of and
28  employed by/with MILT L. BELFER INSURANCE SERVICES, INC., and ROBERT

1    EDWARD KRONER, who, at all relevant times, was principal of and employed

2    by/with ROBERT E. KRONER INSURANCE SERVICES, INC.

3        75.    Plaintiffs WILLIAM WHITE and JUDITH WHITE (the "WHITES") are

4    individuals residing in Visalia, Tulare County, California, are over the age of 65, and

5    as a result of the solicitation and representations of Defendants, deposited

6    approximately $60,000 into DLG that was represented to return a guaranteed interest

7    rate of 9% per annum for a five-year period, and which was represented to be 100%

8    insured and guaranteed by a collateral assignment issued by Defendant JACKSON

9    NATIONAL. The beneficiaries to the WHITES' DLG account were their daughter

10    JILL CHRISTINE DINKINS (33.33%), their son JON CHRISTOPHER WHITE

11    (33.33%), and their daughter SHELLEY ANNE DODD (33.33%). The insurance

12    agent who sold the WHITES the aforesaid DLG investment was HAL CARTER,

13    who, at all relevant times, was principal of HAL CARTER INSURANCE

14    SERVICES. The agency which worked on the WHITES' DLG account and with

15    HAL CARTER was Defendant STRATEGIC BENEFITS PLANNING GROUP, INC.

16    The loss of investment and expected interest greatly affected the WHITES and the

17    WHITES' family. They have been unable to pay day-to-day expenses and medical

18    expenses, and less able to care for their family. The WHITES have also suffered and

19    continue to suffer feelings of anxiety, stress, and anger.

20        76.    Plaintiffs ALAN S. WIENER and NANCY R. WIENER (the

21    "WIENERS") are individuals residing in Sharon, Norfolk County, Massachusetts;

22    ALAN WIENER is over the age of 65; as a result of the solicitation and

23    representations of Defendants, ALAN WIENER deposited approximately

24    $159,567.73 into DLG that was represented to return a guaranteed interest rate of 9%

25    per annum for a five-year period, and which was represented to be 100% insured and

26    guaranteed by a collateral assignment issued by Defendant JACKSON NATIONAL

27    and/or Defendant AMERICAN NATIONAL; and as a result of the solicitation and

28    representations of Defendants, NANCY WIENER deposited approximately

FIRST AMENDED COMPLAINT FOR DAMAGES

1 | $79,011.00 into DLG that was represented to return a guaranteed interest rate of 12%
2 | per annum for a five-year period. The insurance agent who sold the WIENERS the
3 | aforesaid DLG investments was Defendant BRUCE PLOTNICK, who, at all relevant
4 | times, was principal and employed with/by Defendant ESTATE PLANNING
5 | SOLUTIONS NETWORK, LLC.

6 |     77.   Plaintiff EDDIS ALLEN WILLIAMS ("WILLIAMS") is an individual
7 | residing in Southfield, Oakland County, Michigan, is over the age of 65, and as a
8 | result of the solicitation and representations of Defendants, deposited approximately
9 | $50,000.00 into DLG that was represented to return a guaranteed interest rate of 12%
10 | per annum for a five-year period. The insurance agent who sold WILLIAMS the
11 | aforesaid DLG investments was Defendant EDWARD W. GRACE, JR, who, at all
12 | relevant times, was principal and employed with/by Defendant GRACE & PORTA
13 | INSURANCE AGENCY, INC.   Defendant POLYCOMP ADMINISTRATIVE
14 | SERVICES, INC. held the funds of and administered WILLIAMS' DLG account.
15 | The loss of investment and expected interest has greatly affected WILLIAMS.
16 | WILLIAMS has been unable to make mortgage payments on her home, and currently
17 | her primary home and her rental houses are in foreclosure. As a result, WILLIAMS
18 | suffered and continues to suffer from deep depression, anxiety, and stress.

19 |     78.   Plaintiff SHIZUKO YOSHIMOTO ("YOSHIMOTO") is an individual
20 | residing in Fowler, Fresno County, California, is over the age of 65, and as a result
21 | of the solicitation and representations of Defendants, deposited approximately
22 | $210,000.00 into DLG that was represented to return a guaranteed interest rate of
23 | 12% per annum for a five-year period. The beneficiary of YOSHIMOTO's account
24 | is in accordance with the SHIZUKO YOSHIMOTO IRREVOCABLE TRUST
25 | AGREEMENT, dated October 23, 1995.   The insurance agent who sold
26 | YOSHIMOTO the aforesaid DLG investments was RON CARTER, who at all
27 | relevant times was a principal of CAL-STATE INSURANCE INC. The agency
28 | which worked on YOSHIMOTO's DLG account and with RON CARTER was

FIRST AMENDED COMPLAINT FOR DAMAGES

1   Defendant STRATEGIC BENEFITS PLANNING GROUP, INC. As a result of the
2   loss of investment and expected interest, YOSHIMOTO has suffered and continues
3   to suffer sleeplessness and feelings of anxiety, stress, and anger.

4        79.    Plaintiff ALICE YOSHIMURA ("YOSHIMURA") is an individual
5   residing in Visalia, Tulare County, California, is over the age of 65, and as a result
6   of the solicitation and representations of Defendants, deposited approximately
7   $119,596.22 into DLG that was represented to return a guaranteed interest rate of 9%
8   per annum for a five-year period, and which was represented to be 100% insured and
9   guaranteed by a collateral assignment issued by Defendant JACKSON NATIONAL.
10  The beneficiaries on her account were her son LINDELL YOSHIMURA (1/3 share),
11  her son MYRON YOSHIMURA (1/3 share), and her daughter GERALDINE
12  BRADY (1/3 share). The insurance agent who sold YOSHIMURA the aforesaid
13  DLG investment was RON CARTER, who at all relevant times was a principal of
14  CAL-STATE INSURANCE INC. The agency which worked on YOSHIMURA's
15  DLG account and with RON CARTER was Defendant STRATEGIC BENEFITS
16  PLANNING GROUP, INC. The loss of investment has caused YOSHIMURA great
17  distress, anxiety, sleeplessness, and financial uneasiness.

18        80.    Plaintiffs WILHELM ZINDRIC and FRIEDA ZINDRIC (the
19  "ZINDRICS") are individuals residing in Hawthorne, Los Angeles County,
20  California, are over the age of 65, and deposited combined approximately $85,693.79
21  into DLG that was represented to return a guaranteed interest rate of 12% per annum
22  for a five-year period. The insurance agent who sold the ZINDRICS the aforesaid
23  DLG investment was JIM CARTER, who at all relevant times, was a principal of
24  STATEWIDE FINANCIAL. The agency which worked on ZINDRICS' DLG account
25  and with JIM CARTER was Defendant STRATEGIC BENEFITS PLANNING
26  GROUP, INC. Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC. held
27  the funds of and administered CLARK-LEAHY's DLG account. The loss of funds
28  caused the ZINDRICS great anxiety, stress, and fear.

1

## DEFENDANTS

2    81.    Defendant DLG is a California corporation, and, upon information and
3 belief, was at all relevant times doing business in Los Angeles County, California.
4 Defendant AEI is a wholly owned subsidiary of DLG. Plaintiffs are informed and
5 believe and thereon allege that DLG, through its principal, BRUCE FRED
6 FRIEDMAN, its owners, shareholders, partners, employees, officers, insiders, and
7 salespeople, was run as a classic Ponzi scheme throughout its existence up until the
8 time of the appointment of the Receiver David A. Gill on March 4, 2009. At all
9 relevant times DLG knew, or reasonably should have known, that "loans" made to
10 DLG were not insured through the use of the afore-described collateral assignments
11 of fixed annuities sold on the life of BRUCE FRED FRIEDMAN, but rather were a
12 material element in the Ponzi Scheme constructed by defendants to defraud Plaintiffs
13 and each of them. Moreover, DLG at all times participated in the Ponzi Scheme for
14 the primary purpose of promoting, accelerating, and fostering the financial fraud
15 committed by Defendants which financially harmed Plaintiffs. It is alleged that DLG
16 was financially rewarded for its participation and support of this Ponzi Scheme by
17 being paid by victims, and by other delivery mechanisms as yet unknown, large sums
18 of money which were not earned for any legal activities, but which were styled "loan
19 proceeds" or "commissions" and other stylings to enable BRUCE FRED
20 FRIEDMAN, et al to pay DLG and its officers and agents for their support and
21 assistance in perpetuating the fraud visited upon Plaintiffs, and each of them.
22 Plaintiffs, in addition to seeking full, 100% recovery of their financial losses, plus
23 agreed contractual interest, supplemented by legal interest, as appropriate, at the legal
24 rate of 10% per annum, from and after the date of the "investment," shall seek
25 recovery of all their litigation costs, expert witness forensic accounting fees and costs,
26 expert witness securities/loan structures fees and costs, attorneys' fees, and shall seek
27 an Order compelling DLG and its principals and agents to disgorge to Plaintiffs all
28 "fees" "commissions" and other financial emoluments which DLG and its

1    co-defendants were paid for the services they are alleged to have rendered.  Plaintiffs
2    contend DLG rendered no legitimate or lawful services, and that therefore it is not
3    entitled to retain any money paid to it during the pendency of this Ponzi Scheme, and
4    that all such funds be ordered disgorged.  Such "clawed back" funds shall be
5    employed first to remedy the financial losses suffered by Plaintiffs.

6        82.    Defendant BRUCE FRED FRIEDMAN is an individual who, upon
7    information and belief, was at all relevant times residing in Los Angeles County,
8    California, and was the sole shareholder of DLG at all relevant times herein.  BRUCE
9    FRED FRIEDMAN was also Chief Executive Officer and a director of DLG since
10   about 2006.  BRUCE FRED FRIEDMAN controlled DLG as his sub-altern and alter
11   ego. At all relevant times the acts of dishonesty, fraud, conversion, manipulation,
12   financial elder abuse, and other torts and wrongs committed by BRUCE FRED
13   FRIEDMAN, and his fellow responsible co-defendants, in the matters described
14   herein were also, as shall be proven, the acts of dishonesty, fraud, conversion,
15   manipulation, financial elder abuse, and other torts and wrongs of DLG, AEI,
16   co-defendants and others as yet unknown.

17       83.    Defendant DIANE MARIE CANO ("CANO") is an individual who,
18   upon information and belief, is residing in Los Angeles County, California, and was
19   the President of AEI, an employee of DLG, a co-conspirator and agent of BRUCE
20   FRED FRIEDMAN, and a licensed insurance agent in the state of California, and at
21   the same time was an authorized agent of JACKSON NATIONAL at all relevant
22   times herein.  CANO also held herself out to the elderly public as being a Certified
23   Senior Advisor. CANO knew that DLG and AEI were representing to investors that
24   investments which were represented to return a guaranteed interest rate of 9% per
25   annum for a five-year period, were 100% insured and guaranteed by a collateral
26   assignment issued by Defendant JACKSON NATIONAL. CANO also knew that the
27   annuities issued by JACKSON NATIONAL and the collateral assignments thereof
28   were not consistent with those representations. CANO, acting within the scope of her

1  agency relationship with JACKSON NATIONAL, prepared collateral assignment
2  forms for annuities issued by JACKSON NATIONAL with the intent to assign those
3  annuities to investors as alleged security for their principal investments, all the while
4  knowing that the amount of the annuities being assigned was significantly less than
5  the amount of the principal investment which the annuities purported to secure.
6  JACKSON NATIONAL represented to Plaintiffs and other investors that CANO was
7  an authorized representative of JACKSON NATIONAL. JACKSON NATIONAL
8  authorized CANO to sell its annuity products to investors and authorized CANO to
9  prepare collateral assignment forms for those annuities.

10      84.    Defendant KAREN O'CALLAGHAN ("O'CALLAGHAN") is an
11  individual who, upon information and belief, is residing in Los Angeles County,
12  California, and was an officer and director of DLG at all relevant times herein.
13  O'CALLAGHAN was, among other things, responsible for negotiating and
14  documenting a number of real estate transactions that O'CALLAGHAN knew did not
15  result in the ownership by DLG of "scratch and dent" properties.

16      85.    Defendant SHIRLEY HOWARD ("HOWARD") is an individual who,
17  upon information and belief, is residing in Los Angeles County, California, and was
18  an officer of DLG at all relevant times herein. HOWARD was also an officer of AEI
19  during some of the same time period that she was an officer of DLG. HOWARD was
20  one of DLG's employees responsible for keeping its financial books and records and
21  preparing DLG's tax reporting documents. HOWARD knew of the fraud, knew that
22  DLG was not in the business of buying "scratch and dent" property and knew that
23  DLG was not generating revenue from such fictitious investments. HOWARD knew
24  that DLG's false financial statements reported payroll far in excess of what was
25  reported to the taxing agencies. HOWARD knew that the financial statements
26  disseminated by DLG to investors were false.

27      86.    Defendant KEVIN KELLER ("KELLER") is an individual who, upon
28  information and belief, is residing in Los Angeles County, California, and was an

1  employee of DLG and assistant to BRUCE FRIEDMAN at all relevant times herein.
2  KELLER knew of the fraud, knew that DLG was not in the business of buying
3  "scratch and dent" property, and that DLG was not generating revenue from such
4  fictitious investments.

5       87.    Defendant BRIAN NATHAN GLEDHILL ("GLEDHILL") is an
6  individual who, upon information and belief, is residing in Los Angeles County,
7  California, and was an officer of AEI and an employee of DLG at all relevant times
8  herein. GLEDHILL had intimate knowledge of the workings of DLG and AEI and
9  assisted in the preparation of financial statements to be disseminated to investors.
10  GLEDHILL knew of the fraud, knew that DLG was not in the business of buying
11  "scratch and dent" property, and that DLG was not generating revenue from such
12  fictitious investments.

13       88.    Defendant STEPHANIE IZEN ("IZEN") is an individual who, upon
14  information and belief, is residing in Los Angeles County, California, and is a
15  California-licensed attorney, and was in-house counsel for DLG. Izen is alleged to
16  have used her attorney's license and legal knowledge to further the fraud and
17  wrongdoing of the defendants and to aid in the financial harm caused the plaintiffs.
18  IZEN knew of the fraud, knew that DLG was not in the business of buying "scratch
19  and dent" property, and that DLG was not generating revenue from such fictitious
20  investments. IZEN was responsible for providing false information to state regulators
21  and providing false information in the preparation of the October 2008 PPM.

22       89.    Defendant JACKSON NATIONAL is a Michigan corporation, that, upon
23  information and belief, has its principal office of business located in Ingham County,
24  Michigan, and that is qualified to transact business and sell insurance in California.
25  Plaintiffs are informed and believe and thereon allege that between 2005 and 2008,
26  JACKSON NATIONAL sold approximately 178 deferred fixed annuities to DLG, all
27  of them insuring BRUCE FRED FREIDMAN's life.  Those annuities were
28  collaterally assigned by DLG to its lenders to secure repayment of DLG's 9%

**FIRST AMENDED COMPLAINT FOR DAMAGES**

Reinsured Investment Notes.  By this action, Plaintiffs are seeking affirmative relief from JACKSON NATIONAL, who knowingly provided substantial assistance to DLG, BRUCE FRED FRIEDMAN, et al, in defrauding, financially harming, and wronging Plaintiffs, and each of them.  At all relevant times JACKSON NATIONAL knew, or reasonably should have known, that "loans" made to DLG were not insured through the use of the afore-described collateral assignments of fixed annuities sold on the life of BRUCE FRED FRIEDMAN, but rather were a material element in the Ponzi Scheme constructed by defendants to defraud plaintiffs and each of them. Moreover, JACKSON NATIONAL at all times participated in the Ponzi Scheme for the primary purpose of promoting, accelerating, and fostering the financial fraud committed by Defendants which financially harmed Plaintiffs.  It is alleged that JACKSON NATIONAL was financially rewarded for its participation and support of this Ponzi Scheme by being paid, through DLG, and by other delivery mechanisms as yet unknown, large sums of money which were not earned for any legal activities, but which were styled "commissions" and other stylings to enable BRUCE FRED FRIEDMAN, DLG, et al., to pay JACKSON NATIONAL for their support and assistance in perpetuating the fraud visited upon Plaintiffs, and each of them. Plaintiffs, in addition to seeking full, 100% recovery of their financial losses, plus agreed contractual interest, supplemented by legal interest, as appropriate, at the legal rate of 10% per annum, from and after the date of the "investment," shall seek recovery of all their litigation costs, attorneys' fees, and shall seek an Order compelling JACKSON NATIONAL and its principals and agents to disgorge to Plaintiffs all "fees" "commissions" and other financial emoluments which AMERICAN NATIONAL was paid by DLG, et al., for the services it is alleged to have rendered.  Plaintiffs contend AMERICAN NATIONAL rendered no legal services, and that therefore it is not entitled to retain any money paid to it during the pendency of this Ponzi Scheme, and that all such funds disgorged or "clawed back" shall be employed first to remedy the financial losses suffered by Plaintiffs.

90. Defendant AMERICAN NATIONAL is a Texas corporation that, upon information and belief, has its principal office of business located in Galveston County, Texas, and that is doing business in California. Plaintiffs are informed and believe and thereon allege that between 2005 and 2008, AMERICAN NATIONAL, along with JACKSON NATIONAL, sold deferred fixed annuities to DLG, all of them insuring BRUCE FRED FRIEDMAN's life, which annuities were collaterally assigned by DLG to its lenders to secure repayment of DLG's 9% Reinsured Investment Notes. By this action, Plaintiffs are seeking affirmative relief from AMERICAN NATIONAL, who knowingly provided substantial assistance to DLG in, among other things, defrauding Plaintiffs, and each of them. At all relevant times AMERICAN NATIONAL knew, or reasonably should have known, that "loans" made to DLG were not insured through the use of the afore-described collateral assignments of fixed annuities sold on the life of BRUCE FRED FRIEDMAN, but rather were a material element in the Ponzi Scheme constructed by Defendants to defraud Plaintiffs and each of them. Moreover, AMERICAN NATIONAL at all times participated in the Ponzi Scheme for the primary purpose of promoting, accelerating, and fostering the financial fraud committed by Defendants which financially harmed Plaintiffs. It is alleged that AMERICAN NATIONAL was financially rewarded for its participation and support of this Ponzi Scheme by being paid, through DLG, and by other delivery mechanisms as yet unknown, large sums of money which were not earned for any legal activities, but which were styled "commissions" and other stylings to enable BRUCE FRED FRIEDMAN, DLG, et al., to pay AMERICAN NATIONAL for their support and assistance in perpetuating the fraud visited upon plaintiffs, and each of them. Plaintiffs, in addition to seeking full, 100% recovery of their financial losses, plus agreed contractual interest, supplemented by legal interest, as appropriate, at the legal rate of 10% per annum, from and after the date of the "investment," shall seek recovery of all their litigation costs, attorneys' fees, and shall seek an Order compelling AMERICAN NATIONAL

1   and its principals and agents to disgorge to Plaintiffs all "fees" "commissions" and

2   other financial emoluments which AMERICAN NATIONAL was paid by DLG, et

3   al, for the services it is alleged to have rendered.  Plaintiffs contend AMERICAN

4   NATIONAL rendered no legal services, and that therefore it is not entitled to retain

5   any money paid to it during the pendency of this Ponzi Scheme, and that all such

6   funds disgorged or "clawed back" shall be employed first to remedy the financial

7   losses suffered by Plaintiffs.

8         91.    Defendant YOUR PLATINUM DISTRIBUTORS, INSURANCE

9   MARKETING CO. ("YOUR PLATINUM DISTRIBUTORS") is a dissolved Texas

10   corporation, and upon information and belief, had its principal office of business

11   located in Travis County, Texas, and at all relevant times herein, was a sales person

12   for DLG, and/or BRUCE FRED FRIEDMAN, and/or AEI, and assisted in promoting,

13   accelerating, and fostering the financial fraud committed by Defendants which

14   financially harmed Plaintiffs. It is alleged that YOUR PLATINUM DISTRIBUTORS

15   made false representations to investors and others involved in this Ponzi Scheme

16   regarding  DLG,  and/or  FRIEDMAN,  and/or  AEI.     YOUR  PLATINUM

17   DISTRIBUTORS made said fraudulent and false representations with the advance

18   knowledge and belief that said representations were false and fraudulent, and made

19   them for the purpose of promoting, accelerating, and fostering the financial fraud

20   committed by Defendants which financially harmed Plaintiffs.  It is alleged that

21   YOUR PLATINUM DISTRIBUTORS was rewarded for its participation and support

22   of this Ponzi Scheme by being paid, through DLG, and/or BRUCE FRED

23   FRIEDMAN, and/or AEI, and/or by other delivery mechanisms as yet unknown, large

24   sums of money which were not earned for any legal activities, but which were styled

25   "commissions" and other stylings to enable BRUCE FRED FRIEDMAN, DLG, et al

26   to pay YOUR PLATINUM DISTRIBUTORS for its support and assistance in

27   perpetuating the fraud visited upon Plaintiffs, and each of them.

28         92.    Defendant TOTAL FINANCIAL & INSURANCE SERVICES, INC.

("TFIS") is a California corporation that, upon information and belief, has its principal office of business located in Los Angeles County, California. Plaintiffs are informed and believe and thereon allege that TFIS served as an insurance inter-exchange company between DLG and insurance carriers, actively sought to sell DLG notes, and used its financial and business standing to promote, accelerate, and foster the financial fraud alleged to have been committed by Defendants.

93.     Defendant MARTIN GREENBERG ("GREENBERG") is an individual who, upon information and belief, is residing in Los Angeles County, California, and was a principal of TFIS at all relevant times herein, and as a principal controlled the role that TFIS played in promoting, accelerating, and fostering the financial fraud committed by Defendants which financially harmed Plaintiffs. It is alleged that GREENBERG was rewarded for his participation and support of this Ponzi Scheme by being paid, through TFIS, and by other delivery mechanisms as yet unknown, large sums of money which were not earned for any legal activities, but which were styled "commissions" and other stylings to enable BRUCE FRED FRIEDMAN, DLG, et al., to pay GREENBERG and TFIS for their support and assistance in perpetuating the fraud visited upon Plaintiffs, and each of them.

94.     Defendant RICHARD FINKELSTEIN ("FINKELSTEIN") is an individual who, upon information and belief, is residing in Los Angeles County, California, and was a principal of TFIS at all relevant times herein, and as a prinicipal assisted in controlling the role that TFIS played in promoting, accelerating, and fostering the financial fraud committed by Defendants which financially harmed Plaintiffs. It is alleged that FINKELSTEIN was rewarded for his participation and support of this Ponzi Scheme by being paid, through TFIS, and by other delivery mechanisms as yet unknown, large sums of money which were not earned for any legal activities, but which were styled "commissions" and other stylings to enable BRUCE FRED FRIEDMAN, DLG, et al., to pay him and TFIS for their support and assistance in perpetuating the fraud visited upon Plaintiffs, and each of them.

1   95.   Defendant RICK WALTERS ("WALTERS") is an individual who, upon
2   information and belief, is residing in Los Angeles County, California and was a
3   principal of TFIS at all relevant times herein, and as a principal assisted in controlling
4   the role that TFIS played in promoting, accelerating, and fostering the financial fraud
5   committed by defendants which financially harmed plaintiffs.  It is alleged that
6   WALTERS was rewarded for his participation and support of this Ponzi Scheme by
7   being paid, through TFIS, and by other delivery mechanisms as yet unknown, large
8   sums of money which were not earned for any legal activities, but which were styled
9   "commissions" and other stylings to enable BRUCE FRED FRIEDMAN, DLG, et al.,
10   to pay WALTERS and TFIS for their support and assistance in perpetuating the fraud
11   visited upon Plaintiffs, and each of them.
12   96.   Defendant STRATEGIC BENEFITS PLANNING GROUP, INC., dba
13   SBPG INSURANCE SERVICES ("SBPG") is a California corporation that, upon
14   information and belief, has its principal office of business located in Los Angeles
15   County, California, and which, at all relevant times herein, was a sales person for
16   DLG, AEI, BRUCE FRED FRIEDMAN, and others as yet unknown. Said defendant
17   played a material role in promoting, accelerating, and fostering the financial fraud
18   committed by Defendants which financially harmed Plaintiffs.  It is alleged that
19   STRATEGIC BENEFITS PLANNING GROUP was rewarded for its participation
20   and support of this Ponzi Scheme by being paid, through delivery mechanisms as yet
21   unknown, large sums of money which were not earned for any legal activities, but
22   which were styled "commissions" and other stylings to enable BRUCE FRED
23   FRIEDMAN, DLG, et al., to pay STRATEGIC BENEFITS PLANNING GROUP for
24   their support and assistance in perpetuating the fraud visited upon Plaintiffs, and each
25   of them.
26   97.   Defendant ERIC CANNON ("CANNON") is an individual who, upon
27   information and belief, is residing in Los Angeles County, California, and was a
28   principal of SBPG at all relevant times herein, and as a principal assisted in

1   controlling the role that SBPG played in promoting, accelerating, and fostering the

2   financial fraud committed by Defendants which financially harmed Plaintiffs. It is

3   alleged that CANNON was rewarded for his participation and support of this Ponzi

4   Scheme by being paid, through SBPG, and by other delivery mechanisms as yet

5   unknown, large sums of money which were not earned for any legal activities, but

6   which were styled "commissions" and other stylings to enable BRUCE FRED

7   FRIEDMAN, DLG, et al., to pay CANNON and SBPG for their support and

8   assistance in perpetuating the fraud visited upon Plaintiffs, and each of them.

9        98.    Defendant J. RAY AREVALO ("AREVALO") is an individual who,

10  upon information and belief, is residing in Los Angeles County, California, and was

11  a principal of SBPG at all relevant times herein, and as a prinicipal assisted in

12  controlling the role that SBPG played in promoting, accelerating, and fostering the

13  financial fraud committed by Defendants which financially harmed Plaintiffs. It is

14  alleged that AREVALO was rewarded for his participation and support of this Ponzi

15  Scheme by being paid, through SBPG, and by other delivery mechanisms as yet

16  unknown, large sums of money which were not earned for any legal activities, but

17  which were styled "commissions" and other stylings to enable BRUCE FRED

18  FRIEDMAN, DLG, et al., to pay AREVALO and SBPG for their support and

19  assistance in perpetuating the fraud visited upon plaintiffs, and each of them.

20       99.    Defendant KAREN G. BURHOE ("BURHOE") is an individual who,

21  upon information and belief, is residing in Los Angeles County, California, and was

22  a principal of SBPG at all relevant times herein, and as a prinicipal assisted in

23  controlling the role that SBPG played in promoting, accelerating, and fostering the

24  financial fraud committed by Defendants which financially harmed Plaintiffs. It is

25  alleged that BURHOE was rewarded for her participation and support of this Ponzi

26  Scheme by being paid, through SBPG, and by other delivery mechanisms as yet

27  unknown, large sums of money which were not earned for any legal activities, but

28  which were styled "commissions" and other stylings to enable BRUCE FRED

1 | FRIEDMAN, DLG, et al., to pay BURHOE and SBPG for their support and
2 | assistance in perpetuating the fraud visited upon Plaintiffs, and each of them.

3 |     100. Defendant POLYCOMP ADMINISTRATIVE SERVICES, INC.
4 | ("POLYCOMP") is a California corporation that, upon information and belief, has its
5 | principal office of business in Los Angeles County, California. Plaintiffs are
6 | informed and believe and thereon allege that POLYCOMP managed, administered,
7 | and maintained control over accounts for DLG products, in particular IRA accounts
8 | for DLG investments. POLYCOMP knew about or had access to strong evidence of
9 | fraud, giving rise to an inference of actual knowledge of the DLG Ponzi Scheme, but
10 | failed to act upon said knowledge.

11 |     101. Defendant CINDY BALTIMORE ("BALTIMORE") is an individual
12 | who, upon information and belief, is residing in Los Angeles County, California, and
13 | was a principal of POLYCOMP at all relevant times herein, and as a principal
14 | assisted in controlling the role that POLYCOMP played in the aforementioned DLG
15 | Ponzi Scheme.

16 |     102. Defendant AMERICAN BENEFIT CONCEPTS, INC. ("AMERICAN
17 | BENEFIT CONCEPTS") is a Michigan corporation that, upon information and belief,
18 | has its principal office of business located in Kalamazoo County, Michigan, and at
19 | all relevant times herein, was a sales person for DLG. Several Plaintiffs may be
20 | subject to the settlement of the case Morgenthau v. American Benefit Concepts, Inc.,
21 | Case No. 09-0433-CZ, handled by Hon. Gary Giguere, Jr. of Kalamazoo County
22 | Circuit Court.

23 |     103. Defendant TRAVIS OLIVER ("OLIVER") is an individual who, upon
24 | information and belief, is residing in Kent County, Michigan, and at all relevant times
25 | herein, was a sales person for DLG.

26 |     104. Defendant METLIFE, INC. ("METLIFE"), a Delaware corporation, that,
27 | upon information and belief, has its principal office of business located in New York
28 | County, New York, bears liability for the wrongdoing of its subsidiary, WALNUT

1  STREET SECURITIES, INC. ("WALNUT STREET SECURITIES").

2     105.  Defendant WALNUT STREET SECURITIES is a New York corporation
3  and a subsidiary of METLIFE, with its principal office of business located in New
4  York County, New York, and at all relevant times was a sales person for DLG.

5     106.  Defendant JOHN T. GASPER, III ("GASPER") is an individual who,
6  upon information and belief, is residing in Camden County, New Jersey, and at all
7  relevant times herein, was a principal of WALNUT STREET SECURITIES, and was
8  a sales person for DLG.

9     107.  Defendant JIM CARTER ("JIM CARTER") is an individual who, upon
10  information and belief, is residing in Tulare County, California, and at all relevant
11  times herein, was a principal of STATEWIDE FINANCIAL, and was a sales person
12  for DLG.

13     108.  Defendant STATEWIDE FINANCIAL ("STATEWIDE FINANCIAL")
14  is an unknown California entity, that, upon information and belief, has its principal
15  office of business located in Tulare County, California, and at all relevant times
16  herein, was a sales person for DLG.

17     109.  Defendant LINCOLN FINANCIAL ADVISORS CORPORATION
18  ("LINCOLN FINANCIAL") is an Indiana corporation, that, upon information and
19  belief, has its principal office of business located in Allen County, Indiana, and at all
20  relevant times herein, was a sales person of DLG.

21     110.  Defendant DAAT ASSET MANAGEMENT ("DAAT") is a California
22  corporation, that, upon information and belief, has its principal office of business
23  located in Westlake Village, California, split between Los Angeles County,
24  California, and Ventura County, California, and at all relevant times herein, was a
25  sales person for DLG.

26     111. Defendant  ADAM  HOWARD  MARKOWITZ  ("ADAM
27  MARKOWITZ") is an individual residing in the state of California and at all relevant
28  times herein, was a sales person for DLG.

1    112. Defendant LIGHTHOUSE CAPITAL CORPORATION

2    ("LIGHTHOUSE") is a California corporation that, upon information and belief, has

3    its principal office of business located in Monterey County, California, and at all

4    relevant times herein, was a sales person for DLG.

5    113. Defendant AFFILIATED WEALTH RESOURCES, INC.

6    ("AFFILIATED WEALTH") is a suspended California corporation, that, upon

7    information and belief, had its principal office of business located in San Diego

8    County, California, and at all relevant times herein, was a sales person for DLG.

9    114. Defendant GLENN DUGGINS ("DUGGINS") is an individual who,

10    upon information and belief, is residing in San Diego County, California, and at all

11    relevant times herein, was a sales person for DLG.

12    115. Defendant STATE WIDE FINANCIAL & INSURANCE SERVICES

13    ("STATE WIDE FINANCIAL & INSURANCE") is an unknown Texas entity, that,

14    upon information and belief, had its principal office of business located in Tarrant

15    County, Texas, and at all relevant times herein, was a sales person for DLG.

16    116. Defendant DANE R. CARTER ("DANE CARTER") is an individual

17    who, upon information and belief, is residing in Tarrant County, Texas, and at all

18    relevant times herein, was a principal of STATE WIDE FINANCIAL &

19    INSURANCE and a sales person for DLG.

20    117. Defendant RUSSELL JALBERT ("JALBERT") is an individual who,

21    upon information and belief, is residing in Oakland County, Michigan, and at all

22    relevant times herein, was a principal of JALBERT FINANCIAL GROUP, LLC and

23    a sales person for DLG.

24    118. Defendant EUGENE WITTSTOCK ("WITTSTOCK") is an individual

25    who, upon information and belief, is residing in Oakland County, Michigan, and at

26    all relevant times herein, was a principal of JALBERT FINANCIAL GROUP, LLC

27    and WITTSTOCK FINANCIAL & ASSOCIATES, and was a sales person for DLG.

28    119. Defendant JALBERT FINANCIAL GROUP, LLC ("JALBERT

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1  FINANCIAL") is a Michigan limited liability group that, upon information and belief,
2  has its principal office of business in Oakland County, Michigan, and at all relevant
3  times herein, was a sales person for DLG.

4      120. Defendant  WITTSTOCK  FINANCIAL  &  ASSOCIATES
5  ("WITTSTOCK FINANCIAL") is an unknown Michigan entity that, upon
6  information and belief, has its principal office of business in Oakland County,
7  Michigan, and at all relevant times herein, was a sales person for DLG.

8      121. Defendant TERRY LEE MADISON ("MADISON") is an individual
9  who, upon information and belief, is residing in Kalamazoo County, Michigan, and
10 at all relevant times herein, was principal of AMERICAN BENEFIT CONCEPTS,
11 and was a sales person for DLG.

12     122. Defendant NANCY L. REED ("REED") is an individual who, upon
13 information and belief, is residing in Kalamazoo County, Michigan, and at all
14 relevant times herein, was principal of AMERICAN BENEFIT CONCEPTS, and was
15 a sales person for DLG.

16     123. Defendant ESTATE PLANNING SOLUTIONS NETWORK, LLC
17 ("ESTATE PLANNING") is a Massachusetts limited liability company that, upon
18 information and belief, has its principal office of business in Middlesex County,
19 Massachusetts, and at all relevant times herein, was a sales person for DLG.

20     124. Defendant BRUCE PLOTNICK ("PLOTNICK") is an individual who,
21 upon information and belief, is residing in Middlesex County, Massachusetts, and at
22 all relevant times herein, was principal of ESTATE PLANNING, and was a sales
23 person for DLG.

24     125. Defendant MIKE D. GARDNER ("GARDNER") is an individual who,
25 upon information and belief, is residing in Cross County, Arkansas, and at all relevant
26 times herein, was principal of GARDNER INSURANCE AGENCY, INC., and a sales
27 person for DLG.

28     126. Defendant GARDNER INSURANCE AGENCY, INC. ("GARDNER

1 INSURANCE") is an Arkansas corporation that, upon information and belief, has its
2 principal office of business in Cross County, Arkansas, and at all relevant times
3 herein, was a sales person for DLG.

4     127. Defendant VICTOR FRANCISCO ("FRANCISCO") is an individual
5 who, upon information and belief, is residing in Los Angeles County, California, and
6 at all relevant times herein, was a sales person for DLG.

7     128. Defendant CORZAN CAPITAL MANAGEMENT, LLC ("CORZAN
8 CAPITAL") is a Nevada limited liability company that, upon information and belief,
9 has its principal office of business in Los Angeles County, California, and at all
10 relevant times herein, was a sales person for DLG.

11     129. Defendant STEVEN JOSEPH CORZAN ("CORZAN") is an individual
12 who, upon information and belief, is residing in Los Angeles County, California, and
13 at all relevant times herein, was a principal of CORZAN CAPITAL and a sales person
14 for DLG.

15     130. Defendant FISH TAX ADVISORY GROUP, INC. ("FISH TAX
16 ADVISORY GROUP") is a New Jersey corporation that, upon information and belief,
17 has its principal office of business in Gloucester County, New Jersey, and at all
18 relevant times herein, was a sales person for DLG.

19     131. Defendant JOHN P. FISH ("FISH") is an individual who, upon
20 information and belief, is residing in Gloucester County, New Jersey, and at all
21 relevant times herein, was a principal of FISH TAX ADVISORY GROUP and a sales
22 person for DLG.

23     132. Defendant DENNIS ALLEN LAWTON ("LAWTON") is an individual
24 who, upon information and belief, is residing in Los Angeles County, California, and
25 at all relevant times herein, was a principal of DLI ASSOCIATES and PRB
26 FINANCIAL, INC., and was a sales person for DLG.

27     133. Defendant DLI ASSOCIATES ("DLI ASSOCIATES") is an unknown
28 California entity that, upon information and belief, has its principal office of business

1  in Los Angeles County, California, and at all relevant times herein, was a sales person
2  for DLG.

3      134.   Defendant PRB FINANCIAL, INC. ("PRB FINANCIAL") is a
4  California corporation that, upon information and belief, has its principal office of
5  business in Los Angeles County, California, and at all relevant times herein, was a
6  sales person for DLG.

7      135.   Defendant MANULIFE FINANCIAL CORPORATION, a Canadian
8  corporation, that  upon information and belief, has its principal office of business in
9  Boston, Massachusetts, bears liability for the wrongdoing of its wholly-owned
10 subsidiary, JOHN HANCOCK FINANCIAL SERVICES, INC. ("JOHN
11 HANCOCK").

12     136.   Defendant JOHN HANCOCK FINANCIAL SERVICES, INC. ("JOHN
13 HANCOCK") is a wholly-owned subsidiary of Manulife Financial Corporation, and
14 upon information and belief, has its principal office of business in Boston,
15 Massachusetts, and at all relevant times herein, was a sales person for DLG. JOHN
16 HANCOCK owed a duty of due care to its note buyers, and was obligated to conduct
17 a due diligence sufficient to assess the credibility of those seeking to sell DLG notes
18 to the investing public.

19     137.   Defendant KEMO BARROW ("BARROW") is an individual who, upon
20 information and belief, is residing in Oakland County, Michigan, and at all relevant
21 times herein, was a principal of JOHN HANCOCK and a sales person for DLG.

22     138.   Defendant MASSACHUSETTS MUTUAL LIFE INSURANCE
23 COMPANY ("MASSMUTUAL") is a Massachusetts corporation, that upon
24 information and belief, has its principal office of business in Boston, Massachusetts,
25 and at all relevant times herein, was a sales person for DLG.

26     139.   Defendant ESTATE OF JOHN TALMAGE ("ESTATE OF JOHN
27 TALMAGE") represents JOHN TALMAGE, who, upon information and belief, was
28 an individual residing in Kalamazoo County, Michigan, and at all relevant times

herein, was a principal of and/or employed by AMERICAN BENEFIT CONCEPTS and was a sales person for DLG.

140.   Defendant AMERICORP FUNDING, INC. ("AMERICORP") is a California corporation that, upon information and belief, has its principal office of business in Los Angeles County, California, and at all relevant times herein, was a sales person for DLG.

141.   Defendant MICHAEL BAKER ("BAKER") is an individual who, upon information and belief, is residing in Los Angeles County, California, and at all relevant times herein, was a principal of AMERICORP and a sales person for DLG.

142.   Defendant KELLY HORNBAKER ("HORNBAKER") is an individual who, upon information and belief, is residing in Los Angeles County, California, and at all relevant times herein, was a sales person for DLG.

143.   Defendant PERLOW PLANNING COMPANY, INC. ("PERLOW PLANNING") is a dissolved New York corporation that upon information and belief, has its principal office of business in New York County, New York, and at all relevant times herein, was a sales person for DLG.

144.   Defendant JOSEPH PERLOW ("PERLOW") is an individual who, upon information and belief, is residing in New York County, New York, and at all relevant times herein, was a sales person for DLG.

145.   Defendant GRACE & PORTA INSURANCE AGENCY, INC. ("GRACE & PORTA") is a Michigan corporation that upon information and belief, has its principal office of business in Livingston County, Michigan, and at all relevant times herein, was a sales person for DLG.

146.   Defendant EDWARD W. GRACE, JR ("EDWARD GRACE") is an individual who, upon information and belief, is residing in Livingston County, Michigan, and at all relevant times herein, was a sales person for DLG.

147.   Plaintiffs are unaware of the true names, identities and capacities of the defendants sued herein as ROES 1 through 10. Plaintiffs will amend this Complaint

1  to allege the true names and capacities of ROES 1 through 10 when ascertained.
2  Plaintiffs are informed and believe, and thereupon allege, that each of the defendants
3  sued herein as a ROE is legally responsible in some manner for the events and
4  happenings set forth herein, and has proximately caused injuries and damages to
5  Plaintiffs, and/or each of them as set forth below.

6       148.  As used herein, the term "Defendants" shall refer to JACKSON
7  NATIONAL, and all other named Defendants and ROES 1 through 10, collectively.

8       149.  Defendants, and each of them, carried out their acts both directly and/or
9  through the acts and/or omissions of their agents, insurance brokers, insurance agents,
10 inter-insurance exchange representatives, investment advisers, co-conspirator family
11 members, independent contractors, servants and/or employees, who at all times were
12 acting within the course and scope of said agency, independent contractor agreement
13 and/or employment, and sought to achieve the thefts of money and fraudulent
14 manipulation of Plaintiffs described in this Complaint.

15
16                        **FACTS COMMON TO ALL COUNTS**

17      150.  This action arises out of BRUCE FRED FRIEDMAN and DLG'S
18 blatantly fraudulent, Ponzi investment scheme involving the sale of purported
19 investment notes issued by DLG.  Certain of those notes (the 9% notes) were
20 purportedly fully insured and guaranteed by JACKSON NATIONAL through the
21 collateral assignment of annuities secured by DLG's portfolio of allegedly valuable
22 investment real estate.  The notes were styled as insured, guaranteed, rock-solid, blue
23 chip investments yielding, depending upon the program selected, either 9% insured
24 and guaranteed per year or 12% per year.  The notes were offered and sold to the
25 public through a network of investment advisors, insurance agents, insurance brokers,
26 accountants, an inter-insurance exchange (by and through its representatives), and/or
27 through securities broker-dealers and/or their associated persons.

28      151.  In furtherance of the scheme, DLG recruited insurance salespersons and

1  registered financial advisors to solicit individuals to loan funds to DLG.   DLG
2  provided written information and promotional material to the salespersons to be
3  utilized to induce third parties to loan funds to DLG.

4      152.   DLG and its salespeople, as referenced above, represented to potential
5  investors, including Plaintiffs, that it was a "private real estate investment pool"
6  whose primary business involved acquiring "scratch and dent," "investment-quality,"
7  "income-stream yielding real estate," primarily for cash, rehabilitating the properties,
8  discerningly operating the properties, thereby generating healthy income streams that
9  allowed it to pay either 9% per annum or 12% per annum returns to its investors.
10  DLG publicly boasted of its success stating that it had "$0 debt" and that it owned
11  "over 100 properties" with "$1.5 billion in market value," and that its large size,
12  prudent and savvy investment philosophy, wise and effective investment of
13  investor-lent funds into lucrative, undervalued income-producing real estate, coupled
14  with its iron-clad security contracts with JACKSON NATIONAL made it a secure,
15  problem-free, income-producing solution for investors trying to better the paltry
16  investment returns then offered by banks, treasury bills, and other "paper"
17  investments in the then-current market.

18      153.   DLG offered investments to the public in the form of loans made by
19  investors to DLG. These loans were for either a one (1) year term, or a five (5) year
20  term. These loans were represented as 9% Reinsured Investment Notes, or 12%
21  Secured Investment Notes, based upon the guaranteed annual return paid by said
22  notes.   In order to allow it to earn high premiums and other fees, JACKSON
23  NATIONAL allowed its "good will" and licensure as an insurance company in good
24  standing to be misused and dangled in front of investors, with the purpose of tricking
25  investors   into   believing   that   BRUCE   FRED   FRIEDMAN'S   investment
26  representations were "backed up" by the assets and facilities of well-regarded and
27  maturely managed, giant JACKSON NATIONAL. In turn, JACKSON NATIONAL
28  "earned" and was paid at the direction of BRUCE FRED FRIEDMAN enormous fees,

1    premiums, commissions, and other financial emoluments by lending its name,
2    prestige, and reputation to the misbegotten Ponzi Scheme of BRUCE FRED
3    FRIEDMAN and his co-defendants.

4          154.  DLG represented that the DLG 9% Reinsured Notes were insured by
5    JACKSON NATIONAL, a Best A+ rated national life insurance company, which
6    DLG represented guaranteed through reinsurance the repayment of the DLG Notes.
7    As such, the 9% Reinsured Notes were touted as "zero risk" investments. JACKSON
8    NATIONAL was the primary insurer of choice to reinvest DLG's 9% Reinsured
9    Notes.  In reality, BRUCE FRED FRIEDMAN and his cohorts, and DLG lied
10   shamelessly in their campaign to fleece Plaintiffs of as much of their life-savings as
11   they could capture. DLG's investment program was a sham.  Contrary to its written
12   and verbal representations, DLG did not invest all of the monies received from
13   investors primarily in "distressed" or "scratch and dent" income-producing
14   investment-grade real estate; nor did DLG purchase the real estate it owned primarily
15   for cash. Instead, BRUCE FRED FRIEDMAN diverted millions of dollars "lent" to
16   him for investment, used tens of millions of dollars for his, his families', and his
17   friends'/co-conspirators' own personal use and benefit. Moreover, BRUCE FRED
18   FRIEDMAN and his wholly controlled entity, Diversified Lending Group ("DLG"),
19   and his co-conspirators invested a great amount of the money raised from investors
20   in ventures that were unrelated to mortgage loans or income producing properties.
21   According to the SEC investigation and to Receiver Gill's recent report, BRUCE
22   FRED FRIEDMAN diverted and misappropriated at a minimum $57 million of
23   investor money to support his lavish lifestyle and that of his friends and beneficiaries.
24   Friedman spent no less than $16.7 million on real estate for himself, friends and
25   family, and spent $8.9 million on private jet travel.  He bought a fleet of luxury cars
26   for $1.4 million, including a $250,000 Bentley, and improvidently spent investors'
27   funds to acquire jewelry, and designer clothing and accessories, and to take luxurious
28   vacations.    Moreover, to enhance his social standing, and to trumpet his

1    self-acknowledged stellar position in society, thereby garnering additional prestige

2    and reputation which allowed him to continue and deepen his Ponzi Scheme, BRUCE

3    FRED FRIEDMAN diverted approximately $5 million of investor funds to

4    "charities," including but not limited to the Dodgers Dream Foundation, which the

5    Dodgers' Baseball Team founded to benefit underprivileged children. BRUCE FRED

6    FRIEDMAN shrewdly parlayed his charitable "donations" into moments of public

7    glory which he trumpeted in his unrelenting campaign to steal more and more from

8    unwitting, misled, and vulnerable elderly investors. For example, as late at March 29,

9    2008, the Dodgers invited Bruce to play a central role in an exhibition game, granting

10   him the rare and highly-coveted privilege of throwing out the "first ball" in the

11   Dodgers v. Boston Red Sox Game at Los Angeles Memorial Coliseum to

12   commemorate the Dodger's 50th Anniversary of their controversial and world-famous

13   relocation from Brooklyn to Los Angeles.

14        155.   The 9% Reinsured Notes were fraudulent, and these notes were not

15   "insured" by JACKSON NATIONAL. Contrary to DLG's representations, when an

16   investor chose to invest in a 9% Reinsured Note, DLG usually purchased an annuity

17   insuring BRUCE FRED FRIEDMAN equal to approximately ten percent (10%) of

18   the value of the amount invested. DLG then assigned the purchased annuity to the

19   investor via a Collateral Assignment provided by JACKSON NATIONAL.

20        156.   JACKSON NATIONAL did not disclose that the actual value of its

21   annuities collaterally assigned to Plaintiffs or other DLG investors to reinsure their

22   DLG investment was only a small fraction of the amount invested by the DLG

23   investor. Instead, the Jackson Collateral Assignment, at the space identified for the

24   "Loan No. or Description of Liability," indicated that the assigned JACKSON

25   NATIONAL annuity covered an amount "not more than" a dollar amount that equaled

26   the face value of the investor's DLG investment. The reinsurance clause contained

27   in the DLG Contract provided to DLG's investors guaranteed that the investor's

28   principal plus accumulated interest on matured investments were reinsured.

1  JACKSON NATIONAL essentially supported DLG's and Friedman's fraudulent
2  investment scheme in order to earn high commissions, fees, and premiums for the role
3  JACKSON NATIONAL happily played in this Ponzi Scheme.

4       157. Plaintiffs are informed and believe that DLG consistently falsely
5  represented to both its investors and prospective investors that its Collateral
6  Assignment of the aforementioned annuities on the life of fraud architect BRUCE
7  FRED FRIEDMAN provided them with insurance, potent financial guarantees, and
8  security for their investment in the 9% notes, and by strengthening DLG's financial
9  sufficiency provided added security and backing even for the 12% notes. JACKSON
10 NATIONAL made these false representations even though it knew, by at least March
11 23, 2007, that its annuities sold to DLG were, in reality, at best 10% fractional
12 reinsurance of a portion of DLG investments, i.e. the 9% notes.   JACKSON
13 NATIONAL also knew long before this Ponzi Scheme collapsed that JACKSON
14 NATIONAL's reinsurance of DLG investments was a material selling point used by
15 DLG and its agents in their respective solicitations and sales of DLG investments to
16 the public, including Plaintiffs. Rather than take immediate effective legal action to
17 stop the misuse of its name and standing as an A+ rated Best Insurance Company, and
18 rather than actually stop defendants from using its name and reputation to defraud
19 investors, JACKSON NATIONAL chose to confine its response to the above
20 knowledge to the impotent practice of writing "CYA" letters to BRUCE FRED
21 FRIEDMAN et al.  These innocuous "letters of protest" it wrote to BRUCE FRED
22 FRIEDMAN et al., appearing to attempt to distance itself from what JACKSON
23 NATIONAL then knew to be his grossly fraudulent and dishonest activities, were
24 designed by JACKSON NATIONAL to provide it with evidence of deniability, and
25 to erect a wall between JACKSON NATIONAL and BRUCE FRED FRIEDMAN's
26 Ponzi Scheme.   Tellingly, JACKSON NATIONAL neither attempted to warn
27 investors, nor communicated directly with investors to advise them that contrary to
28 the representations of DLG and BRUCE FRED FRIEDMAN, and contrary to the

**FIRST AMENDED COMPLAINT FOR DAMAGES**

investors' beliefs which were known to JACKSON NATIONAL through its interactions with investors to service their accounts, those investments were not "guaranteed" and were not "insured" and were not secured in any manner by JACKSON NATIONAL or by any other financial intermediary, but were wholly at risk as unsecured loans. Moreover, JACKSON NATIONAL failed and refused to do even the most brief and limited due diligence upon BRUCE FRED FRIEDMAN, and refused and failed to discover that BRUCE FRED FRIEDMAN, then known as Prisoner Number C34344 in the California State Prison System, had been imprisoned in a California state prison for two years in the 1980's after being convicted of Grand Theft, i.e. stealing approximately $300,000.00 from his then employer, Avery Dennison, for whom he worked in an executive capacity as a tax manager. JACKSON NATIONAL did not investigate or learn, or share with investors, the fact that BRUCE FRED FRIEDMAN had declared Personal Bankruptcy in 1993. JACKSON NATIONAL had an affirmative duty to do the above investigation and due diligence since it knew that BRUCE FRED FRIEDMAN and DLG were trading on the value of the good name and reputation for fair dealing and integrity which JACKSON NATIONAL purported to hold in the community. Had JACKSON NATIONAL done even the most shallow investigation, it would have quickly discovered the black past of BRUCE FRED FRIEDMAN and those facts would have quickly and decisively discouraged the plaintiffs from entrusting their life savings and retirement funds to a blackguard such as BRUCE FRED FRIEDMAN, thereby saving plaintiffs from the losses and damages about which they here complain. JACKSON NATIONAL either purposely failed to perform that due diligence, or hid the results of their investigation into the character and background of BRUCE FRED FRIEDMAN, all for the purpose of reaping the large financial rewards it extracted from the described fraudulent scheme.

158.   JACKSON NATIONAL also knew that, while its Collateral Assignments issued to the DLG investors represented that they covered a loan or liability that was

1    "not more than" an amount which represented the investor's DLG investment, the true

2    fact is (was) that the cash value of the underlying JACKSON NATIONAL annuity

3    referenced in the Collateral Assignment typically - and certainly in Plaintiffs' cases

4    - was only approximately ten percent (10%) of the amount referenced on the

5    Collateral Assignment, meaning that approximately 90% of even the "fully insured

6    and guaranteed" 9% notes sold by DLG were at best 90% unsecured, and therefore

7    at best 90% nakedly at risk of principal loss, and wholly not covered by any insurance

8    product issued, supported, or backed by JACKSON NATIONAL. Hence, JACKSON

9    NATIONAL knew or should have known that BRUCE FRED FRIEDMAN and DLG

10    and its agents were actively misleading potential and existing DLG investors to

11    believe that the entire amount (100%) of their DLG investments was insured by

12    JACKSON NATIONAL, when in fact at most 10% was insured, but in fact none was

13    "insured" or guaranteed.

14       159.  On March 23, 2007, JACKSON NATIONAL, to attempt to insulate and

15    distance itself from BRUCE FRED FRIEDMAN'S and DLG's massive theft of

16    investor assets, issued a purported Cease and Desist letter to DLG, demanding that

17    DLG stop referencing JACKSON NATIONAL in its marketing, solicitation and sales

18    of DLG Notes.  On March 30, 2007, DLG duplicitously responded to JACKSON

19    NATIONAL's March 23, 2007 letter, stating that DLG "will not use or make

20    reference to any Contract Number on any future collateral assignment."  This

21    statement was false, and known to be false by BRUCE FRED FRIEDMAN and DLG

22    when issued. Further, this letter confirmed DLG's use of the name and purportedly

23    "good" reputation of JACKSON NATIONAL in marketing its investment program,

24    the sales of which were not qualified nor registered with the SEC or any State

25    securities division, thereby violating both Federal and State securities laws.

26    JACKSON NATIONAL's hollow "protestations" were merely its shallow and

27    diversionary attempt to "paper its file" with "cover up" documentation, so as to

28    attempt to shield JACKSON NATIONAL from the inevitable liability which it knew

1  it faced when DLG and FRIEDMAN could not make good on the insurance
2  guarantees which were at the center of the Ponzi Scheme DLG note-marketing
3  campaign.

4      160.   Plaintiffs are informed and believe that during the time that JACKSON
5  NATIONAL was selling annuities to DLG and DLG was collaterally assigning these
6  annuities to its 9% Reinsured Note holders, JACKSON NATIONAL was receiving
7  inquiries from DLG investors, both via telephone inquiries to JACKSON
8  NATIONAL's Customer Service Center and in writing, requesting information as to
9  JACKSON NATIONAL's participation in DLG's investment program and requesting
10 confirmation as to how the investor would obtain from JACKSON NATIONAL
11 reimbursement in full of their large investments in DLG. Those investor inquiries to
12 JACKSON NATIONAL put the company on direct notice that investors had been
13 tricked into believing that JACKSON NATIONAL would return in full their
14 investments in the event that anything went wrong with them in the future, or in the
15 event of default by DLG. Plaintiffs are further informed and believe that JACKSON
16 NATIONAL was aware that DLG investors were informed that DLG guaranteed that
17 the full amount of their DLG investments were insured by the JACKSON
18 NATIONAL annuities assigned to them by DLG when, in fact, the JACKSON
19 NATIONAL annuity assigned to them was for a much smaller amount (e.g. 10% of
20 the investments, leaving at least 90% uninsured and fully at risk).

21     161.   Notwithstanding this notice, the expectation of the DLG investors who
22 contacted them, and the contradictory information being relayed by DLG to its
23 investors and to JACKSON NATIONAL, and despite JACKSON NATIONAL's
24 demand that DLG cease its unlawful reference to JACKSON NATIONAL,
25 JACKSON NATIONAL continued to sell and issue annuities to DLG, process
26 Collateral Assignments and Releases of Collateral Assignments received from DLG,
27 receive premium payments from DLG, and liquidate JACKSON NATIONAL
28 annuities as requested by DLG paying the monies to DLG after March 23, 2007.

1   JACKSON NATIONAL was a full participant in this unlawful investor-money theft

2   scheme, and accordingly should be held liable to repay all investors the totality of

3   their investments, plus interest, and in addition should be compelled to disgorge in

4   full all commissions, premiums, fees, and other financial emoluments and benefits

5   JACKSON NATIONAL received by participating in this fraudulent scheme with

6   BRUCE FRED FRIEDMAN and DLG.

7        162.  Prior to JACKSON NATIONAL's March 23, 2007 Cease and Desist

8   letter, JACKSON NATIONAL issued at least 77 annuities to DLG on BRUCE FRED

9   FRIEDMAN which were assigned to DLG investors.  JACKSON NATIONAL

10  received approximately $2 million dollars in premium payments. After JACKSON

11  NATIONAL issued its March 23, 2007 Cease and Desist letter to DLG, JACKSON

12  NATIONAL issued at least another 101 annuities to DLG on BRUCE FRED

13  FRIEDMAN which were also assigned to DLG investors, and thereby raked in an

14  additional $5 million dollars in premium payments from BRUCE FRED

15  FRIEDMAN/DLG. Plaintiffs contend that they should be repaid that $7 million plus

16  interest at the legal rate, and should also be permitted to recoup any and all other fees,

17  commissions, premiums, and financial emoluments and benefits which JACKSON

18  NATIONAL, and its agents, and all other financial advisers obtained in participation

19  with this fraudulent investment scheme.

20       163.  On October 11, 2007, JACKSON NATIONAL, well on notice of the

21  fraudulent Ponzi scheme described herein, sent another Cease and Desist letter to

22  DLG, regarding its continued improper use of and reference to JACKSON

23  NATIONAL in its solicitation of investments. JACKSON NATIONAL included a

24  specimen of DLG's continued use of Jackson's name in its marketing materials, which

25  contained the following representations:

26            a.    The Annuity contracts are fully insured by JACKSON

27                  NATIONAL.

28            b.    The amount of the deposits in the Annuity Contracts by DLG is

---

equal to, or greater, than the Investor Note Holder Contract with
DLG.

    c.    DLG gives JACKSON NATIONAL written authorization to bind those funds in the Annuity Contract as "Collateral" against a loss of principal in the DLG Investment Note Contract.

    d.    This is known as the "Collateral Assignment Agreement." The Agreement guarantees that the funds in the Annuity contract cannot be surrendered by DLG or reassigned by DLG for the term of the Investment Note Contract.

    e.    JACKSON NATIONAL issues the Countersigned, Collateral Assignment Agreement to the DLG Investment Note Contract owner showing the DLG Investment Note Contract number and JACKSON NATIONAL Annuity Contract number used for the Assignment.   The assignment also gives the amount of the Assignment.

164.   The foregoing representations by DLG were false, and were known to be false by DLG when those representations were made. At all times JACKSON NATIONAL knew DLG'S representations were false, and knew that said false representations were being advanced to gull naïve investors into believing that the DLG Notes they were purchasing were "guaranteed" and "insured" by JACKSON NATIONAL, when JACKSON NATIONAL always knew said it would disavow responsibility to repay any such Notes on which DLG will have defaulted in the future.  Thus, DLG'S and JACKSON NATIONAL'S false  representations were issued for the purpose of promoting the aforesaid DLG PONZI investment scheme, and were made for the purpose of giving investors and future potential investors the false sense of security that their "investments" in DLG were fully backed and 100% insured and guaranteed against loss by JACKSON NATIONAL LIFE INSURANCE COMPANY.  Further, when JACKSON NATIONAL received the DLG materials

describing the relationship between DLG and JACKSON NATIONAL with respect to DLG's 9% "Reinsured Notes", JACKSON NATIONAL knew that DLG was continuing to mislead its investors into believing they were fully insured, when JACKSON knew they were not, all for the purpose of enabling BRUCE FRED FRIEDMAN and DLG to continue to raise investor funds, which in turn generated more commissions and fees and premiums paid over to JACKSON NATIONAL. Thus, JACKSON NATIONAL was an active participant in this PONZI investment scheme, and co-ventured with DLG is converting money from the plaintiffs, note-buyers.

165.   Despite its knowledge of DLG's wrongdoing, and because it was being paid well to do so, JACKSON NATIONAL continued to sell annuities to DLG, process JACKSON NATIONAL'S Collateral Assignments and Releases of Assignments of JACKSON NATIONAL annuities submitted by DLG, communicate with DLG investors in a manner supportive of DLG. JACKSON NATIONAL, by its support and misrepresentations to investors and other interested parties, continued to buttress DLG's standing in the marketplace, and continued thereby to receive millions in premiums, commissions and fees from DLG allegedly for the purchase of additional JACKSON NATIONAL "annuities" which were represented to be guarantees of, and full insurance of the 9% DLG notes.

166.   Despite JACKSON NATIONAL's knowledge of DLG's fraudulent activities, JACKSON NATIONAL continued to actively participate in DLG's sale of 9% Reinsured Notes, and ratified DLG's wrongful conduct, and in doing so acted as a partner, joint venturer, promoter and/or coconspirator of DLG and BRUCE FRED FRIEDMAN in the unlawful sale of fraudulent investment notes to DLG investors.

167.   In May 2008, the Michigan Department of Labor & Economic Growth Office for Financial and Insurance Regulation opened a regulatory investigation into DLG and sought in that investigation to determine whether it had offered and sold unregistered securities to Michigan residents without having a license. On November

1   21, 2008, the Michigan Department issued an Order to Cease and Desist against DLG
2   ("Order"), finding, inter alia, that DLG violated Section 301 of the Michigan Uniform
3   Securities Act, as amended, MCL 451.501 et seq., and MCL 451.701 for engaging in
4   the unlawful sale of unregistered securities, without having a license or registration
5   from Michigan.

6      168.  In a long-overdue December 16, 2008 letter to DLG investors, BRUCE
7   FRED FRIEDMAN admitted that he had not disclosed material negative information
8   regarding his background, and had failed to disclose important and
9   required-to-be-disclosed facts, including but not limited to the following:

10         a.    that he was a convicted felon, and had been convicted of Grand
11                 Theft for stealing $300,000 from his former employer, Avery
12                 Dennison Corporation;

13         b.    had been imprisoned in the California State Penitentiary System
14                 for two years for his Grand Theft conviction in the 1980's;

15         c.    had filed for personal bankruptcy in 1993;

16         d.    and had been charged with RICO for mail fraud by the State of
17                 New York (those wire fraud charges were eventually dropped).
18                 BRUCE FRED FRIEDMAN then informed DLG's investors that
19                 they could request and obtain a refund of their monies without
20                 penalty or fine.

21      169.  At the time JACKSON NATIONAL processed the Releases of
22   Assignments, and at the time DLG and JACKSON NATIONAL liquidated the
23   JACKSON NATIONAL annuities, JACKSON NATIONAL knew, or should have
24   known, that DLG was an illegal investment program and that the value of the
25   JACKSON NATIONAL annuities assigned to DLG investors was wholly insufficient
26   to repay DLG investors or to make them whole. Notwithstanding this knowledge,
27   JACKSON NATIONAL processed DLG's requests to liquidate JACKSON
28   NATIONAL annuities that were previously assigned and then identified in Releases

1  of Assignments submitted by DLG. Further, defrauding the plaintiffs, JACKSON
2  NATIONAL paid the proceeds of these released annuities to DLG, and not to the
3  releasing DLG assignee, further assisting in defrauding the DLG investors. Both
4  JACKSON NATIONAL and DLG had represented to investors that such proceeds
5  were owned by the protected DLG note holders, and both JACKSON NATIONAL
6  and DLG knew that each of them had represented to investors that the investors
7  owned the annuity protection. JACKSON NATIONAL did these wrongful acts to stay
8  aligned with DLG in order to continue to reap the generous financial benefits flowing
9  to JACKSON NATIONAL as a result of their unholy bargain with BRUCE FRED
10 FRIEDMAN/DLG.

11     170.   In January 2009 and thereafter, JACKSON NATIONAL failed and/or
12 refused to pay to DLG investors, including Plaintiffs, claims made by the DLG
13 investors on the JACKSON NATIONAL annuities assigned to them by DLG.

14     171.   On March 4, 2009, the United States Securities and Exchange
15 Commission filed a Complaint against DLG, FRIEDMAN, and others, alleging that
16 DLG had violated anti-fraud "provisions of the federal securities laws by
17 misrepresenting their use of investor proceeds," effectively bilking investors out of
18 roughly $216 million. The SEC case remains pending in the U.S. District Court for
19 the Central District of California.

20     172.   In June 2009, the Court in the SEC case modified the preliminary
21 injunction to allow JACKSON NATIONAL to pay the actual cash value of the
22 assigned JACKSON NATIONAL annuities to the DLG assignees. Hence, the DLG
23 investors who had portions of their DLG investments reinsured by the JACKSON
24 NATIONAL Collateral Assignments were not and have not been made whole by
25 JACKSON NATIONAL.

26     173.   There was strong evidence of fraud available to all Defendants, giving
27 rise to an inference of actual knowledge. This evidence includes:

28          a.    DLG represented it was making substantial returns by investing

1                in real property at a time when the real estate marker had

2                bottomed out.

3        b.    DLG's returns were unbelievably positive over time.

4        c.    American Accounting Association, Inc. which was identified as

5                the auditor for the alleged audited financial statements, was not

6                an operating business.  Minimal efforts to contact the alleged

7                auditor would have revealed that no such audit of the financial

8                statements had ever taken place and that the purported auditor did

9                not exist.  A simple check with the State of California would have

10             revealed that neither Giovanni Bellini, who Plaintiffs allege at all

11             times relevant herein did business as American Accounting

12             Association, Inc., nor American Accounting Association, Inc. was

13             licensed.

14        d.    FRIEDMAN consistently refused to provide audited financial

15             statements when requested by investors.

16        e.    The financial statements disseminated by DLG were obviously

17             wrong.

18        f.    FRIEDMAN consistently refused to identify DLG's investments.

19    174.  Defendants, and each of them, aided and abetted, encouraged, and

20 rendered substantial assistance to the other Defendants in breaching their obligations

21 to Plaintiffs, as alleged herein.  In taking action, as alleged herein, to aid and abet and

22 substantially assist the commissions of these wrongful acts and other wrongdoings

23 complained of, each Defendant had actual knowledge of the fraud and realized that

24 its conduct would substantially assist the accomplishment of the wrongdoings alleged

25 herein.

26    175.  Defendants reached an agreement to perform the acts complained of

27 herein; all were direct, necessary, and substantial participants in the conspiracy,

28 common enterprise, and common course of conduct complained of herein; and each

1   was aware of its overall contribution to and furtherance of the conspiracy, common
2   enterprise, and common course of conduct. Defendants' acts of conspiracy include,
3   inter alia, all of the acts that each of them is alleged to have committed in furtherance
4   of the wrongful scheme complained of herein, except those relating to the reaching
5   of agreements or understandings sufficient to characterize their conduct as
6   conspiratorial.

## FIRST CAUSE OF ACTION

### Fraud and Misrepresentation

### (For Plaintiffs, against all Defendants, and ROES 1-100)

11      176.   Plaintiffs incorporate by this reference Paragraphs 1 through 175 above,
12   and make the same a part hereof as if set forth in haec verba hereat.

13      177.   JACKSON NATIONAL promoted insurance annuities as a convenient,
14   safe security device, and did so to aid its customers, here BRUCE FRED
15   FRIEDMAN, DLG and its noteholders, in the sale and lucrative exploitation of the
16   Ponzi Scheme in which those insurance contracts were used. For its profit and
17   financial benefit JACKSON NATIONAL actively worked as a co-venturer with
18   BRUCE FRED FRIEDMAN and DLG to fleece unsuspecting elderly investors of
19   their life savings, their nest eggs. JACKSON NATIONAL sought to establish
20   assignment procedures with respect to its own policies and annuities. In furtherance
21   of this PONZI Scheme JACKSON NATIONAL developed and maintained a system
22   to accept and process collateral assignments by filing at its Service Center copies of
23   the collateral assignments to keep itself advised of which annuities had been assigned,
24   and to whom the annuities had been assigned. To aid in the Scheme going forward,
25   and to allay any doubts or fears the elderly Ponzi Scheme victims might develop,
26   JACKSON NATIONAL in its handling of these insurance guarantees confirmed to
27   the parties to the assignment, the assignor and the assignee, that JACKSON
28   NATIONAL had been notified of the assignment, and had accepted the assignment

1  thereby making it fully operational and seemingly fully protective to the elderly
2  plaintiff-investor-victims.   In furtherance of this ruse, JACKSON NATIONAL
3  countersigned each collateral assignment and mailed a copy of the duly executed
4  collateral assignment to the assignee. In establishing, staffing, training staff, and
5  supporting and maintaining its annuity Service Center to process collateral
6  assignments of JACKSON NATIONAL annuities, JACKSON NATIONAL acted to
7  promote and protect its own financial interests by promoting the efficiency of annuity
8  policies as an investment- security device, which they were represented to be to the
9  plaintiffs defrauded,  and kept itself informed concerning the changing interests of
10 owners and creditors in the annuities that it had issued.

11     178.   Because JACKSON NATIONAL maintained a policy of countersigning
12 each collateral assignment it received and mailing a countersigned copy to the
13 assignee identified in the collateral assignment, it did not impose any additional
14 burden for JACKSON NATIONAL to notify the assignee that the value of the actual
15 annuity was in fact dramatically less than the amount of the liability of the assignor
16 referenced in the collateral assignment (10% not 100%).  The fact that JACKSON
17 NATIONAL conveniently elected not to give that notice is but one additional fact
18 which supports the claims against it by the plaintiffs. JACKSON NATIONAL by its
19 conduct was an active, profit-sharing participant with BRUCE FRED FRIEDMAN
20 and DLG in this Ponzi Scheme which defrauded Plaintiffs out of hundreds of millions
21 of dollars of their life's savings.

22     179.   As between the assignor creditor who accepted the collateral assignment
23 of the JACKSON NATIONAL annuity as security for a debt and JACKSON
24 NATIONAL, knowledge of the legal status of the annuity and the actual amount of
25 the annuity is peculiarly within the knowledge of JACKSON NATIONAL, the
26 alleged guarantor.

27     180.   JACKSON NATIONAL owed Plaintiffs a duty to disclose in writing at
28 the earliest possible time to the Plaintiffs the actual value of that annuity. JACKSON

NATIONAL owed a duty to disclose that the collateral assignments it received, processed and recorded at its Service Center were in fact assignments of annuities that only had a value of 10% of the amount of the obligation for which the annuity was being assigned by DLG as security for DLG's obligation to repay the principal amount of the Reinsured Note. JACKSON NATIONAL had superior knowledge of the facts:

a.   JACKSON NATIONAL knew DLG and BRUCE FRED FRIEDMAN were representing to investors and would-be investors that JACKSON NATIONAL was insuring and guaranteeing 100% of the 9% DLG Notes;

b.   JACKSON NATIONAL knew it had protested in writing the use of its name and positive reputation in that DLG marketing campaign;

c.   JACKSON NATIONAL knew defendants continued to use JACKSON NATIONAL's name as the centerpiece in its marketing campaign, and knew the success of the campaign depended upon JACKSON NATIONAL continuing to be ballyhooed as the 100% guarantor and insurer of the DLG 9% Notes;

d.   JACKSON NATIONAL knew, notwithstanding their shallow and deceptive representation to the contrary, and knew tellingly that the "guarantee" and "insurance" on the 9% Notes was not provided by JACKSON NATIONAL;

e.   JACKSON NATIONAL knew that the buyers of the 9% Notes relied to their detriment upon their belief that those notes were 100% guaranteed and insured by JACKSON NATIONAL, based on receipt of applications to purchase annuities accompanied by premium payments from DLG that DLG was purchasing multiple

1          annuities in various amounts on the life of BRUCE FRED

2          FRIEDMAN. Moreover, shortly after purchasing those annuities,

3          DLG was submitting Collateral Assignments to assign the

4          annuities to individuals identified in the assignment document,

5          which also had a reference to the "Loan No. or Description of

6          Liability" specific to the assignee identified in the Collateral

7          Assignment.

8        f.     JACKSON NATIONAL knew it would charge a 10% surrender

9          fee for each annuity it paid, and hid that salient fact from

10          plaintiffs, further burdening them with a large 10% charge which,

11          had they known about it in advance, would have dissuaded

12          plaintiffs from being sucked into this Ponzi scheme, and thus

13          would have saved them from their large financial losses and

14          damages.

15      181.   Several individual lenders who obtained copies of the actual annuities

16 issued by JACKSON NATIONAL complained that the value of the annuity assigned

17 to them was substantially less than the principal amount of their Reinsured Note

18 issued to them by DLG. To solve that problem, in consultation with JACKSON

19 NATIONAL, DLG then requested an agent of JACKSON NATIONAL to purchase

20 replacement annuities from JACKSON NATIONAL in the full amount of the

21 principal of the complaining lenders' Reinsured Notes. Those replacement annuities

22 were then collaterally assigned to the complaining lenders. DLG and JACKSON

23 NATIONAL thus kept this Ponzi Scheme from unraveling earlier than it eventually

24 unraveled, and kept their river of profits and cash benefits flowing to them, by

25 adjusting their actions when they were caught in the "100% insured and guaranteed"

26 lie. In the business of selling insurance policies and annuities, issuers of insurance

27 policies and annuities know that insurance policies and annuities issued by them are

28 regularly assigned to creditors as security for loans made to the owners of the

1   insurance policies and annuities issued. JACKSON NATIONAL was in the business
2   of issuing annuities, which were regularly assigned to creditors as security for loans.
3   When it hid from the lenders the fact that the 9% DLG notes were only insured as to
4   10% of their principal value, not 100% as BRUCE FRED FRIEDMAN and DLG
5   represented, JACKSON NATIONAL knew, inter alia, that the JACKSON annuities
6   sold to DLG were being promoted, advertised and marketed as full, 100% security for
7   the repayment of the full principal amount of the 9% so-called Reinsured Notes. On
8   the other hand, JACKSON NATIONAL also knew that the actual annuities being
9   purchased by DLG and assigned to lenders were only in an amount of 10% of the full
10  principal amount of the loans. Based on that superior knowledge, JACKSON
11  NATIONAL is proved to have actively participated and been a principal player in the
12  afore-described fraud. This is because JACKSON NATIONAL had a duty to disclose
13  to the plaintiff-lender-victims the actual value of the annuity, and had a duty to
14  promptly disclose that the value of the annuities that were being assigned by DLG to
15  each lender was not in the full principal amount of each lenders' Reinsured Notes, and
16  thus that the lenders were being defrauded into falsely believing that JACKSON
17  NATIONAL was fully guaranteeing the "loans." With respect to Plaintiffs,
18  JACKSON NATIONAL, by reviewing, approving, endorsing, countersigning and
19  mailing to Plaintiffs its Collateral Assignments that contained the phrase "not more
20  than (the full principal amount of each Plaintiff's Reinsured Note)," made an
21  affirmative implied representation of material fact/half truths that the annuity
22  collaterally assigned was in the full principal amount of Plaintiffs' Reinsured Note.
23  JACKSON NATIONAL intentionally used vague and imprecise language in order to
24  hide the fact that it was not, contrary to its and its co-conspirators' BRUCE FRED
25  FRIEDMAN and DLG's representations, insuring 100% of the loans. JACKSON
26  NATIONAL did this in order to trick the lenders into not discovering the lies and
27  manipulations, all for the purpose of sharing in the massive cash flow in the nature
28  of premiums, fees, and charges which JACKSON NATIONAL extracted from this

nefarious scheme. JACKSON NATIONAL was a full partner in this nefarious scheme, served the best financial interests of itself and its co-conspirator-partners, BRUCE FRED FRIEDMAN and DLG, and knowingly financially harmed the interests of the plaintiffs.

182.   JACKSON NATIONAL had a duty to disclose not only the actual value of its issued annuity,  but had a duty to disclose the following material facts to Plaintiffs, and intentionally failed to do so for its own financial gains, as evidenced by the following misconduct:

     a.   That the annuities collaterally assigned to Plaintiffs were only funded in an amount approximating 10% of Plaintiffs' loans to DLG, which loans were evidenced by 9% Reinsured Notes;

     b.   That JACKSON NATIONAL had stated in writing that it knew that DLG was "soliciting the sale of 9% Reinsured Investment Notes and Collateral Assignment" and that the sales and marketing materials referenced JACKSON NATIONAL and its satisfactory "relationship" with DLG;

     c.   That JACKSON NATIONAL had claimed in writing to DLG that it had not "endorsed, approved or authorized" the notes, Collateral Assignments or the use of the JACKSON NATIONAL name in connection with the sale and marketing, but did this only to provide protective legal coloration and the posture to be able to deny liability when the scheme eventually unraveled;

     d.   That JACKSON NATIONAL demanded and ordered DLG to cease and desist using its name in promoting and marketing its Reinsured Note products, but never took the effective legal action necessary to enforce this hollow and postured "demand and order;"

     e.   That after March 23, 2007 despite its knowledge that DLG

continued to make material misrepresentations and non-disclosures to new lenders to the Reinsured Note program JACKSON NATIONAL continued to issue the annuities and Collateral Assignments, all to earn profit from its co-conspirators BRUCE FRED FRIEDMAN, DLG, and from the plaintiff-victims;

f.   That any and all representations made by DLG that the 9% Reinsured Notes were either fully reinsured or fully guaranteed by annuities issued by JACKSON NATIONAL were when made false, were when made known to be false by JACKSON NATIONAL, BRUCE FRED FRIEDMAN and DLG, and were knowingly made by all defendants in furtherance of this scheme; and

g.   That even after FRIEDMAN/DLG were ordered by regulatory action of the State of Michigan to stop this fraudulent scheme, FRIEDMAN/DLG and JACKSON NATIONAL continued the scheme, all to extract money from the plaintiff-victims.

183.   In each of the Collateral Assignments received, reviewed, endorsed and countersigned by JACKSON NATIONAL and mailed to Plaintiffs, JACKSON NATIONAL made the same affirmative and implied misrepresentations of material facts to Plaintiffs. Moreover, JACKSON NATIONAL, in furtherance of this scheme, repeatedly and habitually denied and refused its duty to disclose, and repeatedly and habitually failed to disclose material facts regarding the value of the annuity issued by it to DLG, which were subsequently assigned to Plaintiffs. These affirmative misrepresentations, and repeated violations of its duty to disclose material facts were essential to aid BRUCE FRED FRIEDMAN and DLG in continuing the PONZI scheme, and materially aided BRUCE FRED FRIEDMAN and DLG in defrauding the plaintiff-victims out of vast additional sums which would not have been lost to

1 plaintiffs had JACKSON NATIONAL met its legal obligations timely. Plaintiffs
2 relied reasonably to their detriment believing in the bona fides of JACKSON
3 NATIONAL's repeated misrepresentations of material fact, and in its repeated
4 implied misrepresentations of material fact that their loans were fully insured by
5 JACKSON NATIONAL. Plaintiffs would not have acted as they did without
6 JACKSON NATIONAL's affirmative and implied misrepresentations of material fact
7 contained in its Collateral Assignments.

8      184. JACKSON NATIONAL knew the representations it made to the
9 investors were false and knew of its repeated violations of its strict duty to disclose
10 material facts, which if disclosed, would have put investors on notice early that they
11 were being lied to, victimized, and defrauded out of hundreds of millions of dollars
12 by BRUCE FRED FRIEDMAN and DLG et al. JACKSON NATIONAL knew that
13 if it revealed to the investing public and to the plaintiffs the negative material facts
14 it had gleaned in its dealings with FRIEDMAN and DLG, the described fraudulent
15 Ponzi loan scheme would have immediately stopped, thereby depriving JACKSON
16 NATIONAL of the rich financial rewards it was making being a part of the scheme
17 and supporting FRIEDMAN/DLG in the active marketing and alleged "guaranteeing"
18 of the scheme.

19      185. JACKSON NATIONAL intended Plaintiffs to rely on its affirmative
20 misrepresentations of material facts, on its artfully crafted implied misrepresentations
21 of material facts, and upon the multiple and repeated violations of its duty to disclose
22 material facts. JACKSON NATIONAL intended to aid its co-conspirators BRUCE
23 FRED FRIEDMAN and DLG in continuing to conduct this fraudulent Ponzi Scheme,
24 and intended to aid BRUCE FRED FRIEDMAN and DLG to persuade its targeted
25 elderly victims to invest in and hold their DLG Reinsured Notes, which in turn would
26 generate additional premiums, fees, and financial benefits to be paid by DLG to
27 JACKSON NATIONAL. JACKSON NATIONAL was a full, active, willing, and
28 highly remunerated partner with the dishonest BRUCE FRED FRIEDMAN and DLG

1  in this Ponzi Scheme.

2      186. Plaintiffs reasonably relied on JACKSON NATIONAL's
3  misrepresentations and omissions in making their decisions to lend funds to DLG in
4  consideration for a Reinsured Note and a Collateral Assignment of an annuity issued
5  by JACKSON NATIONAL and would not have acted and lost money if they had
6  known the truth. Plaintiffs reasonably relied on JACKSON NATIONAL's and
7  BRUCE FRED FRIEDMAN's and DLG's  representations on the Collateral
8  Assignments concerning the amount being reinsured or covered under the Collateral
9  Assignment, and would not have invested or continued their investment in DLG had
10 JACKSON NATIONAL disclosed that the true value of the annuity was only
11 one-tenth (10%) the amount of the dollar value identified on the face of the Collateral
12 Assignments, i.e. the loans were only guaranteed or insured as to 10% of their
13 principal, not 100% as affirmatively represented by BRUCE FRED FRIEDMAN,
14 DLG, and their co-conspirator agents, representatives, insurance brokers, insurance
15 agents, and others participating profitably in this Ponzi Scheme.

16     187. As each of Plaintiffs' respective DLG contracts matured, Plaintiffs
17 continued to rely on JACKSON NATIONAL's representations as to the value of the
18 Collateral Assignments in making additional investments of monies in DLG's 9%
19 Reinsured Notes.  Subsequent to each reinvestment, JACKSON NATIONAL
20 confirmed the value of Plaintiffs' DLG investments by way of an additional
21 countersigned Collateral Assignment, which it mailed to each
22 Plaintiff-investor-victim.

23     188. As a direct and proximate result of JACKSON NATIONAL's intentional
24 misrepresentations and/or half truths, and as a direct and proximate result of its abject
25 violation of its duty to disclose all material facts, and as a direct and proximate result
26 of its dishonest support of the masterminds behind this Ponzi Scheme, BRUCE FRED
27 FRIEDMAN and DLG, Plaintiffs have suffered massive, life-changing financial
28 damages and losses, in some cases losing their life-savings at the end of their lives

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1   when they need those funds most for their end-of-life medical bills and other costs

2   of living. The exact amount of plaintiffs' damages and losses will be determined at

3   the time of trial, according to proof.

4       189.   In performing the foregoing acts and omissions, JACKSON NATIONAL

5   acted, and failed to act, with the intent to injure Plaintiffs and acted with malice,

6   oppression, and/or fraud. In acting with malice JACKSON NATIONAL intended to

7   cause injury to the plaintiff, or alternatively conducted itself in a dishonest and

8   despicable manner with a willful and conscious disregard for the rights and safety of

9   the defrauded plaintiffs.   In acting with oppression, JACKSON NATIONAL

10  employed its despicable conduct so as to subject each plaintiff-victim to cruel and

11  unjust hardship in conscious disregard of that person's rights. In acting with fraud,

12  JACKSON NATIONAL repeatedly and for its own profit made intentional

13  misrepresentations, acted with deceit, and concealed repeatedly material facts known

14  to JACKSON NATIONAL, all for the purpose of depriving the plaintiff-victims of

15  their money and life-savings, thereby causing the plaintiffs the grave injuries and

16  losses about which they herewith complain. Plaintiffs shall seek an award of punitive

17  damages against JACKSON NATIONAL in an amount appropriate to the wrong

18  doing proven at trial, and in an amount appropriate for the sake of example and by

19  way of punishing JACKSON NATIONAL for its gross wrongdoing. Plaintiffs intend

20  to discover JACKSON NATIONAL's net worth, and its assets, and intend to ask the

21  Court to award a sufficient portion of that net worth and assets to the plaintiffs to both

22  punish JACKSON NATIONAL for their grave misconduct, and to make an example

23  in the community of JACKSON NATIONAL's misconduct thereby deterring others

24  from committing similar misconduct in the future. Plaintiffs shall seek recovery of

25  only that sum of punitive damages which is constitutionally permissible at the time

26  this matter is decided.

27  ///

28

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation, and Aiding and Abetting Negligent Misrepresentation

### (For Plaintiffs, against all Defendants, and ROES 1-10)

190. Plaintiffs incorporate by this reference Paragraphs 1 through 189 above, and make the same a part hereof as if set forth in haec verba hereat.

191. JACKSON NATIONAL owed Plaintiffs a duty to take reasonable care that the information being disseminated by JACKSON NATIONAL and DLG to Plaintiffs, including the information contained in the Reinsured Notes, the Collateral Assignments and related correspondence, was true, complete, and disclosed all material facts JACKSON NATIONAL owed a duty to disclose.

192. With respect to Plaintiffs, JACKSON NATIONAL made the following misrepresentations of material fact: In written Collateral Assignments on JACKSON NATIONAL forms, and executed by JACKSON NATIONAL officers, managers, agents, and authorized employees, JACKSON NATIONAL misrepresented to Plaintiffs that the JACKSON NATIONAL annuity-secured payment of liabilities guaranteed the full amount of their loan (100% of their loan) to DLG. JACKSON NATIONAL made this representation, knowing it was false when it made the representation, by stating in its literature that the annuity secured "not more than [the full principal amount of each Plaintiff's Reinsured Note]." JACKSON NATIONAL knew this hedged language was a false representation because it knew the value of the collaterally-assigned annuity was worth far less (only 10% at most) than the full principal amount of each Plaintiff's Reinsured Note. JACKSON NATIONAL also knew, or should have known, that the amounts referenced in the Collateral Assignment were tied to Plaintiffs' investments in DLG. JACKSON NATIONAL used the above hedged and vague language for the purpose of tricking the elderly plaintiff-victims into believing that BRUCE FRED FRIEDMAN and DLG'S

1  misrepresentations that their loans were fully insured and guaranteed by JACKSON
2  NATIONAL was true and correct. JACKSON NATIONAL knew at all times that the
3  misrepresentations of BRUCE FRED FRIEDMAN and DLG were employed to steal
4  money from the elderly plaintiff-victims, and JACKSON NATIONAL
5  enthusiastically participated in this Ponzi Scheme in order to obtain the vast
6  premiums, fees, money and other financial benefits it reaped as an active
7  co-conspirator and willing participant in this ugly Ponzi Scheme.

8      193.  JACKSON NATIONAL had a duty to disclose the following material
9  facts to Plaintiffs, but intentionally and/or negligently failed to do so:

10          a.    That the annuities collaterally assigned to Plaintiffs were only
11              funded in an amount approximating 10% of Plaintiffs' loans to
12              DLG, which loans were evidenced by 9% Reinsured Notes;

13          b.    That JACKSON NATIONAL had stated in writing that it knew
14              that DLG was "soliciting the sale of 9% Reinsured Investment
15              Notes and Collateral Assignment" and that the sales and
16              marketing materials referenced JACKSON NATIONAL and its
17              "relationship" with DLG;

18          c.    That JACKSON NATIONAL had claimed in writing to DLG that
19              it had not "endorsed, approved or authorized" the Notes,
20              Collateral Assignments or the use of the JACKSON
21              NATIONAL'S name in connection with the sale and marketing of
22              investments by DLG;

23          d.    That JACKSON NATIONAL demanded and ordered DLG to
24              cease and desist using its name in promoting and marketing its
25              Reinsured Investment Note products, but took no affirmative
26              action to implement that hollow and self-serving "demand,"
27              clearly revealing that such demand was made only to make
28              JACKSON NATIONAL look innocent to any investigating entity;

e.   That after March 23, 2007 despite its knowledge that DLG continued to make material misrepresentations and nondisclosures to new lenders to the Reinsured Note program JACKSON NATIONAL continued to issue the annuities and Collateral Assignments;

f.   That any and all representations made by DLG that the 9% Reinsured Notes were either fully reinsured or fully guaranteed by annuities issued by JACKSON NATIONAL were in fact false, and known to be false by JACKSON NATIONAL when those representations were made;

g.   That JACKSON NATIONAL would charge a heavy 10% "surrender fee" or "termination fee" upon the principal sum of any annuity which it might be called upon to pay in the future, and JACKSON NATIONAL hid that charge from DLG note-holders and plaintiffs herein.

194.   In each of the Collateral Assignments issued by JACKSON NATIONAL to the Plaintiffs, JACKSON NATIONAL made actual or implied misrepresentations of material facts to Plaintiffs and failed to disclose material facts regarding the value of the annuity issued by JACKSON NATIONAL to DLG that was assigned to Plaintiffs. At the time of the mailing of the Collateral Assignments, JACKSON NATIONAL had the name and addresses of each Plaintiff-victim and there was no legitimate reason that JACKSON NATIONAL could not make truthful representations and truthful full disclosures, could not efficiently communicate those truthful representations and disclosures of material facts to the defrauded plaintiff-investors, either by US Mail or any other business-like communications method, and thus could not have protected the defrauded plaintiff-victims.

195.   JACKSON NATIONAL knew of the misrepresentations and knew or should have known of the omissions detailed herein.

196. JACKSON NATIONAL intended Plaintiffs to rely on the misrepresentations and omissions, and to hold their DLG Reinsured Notes, and to purchase more such Notes and recommend the purchase of more such Notes to others, all to extract money from the defrauded plaintiff-victims.

197. Plaintiffs reasonably relied on JACKSON NATIONAL's misrepresentations and omissions in making their decisions to make loans to DLG and would not have acted if they had known the truth. Plaintiffs reasonably relied on the information relayed on the Collateral Assignments concerning the amount being reinsured or covered under the Collateral Assignment, and would not have loaned money to DLG on its 9% Reinsured Notes had JACKSON NATIONAL disclosed that the true value of the annuity available to cover any loan or liability was only one-tenth the amount of the dollar value identified on the face of the collateral assignments.

198. As each of Plaintiffs' respective DLG contracts matured, Plaintiffs continued to rely on the misrepresentations as to the value of the collateral assignments in making additional loans to DLG through its 9% Reinsured Notes. Subsequent to each new loan, JACKSON NATIONAL confirmed the value of Plaintiffs' DLG loans by way of the newly issued Collateral Assignments.

199. As a direct and proximate result of JACKSON NATIONAL's negligent misrepresentations, Plaintiffs have suffered damage, the exact amount of which will be determined at the time of trial, according to proof. But for those negligent misrepresentations plaintiffs would not have purchased the subject DLG notes, and thus would have been spared the financial losses and damages which they have suffered, and for which they herein seek relief.

200. The DLG sales people knew of the negligent misrepresentations made by DLG and its Agents. Plaintiffs reasonably relied on the negligent misrepresentations in deciding to invest in DLG and would not have invested funds if the negligent misrepresentations had not been made. The DLG sales people knew

1  that DLG and its Agents were making negligent misrepresentations to DLG investors,
2  and substantially assisted DLG in making the negligent misrepresentations, thereby
3  perpetuating the fraud on Plaintiffs.

4      201.  As a direct and foreseeable result of the conduct of the DLG sales
5  people, DLG remained in existence beyond the point when it should have been
6  dissolved.  Its corporate existence was artificially maintained and prolonged.  The
7  sales people allowed DLG to remain operating when it was clear that DLG was
8  involved and engaged in a fraud, resulting in further debts to an increased number of
9  creditors, and thereby reducing potential recovery for creditors.

10
11                    **THIRD CAUSE OF ACTION**
12                         **Negligence**
13          **(For Plaintiffs, against Defendants, and ROES 1-10)**
14

15     202.  Plaintiffs incorporate by this reference Paragraphs 1 through 201 above,
16  and make the same a part hereof as if set forth in haec verba hereat.

17     203.  JACKSON NATIONAL held itself out to the public and to Plaintiffs as
18  a skilled, experienced, honest professional in annuity sales and as a well-capitalized
19  and honest reinsurance company.  As such, JACKSON NATIONAL owed Plaintiffs
20  a duty to exercise that degree of skill and care ordinarily exercised by others in the
21  annuity sales and investment management profession.

22     204.  JACKSON NATIONAL directly or impliedly held itself out as a skilled
23  specialist in the field of annuity sales and investment management, possessing the
24  specialized knowledge, skill and care ordinarily used by reasonably well-qualified
25  members of the annuity sales and investment management profession.

26     205.  Because of JACKSON NATIONAL's skill, reputation and experience,
27  JACKSON NATIONAL had a duty to exercise that degree of knowledge, skill and
28  care ordinarily used, or which should be used, by reasonably well-qualified members

1 of the annuity sales and investment management profession, including but not limited

2 to discharging competently and honestly the following duties:

3    a. To refrain from misusing and improperly selling annuities, and to

4      refrain from misleading the buying public concerning the value

5      and legal protections accorded by the collateral assignment of

6      JACKSON NATIONAL annuities to others;

7    b. To refrain from and shun participating in fraudulent, deceptive

8      and/or unlawful schemes involving the offer and sale of its

9      insurance products, its annuities, and its use of collateral

10     assignments, whether adjudicated "securities" or not,  to the

11     general public;

12    c. To prevent the false and deceptive dissemination of information

13      regarding its annuity products; and

14    d. To prevent its use or involvement in fraudulent or criminal

15      activity concerning the public.

16   206. JACKSON NATIONAL knew, or should have known, that DLG was

17 improperly using or disseminating JACKSON NATIONAL's name, annuity product,

18 and business and financial reputation as part of its unlawful sale of 9% Reinsured

19 Notes and sale of unregistered securities.

20   207. JACKSON NATIONAL's involvement with DLG investors, including

21 Plaintiffs, included issuing and processing Collateral Assignments of JACKSON

22 NATIONAL annuities sold to DLG, corresponding directly with DLG investors

23 regarding the Collateral Assignments of its annuities sold to DLG, and answering

24 questions regarding the operations and procedures required or entailed in making

25 claims upon JACKSON NATIONAL regarding its annuities assigned to them by

26 DLG. Nevertheless, JACKSON NATIONAL was negligent in one or more of the

27 following ways:

28    a. Failing to provide truthful information to Plaintiffs regarding the

**FIRST AMENDED COMPLAINT FOR DAMAGES**

JACKSON NATIONAL Annuities assigned to them by DLG;

b.    Providing false or misleading information to Plaintiffs regarding the JACKSON NATIONAL annuities assigned to them by DLG;

c.    Ignoring DLG's dissemination of false or misleading information to its investors regarding JACKSON NATIONAL, and its annuities collaterally assigned to Plaintiffs;

d.    Failing to stop DLG's dissemination of false or misleading information to its investors regarding JACKSON NATIONAL, and its annuities collaterally assigned to Plaintiffs; and, among other things,

e.    Failing to disclose to Plaintiffs that the Collateral Assignments were worth only a fraction (10%) of Plaintiffs' investments, when JACKSON NATIONAL knew or should have known that DLG had represented to Plaintiffs, and JACKSON NATIONAL supported this false representation, that the Collateral Assignments were 100% reinsurance of Plaintiffs' entire investments.

208.   Furthermore, JACKSON NATIONAL had a duty to properly train and supervise its representatives, including Cano and others who solicited, recommended, sold, processed or communicated with DLG investors regarding the Collateral Assignments of its annuities securing their DLG 9% Reinsured Notes, to properly evaluate any misuse of the Collateral Assignments of JACKSON NATIONAL annuities by DLG in the offer and sale of Reinsured Notes, and to prevent its participation in the unauthorized or wrongful sales of securities to investors.

209.   By engaging in the acts and conduct set forth previously in this Complaint, JACKSON NATIONAL breached their duty of care to Plaintiffs.

210.   As a direct and proximate result, Plaintiffs have suffered damages, the exact amount to be proven at trial, according to proof.

# FOURTH CAUSE OF ACTION

## Aiding and Abetting Fraud

### (For Plaintiffs, against Defendants, and ROES 1-10)

211.   Plaintiffs incorporate by this reference Paragraphs 1 through 210 above, and make the same a part hereof as if set forth in haec verba hereat.

212.   DLG offers and sells its Notes through a nationwide network of insurance agents and CPAs (the "Agents"). DLG trains the Agents in DLG's business and carefully controls what representations the Agents make to prospective lenders about DLG and the Notes and Collateral Assignments (indeed, FRIEDMAN personally trained many of the Agents). At seminars, workshops, and meetings, the Agents' pre-existing clients and other prospective lenders are told orally and in writing that the Notes are "a safe," "guaranteed," "solid investment" that can be cashed out on written demand and are "zero risk.".

213.   Using PowerPoint presentations and brochures that DLG preapproved, DLG, through its Agents, promised Plaintiffs, and each of them, that: (1) the loans to DLG "are fully insured by Jackson Life"; (2) "the amount of the Deposits in Jackson National Life Annuity Contracts by DLG is equal to, or greater, than the Investment Note Holder Contract with DLG"; and (3) the 9% Reinsured Notes were "reinsured through [an] A+ rated insurance company." These statements were false, and were known at the time they were issued to be false, by the issuers, and each of them, as has been alleged. JACKSON NATIONAL knew that DLG and its Agents were making these false representations to Plaintiffs. JACKSON NATIONAL also knew that DLG was not disclosing to Plaintiffs that the cash value of the actual annuity was only approximately 10% of the amount referenced on the Collateral Assignment, meaning that approximately 90% of the amount loaned to DLG was unsecured, not covered by JACKSON NATIONAL, and that the promise of the loan being "reinsured through [an] A+ rated insurance company" was false.

214. From at least March 23, 2007 until DLG was forced into receivership, JACKSON NATIONAL knowingly assisted DLG in DLG's fraudulent scheme by:

      a.    not disclosing to the Plaintiffs, contrary to its duty to do so, that the representations made by DLG were false;

      b.    by selling and issuing fraudulently-represented annuities to DLG; and

      c.    by reviewing, approving, endorsing and mailing collateral assignments received from DLG and receiving premium payments from DLG with full knowledge of DLG's misrepresentations and material nondisclosures.

215. As the actual and proximate cause of JACKSON NATIONAL's aiding and abetting FRIEDMAN's and DLG's fraud and intentional nondisclosures, Plaintiffs have lost money totaling in the millions of dollars and have incurred additional damages as a proximate and foreseeable result, all in an amount to be shown at trial. The conduct of JACKSON NATIONAL in aiding and abetting DLG's fraudulent scheme was willful, malicious, oppressive and warrants the imposition of punitive damages, which plaintiffs shall seek in a constitutionally-acceptable amount to be proved at time of trial.

## FIFTH CAUSE OF ACTION

**Breach of Fiduciary Duty, and Aiding and Abetting Breach of Fiduciary Duty**

**(For Plaintiffs, against Defendants, and ROES 1-10)**

216. Plaintiffs incorporate by this reference Paragraphs 1 through 215 above, and make the same a part hereof as if set forth in haec verba hereat.

217. A special, fiduciary relationship existed between DLG and Plaintiffs as a result of the following:

      a.    DLG assumed a position of trust and confidence by offering,

selling and servicing the DLG 9% Reinsured Notes to Plaintiffs;

    b.    DLG had actual or constructive notice that Plaintiffs were relying upon DLG's representations that its 9% Reinsured Notes were 100% guaranteed and 100% re-insured by JACKSON NATIONAL, a Best Insurance A+ rated insurance company; and

    c.    DLG knew that Plaintiffs purchased and held DLG 9% Reinsured Notes, renewed their DLG Reinsured Notes, and increased their investments in DLG Reinsured Notes in material, justifiable reliance upon the 100% guarantees and representations that they received from DLG and JACKSON NATIONAL.

218.  As a result of the foregoing, DLG was a fiduciary to Plaintiffs, and DLG owed Plaintiffs certain fiduciary duties, including the duty to treat Plaintiffs with honesty, full disclosure, full explanation of all material facts, and to protect Plaintiffs from loss.  DLG also owed plaintiffs a duty not to self-deal, and not to profit at Plaintiff's expense in their dealings.

219.  DLG breached its fiduciary duties to Plaintiffs in one or more of the following ways:

    a.    By failing to provide complete and truthful information to Plaintiffs regarding the DLG 9% Reinsured Notes;

    b.    By failing to provide complete, truthful and accurate information to Plaintiffs regarding DLG's funding of the JACKSON NATIONAL annuities assigned to Plaintiffs; and

    c.    By misrepresenting to Plaintiffs the rights and ability of Plaintiffs to make claim for 100% of their "loans" against the JACKSON NATIONAL annuities upon default by DLG.

220.  JACKSON NATIONAL knew that at least by March 23, 2007, DLG was repeatedly and chronically breaching its fiduciary duties to Plaintiffs.

221.  JACKSON NATIONAL knowingly joined in DLG's breaches in the

following ways:

a. JACKSON NATIONAL knew that DLG was marketing the Collateral Assignments to Plaintiffs as complete reinsurance for its 9% Reinsured Notes; but JACKSON NATIONAL did not inform Plaintiffs that it had not fully reinsured said 9% Notes, and had not informed Plaintiffs that it did not, and would not, 100% guarantee to Plaintiffs that it would pay back any and all such Notes upon default by DLG;

b. JACKSON NATIONAL knew that the value of its annuities collaterally assigned to DLG investors, including Plaintiffs, were worth only at most 10% of the amount represented by DLG and JACKSON NATIONAL on the face of the Collateral Assignments;

c. JACKSON NATIONAL knew that the purpose of the Collateral Assignments were to induce Plaintiffs to purchase, hold, or expand DLG investments, by giving Plaintiffs a false sense of security that their Notes were 100% re-insured and 100% guaranteed by JACKSON NATIONAL;

d. JACKSON NATIONAL participated in DLG's fraudulent investment scheme by selling to DLG at least over 175 of its annuities on FRIEDMAN, processing the misleading and fraudulent Collateral Assignments in favor of the DLG investors, and communicating with DLG investors, including Plaintiffs, and providing false and misleading information and by failing to disclose material information to the DLG investors, including Plaintiffs, regarding the true value of the annuities collaterally assigned to them, the fees and charges JACKSON NATIONAL would charge upon liquidation of the annuity, and the cozy

1   financial relationship between DLG and JACKSON NATIONAL;

2   e.   JACKSON NATIONAL continued to process false and

3   misleading Collateral Assignments of annuities issued to DLG

4   after March 23, 2007;

5   f.   JACKSON NATIONAL never confirmed or verified that DLG

6   complied with its March 23, 2007 Cease and Desist letter, never

7   sought to compel compliance, and in fact issued its Cease and

8   Desist Letter only to protect itself from future liability when the

9   afore-described fraudulent scheme unraveled.

10   g.   JACKSON NATIONAL continued to sell DLG annuities, and

11   continued to process Collateral Assignments even after learning

12   that DLG had violated its March 23, 2007 Cease and Desist letter;

13   and

14   h.   JACKSON NATIONAL continued to process Collateral

15   Assignments after it knew, or should have known, DLG was

16   selling unregistered securities.

17   222.   JACKSON NATIONAL profited handsomely financially by DLG's

18   breaches of fiduciary duty, and reaped at least ten million dollars in unlawfully

19   obtained revenues by actively participating and cooperating in the fraudulent scheme,

20   and by utilizing its purported high standing as a Best-rated A+ insurance company to

21   aid and abet the fraudulent scheme, all for its own financial advantage, and at all

22   times knowing that JACKSON NATIONAL, like FRIEDMAN and DLG were

23   cheating elderly, weak, infirm, and ailing senior citizens out of their life savings.

24   223.   In addition to the foregoing, JACKSON NATIONAL, by virtue of being

25   an agent for DLG, had a special relationship and/or fiduciary relationship with

26   Plaintiffs and owed fiduciary duties to Plaintiffs, as investors in DLG who purchased

27   9% Reinsured Notes, purportedly 100% guaranteed, and 100% re-insured by

28   JACKSON NATIONAL. As fiduciaries, JACKSON NATIONAL owed Plaintiffs the

1 duty of loyalty, the duty of due care, and the duty of placing Plaintiffs' financial
2 interests ahead of the financial interests of Defendants, and each of them.

3       224.   JACKSON NATIONAL knew the purpose of the Collateral Assignments
4 of JACKSON NATIONAL annuities was to solicit the sale of DLG 9% Reinsured
5 Notes to investors, including Plaintiffs, and to secure and guarantee the availability
6 of monies in the event DLG defaulted on its obligations to its investors, including
7 Plaintiffs.   JACKSON NATIONAL also knew that DLG investors, including
8 Plaintiffs, were relying on the JACKSON NATIONAL annuities to guarantee the
9 obligations of DLG to them on their DLG investment.

10      225.   By engaging in the acts, and misrepresentations set forth hereinabove,
11 and by placing their financial interests ahead of Plaintiffs, JACKSON NATIONAL
12 both aided and abetted DLG's breaches of fiduciary duty, as well as breaching its
13 respective fiduciary duties owed to Plaintiffs.

14      226.   As a direct and proximate result of the multiple breaches of the
15 respective fiduciary duties as set forth in the body of this Complaint, Plaintiffs have
16 suffered damages, the exact amount of which will be proven at the time of trial,
17 according to proof. Plaintiffs contend that the multiple, serial, and extreme breaches
18 of fiduciary duty described infra are willful, malicious, oppressive acts of animus
19 malus misconduct, and thereby warrant the imposition of punitive damages upon
20 JACKSON NATIONAL in a constitutionally-permissible amount at trial. Plaintiffs
21 shall seek such an award of punitive damages against JACKSON NATIONAL at trial.

22      227.   The DLG sales people were aware that DLG Agents' conduct as alleged
23 herein was in breach of their fiduciary duties. Specifically, they were aware that the
24 representations being made by the DLG Agents to attract new investors to DLG were
25 false.   Notwithstanding this knowledge, they substantially assisted DLG and its
26 Agents in carrying out the fraud. The sales people provided substantial assistance to
27 the DLG Ponzi scheme by continuing to seek out customers for DLG products while
28 knowing that the marketing of these products was based on misrepresentations.

228. As a direct and foreseeable result of the conduct of the DLG sales people, DLG remained in existence beyond the point when it should have been dissolved. Its corporate existence was artificially maintained and prolonged. The sales people allowed DLG to remain operating when it was clear that DLG was involved and engaged in a fraud, resulting in further debts to an increased number of creditors, and thereby reducing potential recovery for creditors. The actions of the DLG sales people were malicious, fraudulent, oppressive, and intended to injure Plaintiffs, and therefore Plaintiffs are entitled to punitive damages.

## SIXTH CAUSE OF ACTION

### Breach of the Insurance Guarantee Contract
### (For Plaintiffs, against Defendants, and ROES 1-10)

229. Plaintiffs incorporate by this reference Paragraphs 1 through 228 above, and make the same a part hereof as if set forth in haec verba hereat.

230. Plaintiffs suffered a loss, all or part of which was guaranteed by Defendants.

231. Defendants were notified of the loss as required by the policy; and

232. Defendants failed to pay the covered loss and therefore Plaintiffs shall seek recovery of all their damages and losses as a violation of the insurance guarantee contracts alleged hereinabove, in amounts to be proved at trial.

## SEVENTH CAUSE OF ACTION

### Violation of California Corporations Code § 25110
### (For Plaintiffs, against Defendants, and ROES 1-10)

233. Plaintiffs incorporate by this reference Paragraphs 1 through 232 above, and make the same a part hereof as if set forth in haec verba hereat.

234. The DLG 9% Reinsured Notes and the DLG 12% Secured Notes were and are securities under Federal and California securities laws. The DLG 9% Reinsured Notes and the DLG 12% Secured Notes, contrary to DLG's representations, were not "secured directly by an interest in the same real property, or the sale of an undivided interest in a note secured directly by real property equivalent to a series transaction that complies with all of the provisions of Article 6 of Chapter 3 of Part 1 of Division 4 of the Business and Professions Code."

235. DLG offered and sold unregistered, non-exempt securities to the public, including Plaintiffs, to more than 35 persons, in violation of both California State and Federal law.

236. DLG sold DLG 12% Secured Notes that were not fully or even partially secured by DLG's real estate or other assets.

237. The DLG investments Plaintiffs purchased are unqualified securities and/or investment contracts. At least two other states (e.g. Michigan) have found that the 9% Reinsured Notes and the 12% Secured Notes offered and sold by DLG are securities or investment contracts.

238. California Corporations Code § 25503 provides that any person who violates § 25110 shall be liable to any person acquiring from him the security sold in violation of such section, who may sue to recover the consideration he paid for such security with interest thereon at the legal rate, less the amount of any income received there from, upon the tender of such security, or for damages. DLG violated Corporations Code § 25503, 25110 and numerous other laws of the State of California and Federal laws.

239. California Corporations Code § 25504 provides that every person who directly or indirectly controls a person liable under § 25503, and every partner in a firm so liable, every principal executive officer, managing member, director of a corporation or LLC, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or

1  transaction constituting the violation, and every broker-dealer or agent that materially
2  aids in the act or transaction constituting the violation, are also liable jointly and
3  severally with and to the same extent as such person.

4      240.  At all times herein with respect to the DLG 9% Reinsured Notes,
5  JACKSON NATIONAL was and acted as the agent for DLG in processing and
6  servicing the false or misleading Collateral Assignments that purported to reinsure
7  the DLG 9% Reinsured Notes, which documents and participation were an integral
8  part of the offer and sale of the DLG investments.  At least as early as March 23,
9  2007, if not before, JACKSON NATIONAL knew that DLG was misrepresenting that
10  JACKSON NATIONAL annuities 100% reinsured and 100% guaranteed the entire
11  value of Plaintiffs' respective DLG investments.    Nevertheless, JACKSON
12  NATIONAL continued to sell DLG annuities to DLG on FRIEDMAN, selling at least
13  101 additional annuities since March 24, 2007, and receiving contributions to at least
14  one or more of the annuities assigned to Plaintiffs.

15      241.  JACKSON NATIONAL sent Plaintiffs the misleading Collateral
16  Assignments and falsely represented that JACKSON NATIONAL would fully 100%
17  pay off Plaintiffs' DLG investments with the collaterally assigned JACKSON
18  NATIONAL annuities assigned to Plaintiffs in the event of default by DLG. That
19  false statement was justifiably relied upon by Plaintiffs in making and purchasing
20  DLG investments.  As such, JACKSON NATIONAL materially aided in the acts or
21  transactions constituting the violations, and is therefore also jointly and severally
22  liable to Plaintiffs.

23      242.  California Corporations Code § 25504.1 provides that every person who
24  materially assists in any violation of Section 25110, with intent to deceive or defraud,
25  is jointly and severally liable with any other person liable for a violation of Section
26  25110.  In committing the acts set forth herein, JACKSON NATIONAL materially
27  assisted in the violation of Section 25110, and did so in furtherance of the conspiracy,
28  with the intent to deceive or defraud Plaintiffs in order to sell JACKSON

NATIONAL annuities, all for the purpose of receiving the substantial commissions and annuity premiums it was paid.  Accordingly, JACKSON NATIONAL was a direct co-conspirator with its co-defendants in the fraudulent scheme described, and therefore JACKSON NATIONAL is, and shall remain, jointly and severally liable to Plaintiffs for the entire damages they sustained regarding their respective DLG 9% Reinsured Notes.

243.   As a direct and proximate result of Defendants' wrongful, deceptive and/or fraudulent conduct, Plaintiffs are entitled to obtain the return of their respective principal investments, plus interest at the legal rate of 10% per annum, compounded monthly, from and after the dates of said investments, and continuing until collection. Alternatively, Plaintiffs allege that as a direct and proximate result of Defendants' wrongful, deceptive and/or fraudulent conduct, Plaintiffs have sustained economic harm, damage and loss, in amounts to be proved at trial, and shall seek recovery of such amounts from JACKSON NATIONAL at trial.

244.   Pursuant to California Civil Code section 3287(a), Plaintiffs are further entitled to prejudgment interest of 10% per annum, compounded monthly, as a direct and proximate result of Defendants' wrongful conduct as hereinabove alleged.  The amount of damages suffered by Plaintiffs as a result of these acts was a sum certain, capable of calculation, under the terms of the subject DLG investment, and Plaintiffs are entitled to interest in an amount of said sum(s) certain,  to be set forth at the time of trial, according to proof.

245.   Moreover, due to the fact that the victims of this fraudulent scheme were elderly, over the age of 65, were infirm, were disabled, and were cheated out of their life savings, plaintiffs shall seek from JACKSON NATIONAL recovery of all their legal fees, litigation costs, expert witness costs, forensic accounting costs, and all other sums expended to bring defendants to justice.

246.   Furthermore, given the elderly age and condition of the plaintiff-victims, and due to the RICO nature of the fraudulent misconduct of the defendants, and each

1  of them, plaintiffs shall seeks and are entitled to recover treble damages, or in other
2  three times the amount of the damages they shall prove. Plaintiffs, and each of them,
3  shall seek recovery of treble damages against defendants, and each of them, and
4  against JACKSON NATIONAL, whose participation and involvement in this
5  fraudulent scheme was flagrant, notorious, a violation of its charter as an admitted
6  insurance company, and by the extreme nature of its dishonest acts, was animus
7  malus.

## EIGHTH CAUSE OF ACTION

### Violation of California Corporations Code § 25401
### (For Plaintiffs, against all Defendants, and ROES 1-10)

12  247.  Plaintiffs incorporate by this reference Paragraphs 1 through 246 above,
13  and make the same a part hereof as if set forth in haec verba hereat.

14  248.  California Corporations Code Section 25401 states, "It is unlawful for
15  any person to offer or sell a security in this state or buy or offer to buy a security in
16  this state by means of any written or oral communication which includes an untrue
17  statement of a material fact or omits to state a material fact necessary in order to make
18  the statements made, in the light of the circumstances under which they were made,
19  not misleading." DLG made misrepresentations of material facts to Plaintiffs and
20  failed to disclose material facts to Plaintiffs in connection with the purchase of DLG
21  securities. Likewise, JACKSON NATIONAL made repeated misrepresentations of
22  a material facts, did so for the purpose of extracting millions of dollars from the
23  plaintiff-victims by charging fees, commissions, and premiums for the alleged
24  guarantees and re-insurance it represented it provided to the plaintiff-victims, and by
25  the fraudulent annuity-issuance scheme it conducted, as described above. JACKSON
26  NATIONAL committed its multiple, repeated, serial fraudulent acts in direct violation
27  of California Civil Code Sections 1572 (actual fraud), and specifically committed the
28  following fraudulent acts:

a.  JACKSON NATIONAL suggested that it was 100% guaranteeing and reinsuring plaintiffs' 9% Notes, and that fact was not true and was known not to be true when JACKSON NATIONAL suggested that fact.  This was a clear violation of California Civil Code Section 1572(1);

b.  JACKSON NATIONAL made the positive assertion of the fact that it was guaranteeing 100%, and re-insuring 100% plaintiffs' 9%  loans, and did so in a manner not warranted by the information of the person or persons making that positive assertion.  The person making said positive assertion may have believed it to be true, but such fraudulent misconduct is in violation of California Civil Code Section 1572(2); and

c.  JACKSON NATIONAL suppressed the fact that it only issued 10% annuities, not 100% annuities, on FRIEDMAN, and thus suppressed that material fact to mislead the plaintiff-victims into believing that they were 100% guaranteed and 100% re-insured as to their loans.  Such suppression of that material fact, by one having knowledge or belief of the fact, is a direct violation of California Civil Code Section 1572(3); and

d.  JACKSON NATIONAL promised the elderly plaintiff-victims that in the event of the default by FRIEDMAN/DLG of their 9% loans, in whole or part, that JACKSON NATIONAL would repay the plaintiffs' losses, and at all times JACKSON NATIONAL knew that it was making this promise without the intention of performing the promise.  Such fraudulent misconduct is a direct violation of Civil Code Section 1572(4); and

e.  JACKSON NATIONAL's repeated breaches of its fiduciary duty to the plaintiff-victims, and repeated misrepresentations of fact,

1      and suggestion of facts it knew to be untrue, were multiple acts of

2      dishonesty, and were in direct violation of California Civil Code

3      Section 1572(5).

4   249.  JACKSON  NATIONAL  knew  of  DLG's  misrepresentations  and
5   omissions, detailed herein.

6   250. Plaintiffs  justifiably  and  reasonably  relied  on  Defendants'
7   misrepresentations set forth in this Complaint, and justifiably and reasonably relied
8   upon the absence of omitted facts in purchasing the DLG investments. Plaintiffs were
9   without knowledge of the false statements or omitted material facts, and Plaintiffs
10  would not have purchased the DLG investments had they known the truth.  Plaintiffs
11  were deceived by JACKSON NATIONAL, and but for that deception would not have
12  purchased the Notes which have caused their losses.

13  251.   California Corporations Code § 25504 provides that every person who
14  directly or indirectly controls a person liable under § 25501, and every partner in a
15  firm so liable, every principal executive officer, managing member, director of a
16  corporation or LLC, every person occupying a similar status or performing similar
17  functions, every employee of a person so liable who materially aids in the act or
18  transaction constituting the violation, and every broker-dealer or agent that materially
19  aids in the act or transaction constituting the violation, are also liable jointly and
20  severally with and to the same extent as such person.

21  252. JACKSON  NATIONAL  sent  Plaintiffs  the  misleading  Collateral
22  Assignments and falsely represented that JACKSON NATIONAL would fully pay
23  off Plaintiffs' DLG investment with the collaterally assigned JACKSON NATIONAL
24  annuities assigned to Plaintiffs in the event of default by DLG, which statements were
25  reasonably relied upon by Plaintiffs in making and purchasing DLG investments, and
26  which statements were intended by JACKSON NATIONAL to be relied upon by the
27  plaintiffs.   As such, JACKSON NATIONAL materially aided in the acts or
28  transactions constituting the violations, and is therefore also jointly and severally

1  liable to Plaintiffs, who shall seek repayment from JACKSON NATIONAL of their
2  damages, losses, interest, punitive damages as proven, attorneys' fees and costs, and
3  treble damages, according to proof at trial.

4      253.  California Corporations Code § 25504.1 provides that every person who
5  materially assists in any violation of Section 25110, with intent to deceive or defraud,
6  is jointly and severally liable with any other person liable for a violation of Section
7  25110. In committing the acts set forth herein, JACKSON NATIONAL materially
8  assisted in the violation of Section 25110, and did so in furtherance of the conspiracy,
9  with the intent to deceive or defraud Plaintiffs in order to sell JACKSON
10  NATIONAL annuities, in order to receive the substantial commissions and annuity
11  premiums, and therefore are jointly and severally liable to Plaintiffs for the damages
12  they sustained regarding their respective DLG 9% Reinsured Notes.

13      254.  As a direct and proximate result of Defendants' wrongful, deceptive
14  and/or fraudulent conduct, Plaintiffs are entitled to obtain the return of their
15  respective principal investments, plus interest at 10% per annum, compounded
16  monthly, from the dates of said investments. Alternatively, Plaintiffs allege that as a
17  direct and proximate result of Defendants' wrongful, deceptive and/or fraudulent
18  conduct, Plaintiffs have sustained economic harm, damage and losses, in amounts to
19  be proved at trial, and shall seek full recovery of such damages and losses.

20      255.  Pursuant to California Civil Code section 3287(a), Plaintiffs are further
21  entitled to prejudgment interest as a direct and proximate result of Defendants'
22  wrongful conduct as hereinabove alleged. The amount of damages suffered by
23  Plaintiffs as a result of these acts was a sum certain, capable of calculation, under the
24  terms of the subject DLG investment, and Plaintiffs are entitled to interest on such
25  "sums certain" in the amount of 10% per annum, compounded monthly from and after
26  the date of loss, to the date of recovery, according to proof.

27

28  ///

## NINTH CAUSE OF ACTION

### Holder's Action

### (For Plaintiffs, against Defendants, and ROES 1-10)

256.   Plaintiffs incorporate by this reference Paragraphs 1 through 255 above, and make the same a part hereof as if set forth in haec verba hereat.

257.   DLG and JACKSON NATIONAL made misrepresentations of material facts to Plaintiffs and failed to disclose material facts to Plaintiffs in connection with holding of DLG securities.

258.   DLG and JACKSON NATIONAL misrepresented several material facts, including that:

      a.   Plaintiffs' reinsured accounts were fully guaranteed by JACKSON NATIONAL annuities worth at least the principal amount of Plaintiffs' investments; and

      b.   Plaintiffs could immediately call the full value of assigned JACKSON NATIONAL annuities if DLG did not honor a withdrawal request from a reinsured account.

259.   DLG and JACKSON NATIONAL were under a duty to disclose to Plaintiffs certain facts, but failed to disclose the following material facts:

      a.   That the JACKSON NATIONAL annuities assigned to Plaintiffs were not worth an amount equivalent to Plaintiffs' principal investments;

      b.   Plaintiffs could not immediately call the JACKSON NATIONAL annuities if DLG failed to honor a withdrawal request or otherwise defaulted;

      c.   DLG would not immediately honor a timely and proper request to withdraw an entire account;

      d.   Plaintiffs would not be made whole by or through calling on the

JACKSON NATIONAL annuities collaterally assigned to them to insure or secure their DLG 9% Reinsured Notes;

e.   DLG was offering and selling securities in violation of securities laws;

f.   JACKSON NATIONAL failed to disclose that it had ordered DLG not to solicit purchases of DLG investments using JACKSON NATIONAL's name and reputation, but DLG had failed to discontinue that practice;

g.   JACKSON NATIONAL failed to disclose that it had issued over 175 annuities all of which insured the life of FRIEDMAN, a practice that raised red flags;

h.   That said annuities covered only 10% of the face value of the allegedly 100% guaranteed and 100% re-insured loans, not the 100% represented by FRIEDMAN/DLG, and those facts put JACKSON NATIONAL on notice that it was aiding, abetting, participating in, and profiting from the described fraud, and is thus liable to the plaintiffs for their damages, attorneys' fees, costs, interest at 10% per annum compounded monthly, and for the treble damages as Elder Financial Abuse due plaintiffs, and each of the elderly plaintiffs.

i.   DLG was operating an illegal Ponzi scheme.

260.   DLG and JACKSON NATIONAL knew or should have known of the misrepresentations and/or the omissions of material facts detailed herein.

261.   DLG and JACKSON NATIONAL intended that Plaintiffs would act (i.e., make DLG investments and/or renew DLG investments) or refrain from acting (i.e., not withdraw monies previously invested in DLG) based upon JACKSON NATIONAL's and FRIEDMAN/DLG's misrepresentations or omissions of material facts.

262.   Plaintiffs relied on DLG and/or JACKSON NATIONAL's misrepresentations and omissions of material facts and held, as opposed to selling, investments with DLG that they could have terminated, let mature and/or withdrawn their respective investment funds, pursuant to the terms of their DLG Contracts.

263.   Had Plaintiffs known the true information misrepresented, or had Plaintiffs been informed of the facts that DLG and/or JACKSON NATIONAL failed to disclose to Plaintiffs, Plaintiffs would not have invested in DLG Notes of any kind, would not have held the original or subsequent DLG investments, would have terminated the DLG investments and/or would have not renewed, reinvested or made additional investments in DLG.

264.   As a direct and proximate result of these Defendants' wrongful misrepresentations and omissions, Plaintiffs have suffered damages plus interest, litigation costs and attorneys' fees, the exact amount of which shall be proved at the time of trial.

## TENTH CAUSE OF ACTION

### Aiding and Abetting Violation of California Business & Professions Code § 17200 *et seq.*

### (For Plaintiffs, against All Defendants, and ROES 1-10)

265.   Plaintiffs incorporate by this reference Paragraphs 1 through 264 above, and make the same a part hereof as if set forth in haec verba hereat.

266.   At all times relevant hereto, California Business and Professions Code §§ 17200 et seq. were in full force and effect. Section 17200 of the Business and Professions Code provides, in relevant part, that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice..."

267.   Defendants, and each of them, are "persons" as defined under Business and Professions Code § 17021. Each of the directors, officers, and/or agents of Defendants, and each of them, are equally responsible for the acts of the other

1  directors, officers, employees and/or agents as set forth in the Business and
2  Professions Code § 17095.

3      268.   Plaintiffs, and each of them, have suffered extensive, life-changing
4  financial losses, damages, and injuries, and at the end of their lives, when they are
5  most vulnerable and in need of their financial resources to pay for end-of-life medical
6  care and to support and educate their families and heirs, the injured plaintiff-victims
7  have lost vast sums of money as a result of the wrongful, fraudulent, deceitful,
8  intentional, malicious, oppressive misconduct of Defendants, and each of them.

9      269.   Plaintiffs timely bring this action to pursue their just claims during the
10  applicable four year statute of limitations under § 17208 of the California Business
11  and Professions Code.

12      270.   As discussed above, DLG and BRUCE FRED FRIEDMAN engaged in
13  vast, continuing, unfair, unlawful and deceptive business practices composed, in part,
14  of soliciting individuals to loan funds to DLG. DLG represented those funds would
15  be deposited into "investment pools." Those investment pools would allegedly be
16  employed effectively and prudently by DLG to purchase at deeply discounted prices
17  investment real estate which in turn would generate large free cash flows, more than
18  sufficient to pay off the 9% and 12% Notes DLG sold its defrauded
19  plaintiff-investors. DLG and FRIEDMAN consistently misrepresented the salient
20  facts. Quality commercial real estate acquisition and management was not the
21  "business" of DLG, but rather was the "hook" which lured the trusting plaintiffs to
22  turn over their life-savings to DLG. DLG and FRIEDMAN at no time intended to
23  pay the plaintiff-investors the true returns they promised to pay, and at all times knew
24  that their promise that JACKSON NATIONAL LIFE INSURANCE COMPANY was
25  "guaranteeing" and "re-insuring" the funds entrusted to DLG was false. The true
26  facts were that DLG and FRIEDMAN were operating a Ponzi scheme in which they
27  used the money lent by new lenders to pay purported returns to the original lenders.
28  The true facts were that DLG and FRIEDMAN at all times intended to, and looted

1  millions of solicited dollars for FRIEDMAN's, his family's, and his friends' personal
2  use, enjoyment, and pleasure. Moreover, FRIEDMAN, a convicted and formerly
3  imprisoned California Grand Theft felon, diverted and stole large sums of money to
4  finance his personal hobbies and gambled a large amount of solicited money in
5  ventures that were unrelated to mortgage loans and income-producing commercial
6  real estate properties. FRIEDMAN and DLG hid FRIEDMAN's past from the
7  investors approached for money, and created an image of a community "do gooder"
8  by utilizing the good offices of the well-respected, iconic baseball team, The Los
9  Angeles Dodger to foster the false image that FRIEDMAN was a philanthropist and
10 large supporter of good works in the Los Angeles community. Such manipulation
11 was simply part of the process FRIEDMAN, DLG, and his co-defendants employed
12 to continue, enhance and execute the massive fraud described infra.

13     271.  Through their actions alleged herein, Defendants, and each of them,
14 have engaged in unfair competition within the meaning of California Business &
15 Professions Code § 17200, because Defendants' conduct constituted a continuing,
16 intentionally-designed, artfully executed, profit-seeking fraud perpetrated against
17 members of the general public.

18     272.  Business and Professions Code § 17203 provides that the Court may take
19 those steps necessary to prevent such wrongful conduct and may order defendants,
20 and each of them, to pay full restitution to all aggrieved parties and victims of the
21 aforesaid fraud, including but not limited to the plaintiff-victims named herein.

22     273.  Section 7202 of the California Business and Professions Code states:
23 "Notwithstanding Section 3369 of the Civil Code, specific or preventive relief may
24 be granted to enforce a penalty, forfeiture, or penal law in a case of unfair
25 competition."

26     274.  Beginning at a date unknown to Plaintiffs, but at least as early as January
27 27, 2006, Defendants committed, and continued to commit, acts of unfair
28 competition, as defined by California Business & Professions Code § 17200, et seq,,

1  by and among other things, engaging in the acts and practices as described above.

2       275.   JACKSON NATIONAL knowingly aided and abetted and provided
3  substantial assistance to DLG's and FRIEDMAN's violations of California Business
4  & Professions Code section 17200, et seq. as alleged herein above. JACKSON
5  NATIONAL did this for its own selfish monetary gain, and by aiding and betting
6  DLG and FRIEDMAN, reaped millions of dollars in additional commissions, fees,
7  premiums, and other profit-making business. But for its enthusiastic participation in
8  the fraud described infra JACKSON NATIONAL would not have earned the
9  above-described large sums of money, and JACKSON NATIONAL participated in
10 the fraud solely for the purpose of raking off from the plaintiff-victims such money.

11      276.   As the actual and proximate cause of JACKSON NATIONAL's aiding
12 and abetting DLG's violations of California Business & Professions Code section
13 17200, et seq., Plaintiffs, and each of them, have lost their investments totaling
14 millions of dollars, all in an amount to be proven at trial.

15

16                    **ELEVENTH CAUSE OF ACTION**
17                      **Aiding and Abetting Conversion**
18            **(For Plaintiffs, against all Defendants, and ROES 1-10)**

19

20      277.   Plaintiffs incorporate by this reference Paragraphs 1 through 276 above,
21 and make the same a part hereof as if set forth in haec verba hereat.

22      278.   Conversion is the intentional and wrongful exercise of dominion over
23 the personal property of another, including substantial interference with the
24 possession or the right to possession of said property. The unauthorized use of the
25 property of another is substantial interference. Actionable damages for conversion
26 include the value of the property converted or recovery of the specific property (if
27 still available), with additional monetary damages for its detention. A person entitled
28 to future possession may sue for conversion, even if the owner did not have the right

of immediate possession at the time of the conversion.  Money is properly the subject of conversion if a specific, identifiable sum is involved.

279.   Plaintiffs transferred identifiable funds to DLG for investment.  Plaintiffs each relinquished possession of the funds to another for an express purpose, namely as a loan.  DLG used these loaned funds in a way and for a purpose that was decidedly different from the way and purpose for which they were solicited to be received.  JACKSON NATIONAL aided and abetted that misuse as alleged above.  Thus, the unauthorized use of the invested funds as alleged herein was, as to each instance, a conversion.  As a result each Plaintiff has not been able to obtain possession of their funds. The amount of converted investment from each Plaintiff is a specific and identifiable sum, which shall be demonstrated at trial.

280.   Plaintiffs did not consent to the misappropriation and conversion of their investment, and such conduct was a substantial factor in causing damages and harm to Plaintiffs, and each of them.

281.   JACKSON NATIONAL aided and abetted DLG's conversion as hereinabove alleged, and did so to obtain profit, money, commissions, fees, and premiums, all for its financial gain and all contributing to the financial losses suffered by plaintiffs.

282.   As the actual and proximate result of JACKSON NATIONAL's aiding and abetting DLG's conversion, Plaintiffs have lost their investments totaling millions of dollars and have incurred additional damages as a proximate and foreseeable result, all in an amount to be shown at trial.  Damages include the loss of their investment principal, the expected gains from this or alternative investments, and the need to hire and retain professionals to mitigate losses caused by the conversion. The conduct of JACKSON NATIONAL in aiding and abetting DLG's conversion of Plaintiffs' funds was malicious, oppressive and warrants the imposition of punitive damages as JACKSON NATIONAL's conduct was at all times animus malus.

# TWELFTH CAUSE OF ACTION

## Financial Elder Abuse

### [California Welfare & Institutions Code Section 15610.30]

### (For Plaintiffs, against Defendants, and ROES 1-10)

283.   Plaintiffs incorporate by this reference Paragraphs 1 through 282 above, and make the same a part hereof as if set forth in haec verba hereat.

284.   California Welfare & Institutions Code Section 15610.30 provides that financial abuse of an elder (person over the age of 65) occurs, inter alia, when a person or entity, acting in bad faith: "takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both." Cal. Welf. & Inst. Code § 15610.30(a)(1). Under the same section, a person who assists in the foregoing conduct is also liable.  Cal. Welf. & Inst. Code § 15610.30(a)(2).

285.   A majority of Plaintiffs were age 65 or older at all times relevant to this action.

286.   By the appropriation or retention of the elderly Plaintiffs' monies and property by false or deceptive representations that induced their investment(s) in DLG, JACKSON NATIONAL did so for a wrongful use or with the intent to defraud or both.  JACKSON NATIONAL "took" Plaintiffs' property for an improper use and/or with the intent to defraud as, through said written and verbal misrepresentations engaged in a deceptive scheme that used deceptive practices to cause Plaintiffs to invest monies with DLG in 9% Reinsured Notes, guaranteed and insured by Jackson, and to renew their 9% Reinsured Notes.

287.   Defendant JACKSON NATIONAL aided, abetted, assisted in DLG's unlawful conduct of taking, secreting, appropriate Plaintiffs' property for a wrongful use or with the intent to defraud, and is therefore also liable to Plaintiffs.

288.   Furthermore, JACKSON NATIONAL assisted DLG in the inappropriate

1  and unlawful activities described hereinabove for JACKSON NATIONAL's own
2  financial gain to the detriment of Plaintiffs, and by using deceptive and misleading
3  materials, including the Collateral Assignments that falsely indicated that plaintiffs'
4  DLG Reinsured Notes were insured up to the principal value of their investment(s),
5  JACKSON NATIONAL "took" Plaintiffs' personal property within the meaning of
6  California Welfare & Institutions Code § 15610.30.

7      289.   JACKSON NATIONAL's conduct, as described hereinabove,
8  constitutes financial elder abuse as defined in California Welfare and Institutions
9  Code § 15610. JACKSON NATIONAL is guilty of recklessness, fraud, willfulness,
10 oppression and malice in the commission of the above-described acts of abuse.

11     290.   As a direct and proximate result of JACKSON NATIONAL's wrongful
12 conduct as set forth above, Plaintiffs have suffered general and specific damages, all
13 in an amount to be determined at the time of trial according to proof.

14     291.   Pursuant to California Civil Code § 3287(a), Plaintiffs are further
15 entitled to prejudgment interest as a direct and proximate result of JACKSON
16 NATIONAL's wrongful conduct as hereinabove alleged. The amount of damages
17 suffered by Plaintiffs as a result of these acts was a sum certain, capable of
18 calculation, and Plaintiffs are entitled to interest in an amount to be set forth at the
19 time of trial according to proof, but not less than the legal rate, 10% per annum,
20 compounded monthly.

21     292.   The aforementioned acts of JACKSON NATIONAL were done
22 maliciously, oppressively and with the intent to defraud and Plaintiffs are entitled to
23 punitive and exemplary damages pursuant to California Civil Code § 3294 in an
24 amount to be ascertained at the time of trial according to proof.

25     293.   Under California Welfare and Institutions Code § 15657(a), JACKSON
26 NATIONAL is liable to Plaintiffs for reimbursement of all of Plaintiffs' reasonable
27 attorney fees and litigation costs, including all forensic accounting costs, forensic
28 psychiatric costs, and all other litigation related costs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### THIRTEENTH CAUSE OF ACTION

### Violations of RICO, 18 U.S.C. § 1962(C)

### (For Plaintiffs, against All Defendants, and ROES 1-10)

294.   Plaintiffs incorporate by this reference Paragraphs 1 through 293 above, and make the same a part hereof as if set forth in haec verba hereat.

295.   DLG, FRIEDMAN, and JACKSON NATIONAL are all persons within the meaning of 18 U.S.C. § 1961(3), and are the persons involved in the creation and maintenance of a racketeering enterprise as defined in §1961(4). DLG, FRIEDMAN, and JACKSON NATIONAL, and each of them, have been employed by and/or associated with the enterprise and while so employed and/or associated have conducted, directed, managed or participated in, either directly or indirectly, the conduct of the affairs and business of the enterprise affecting interstate commerce through the described pattern of racketeering activity.

296.   The fraudulent scheme was to gain access to plaintiffs' funds by the marketing and sale of notes/loans to DLG, which were represented to be "guaranteed" by JACKSON NATIONAL through the collateral assignment of annuities and/or secured by DLG's portfolio of allegedly investment-grade commercial real estate. Next, the scheming defendants stole a large percentage of these funds, concealed the theft and their personal non-business-related use and enjoyment of the stolen cash to support FRIEDMAN's lavish lifestyle, and to profit the defendants. Prior to the collapse of the scheme, DLG, FRIEDMAN, and JACKSON NATIONAL continued to further this scheme by soliciting further investment and by actively engaging in mail and wire fraud. Eventually, FRIEDMAN's "past" as a convicted Grand Theft felon who had been incarcerated in a California penitentiary became known to his victims, and this Ponzi Scheme and multi-year criminal enterprise collapsed upon itself.

297.   The enterprise is a group of persons and entities associated together for

a common purpose of engaging in a course of conduct. The structure of the enterprise is consistent with that of an organized crime family with FRIEDMAN at the core. The enterprise consisted of the FRIEDMAN, DLG and JACKSON NATIONAL with their employees and agents acting for their individual advantage and gain. Each person or entity associated with the enterprise managed and directed specific components of the enterprise, each component being useful to the success of the enterprise itself. However, if one member of the enterprise left the enterprise it would continue as an ongoing criminal enterprise until stopped by law enforcement.

298.   The enterprise operated out of a suite of offices located in Sherman Oaks, California but conducted its affairs in various locations in the United States by using interstate commerce, the US Mails, and affecting interstate commerce and was at all times an enterprise as defined in 18 U.S.C. § 1961 (4).

299.   In furtherance of the ongoing scheme, FRIEDMAN, DLG and JACKSON NATIONAL, and each of them, conspired to commit and/or committed hundreds of predicate acts or aided and abetted in the commission of predicate acts, as described above, as proscribed by 18. U.S.C. § 1961 (1)(b), including mail fraud, wire fraud and money laundering. For the purpose of executing the fraudulent scheme as described in the above paragraphs, JACKSON NATIONAL on its behalf and in substantial assistance to DLG mailed the materially false Collateral Assignments to Plaintiffs. In doing so, JACKSON NATIONAL engaged in mail fraud in violation of 18 U.S.C. § 1341.

300.   As the actual and proximate cause of the conspiracy and operation of the enterprise, FRIEDMAN, DLG and JACKSON NATIONAL's association with the enterprise and conducting the affairs of the enterprise through the pattern of racketeering activity and commission of the predicate acts committed by them, and each of them, Plaintiffs have had their money, life-savings, properties, families, health, and businesses damaged in amounts to be shown at trial including.

301.   Plaintiffs, and each of them, are entitled to and seek treble damages from

1  each of the defendants, and from all of them.

2

3  **FOURTEENTH CAUSE OF ACTION**

4  **Unauthorized Sale of Unregistered Securities**

5  **(For Plaintiffs, against All Defendants, and ROES 1-10)**

6

7  302.   Plaintiffs incorporate by this reference Paragraphs 1 through 301 above,

8  and make the same a part hereof as if set forth in haec verba hereat.

9  303.   Between May 18, 2004 and March 4, 2009, DLG was engaged in the sale

10  of securities which were not qualified or exempted from qualification under

11  California law.

12  304.   DLG and its Agents sold the securities directly or retained sales people

13  to sell the securities to the public.  The sales people sold DLG's securities to the

14  public even though the securities were not qualified or exempted from qualification

15  under California law.

16  305.   As a result, DLG increased its insolvency by adding additional liabilities

17  with each new sale of security as an investment to Plaintiffs.

18  306.   Pursuant to California Corporations Code § 25503, Plaintiffs are entitled

19  to judgment against Defendants in an amount to be proven at the time of trial.

20

21  **FIFTEENTH CAUSE OF ACTION**

22  **Unjust Enrichment**

23  **(For Plaintiffs, against All Defendants, and ROES 1-10)**

24

25  307.   Plaintiffs incorporate by this reference Paragraphs 1 through 306 above,

26  and make the same a part hereof as if set forth in haec verba hereat.

27  308.   All Defendants benefitted from receiving property from DLG to which

28  they were not entitled and benefitted unjustly at DLG's expense.

309.  It is inequitable and unjust for Defendants to have received, been enriched by, and retained without payment of value, such benefits from DLG.

310.  Plaintiffs are informed and believe and thereon allege that as a result of transactions herein alleged, Defendants have been unjustly enriched, so that Plaintiffs are entitled to recover from Defendants the property that was transferred to or for their benefit, or the value thereof, plus interest thereon at the legal rate.

## **PRAYER**

WHEREFORE, Plaintiffs pray for the following relief:

1.  For special damages according to proof, all in a sum to be determined at time of trial;

2.  For general damages according to proof, all in a sum to be determined at time of trial;

3.  For other economic and consequential damages according to proof, all in a sum to be determined at trial;

4.  For punitive damages and exemplary damages, according to proof;

5.  For treble damages according to proof;

6.  For an enforceable Court Judgment, ordering all Defendants, their agents, servants, and employees, and all persons acting, directly or indirectly, in concert with them, to restore and disgorge all funds to each Plaintiff acquired by means of any act or practice declared by this Court to be unlawful, unfair, and/or fraudulent and therefore which constitutes unfair competition under Section 17200, et seq., of the California Business & Professions Code.

7.  For injunctive relief pursuant to California Business & Professions Code § 17203, consisting of, inter alia: (1) a declaration that Defendants have engaged in unlawful and unfair and fraudulent business acts and practices in violation of California Business & Professions Code § 17200, et seq.; (2) a preliminary and/or permanent injunction enjoining Defendants and their respective successors, agents,

servants, officers, directors, attorneys, insurance agents, employees and all other persons acting in concert with them from pursuing the policies, acts, and practices complained of herein and prohibiting Defendants, and each of them, from continuing such acts of unfair and illegal business acts and practices in the indefinite future;

8.     For an equitable accounting;

9.     For restitution, including, but not limited to, Plaintiffs' principal amounts provided to DLG;

10.    For costs of suit;

11.    For pre-judgment interest, if any shall be incurred;

12.    For such attorneys' fees and litigation costs as may be authorized, pursuant to California Welfare and Institutions Code § 15657(a); and

13.    For such other and further relief as the court may deem proper.

Dated: June 9, 2011                    **LON B. ISAACSON ASSOCIATES**
                                        An Affiliation Including A
                                        Professional Law Corporation

                                        By: _____
                                             Lon B. Isaacson
                                             Attorneys for Plaintiffs

**FIRST AMENDED COMPLAINT FOR DAMAGES**

## DEMAND FOR JURY TRIAL

Plaintiffs, GERALD HOFFARTH, an individual; DEANNA HOFFARTH, an individual; TADASHI ARAKI, an individual; SACHIKO ARAKI, an individual; EDWIN BERGHOLDT, an individual; WILMA A. BLIVEN, an individual; RAPHAEL BRANCA, an individual; CAROLINE L. BURNES, an individual; RAYMOND CLARK, an individual; NANCI CLARK, an individual; BARBARA CLARK-LEAHY, an individual; SCOTT COHEN, an individual; GLORIA COPPOLA, an individual; MARIAN CREASY VOSBURGH, an individual on behalf of herself and the CREASY FAMILY REVOCABLE LIVING TRUST; PAULINE BEACH, an individual on behalf of the CREASY FAMILY REVOCABLE LIVING TRUST; LANA CRUZ, an individual; ESTELLE DEUTCH, individually and as the successor in interest of MARVIN DEUTCH, deceased; ESTATE OF MARVIN DEUTCH; BRIAN S. EVANS, an individual; T. RICHARD EVANS, an individual; STANLEY C. FORREST, an individual; BARBARA A. FORREST, an individual; BILL FRANKHOUSER, an individual; ZELMA FRANKHOUSER, an individual; BRUCE FRANZ, an individual; NANCY FRANZ, an individual; ALAN H. FRAZIER, an individual; MARILYN J. FRAZIER, an individual; DONALD M. FUJINAGA, an individual; RUTH L. FUJINAGA, an individual; LAWRENCE GENTILE, an individual; GENE T. GREEN, an individual; ROBERT E. GRIER, an individual;  GERALD HALL, an individual; MARY HALL, an individual; JERRY W. HAYNES, an individual; ALAN HEINOLD, an individual; ERIN HEINHOLD, an individual; ROBERT HICKAM, an individual; SHIRLEY HICKAM, an individual; KEVIN HOFFARTH, an individual; COCHRAN HOGAN, an individual; DOROTHIE HOGAN, an individual; ANNE HULBERT, an individual; CANDEE A. JOHNSON, an individual; LILLY KATO, an individual on behalf of deceased ROY KATO; ESTATE OF ROY KATO; KIYOSHI KAWAMOTO, an individual; SUEKO KAWAMOTO, an individual; HAROLD KRAFT, an individual; DORIS KRAFT, an individual; CHRISTINE LEWIS, as the successor in interest of AILEEN

LEWIS, deceased; ESTATE OF AILEEN LEWIS; NORMAN LIETER, an individual; IVY LIETER, an individual; MEGAN LOVELACE, an individual; PHILLIP LOVELACE, an individual; DAVID LUSHER, an individual; MARY LUSHER, an individual; LEONARD MAINS, an individual; HOWARD MATSUMURA, an individual; EARLINE D. MCWILLIAMS, an individual; RONALD C. MEDDINGS, an individual; ELEANOR KAY MEEK, as the successor in interest of HAROLD MEEK, deceased; ESTATE OF HAROLD MEEK; PARI MENDES, an individual on behalf of herself and on behalf of the MENDES FAMILY TRUST; RICARDO MENDES, an individual on behalf of the MENDES FAMILY TRUST; ALEX MORICE, an individual; JANE MORICE, an individual; AMY MOY, an individual; MAXIM MOYAL, an individual; HISAKO NAKAMOTO, individually and as the successor in interest of BEN NAKAMOTO, deceased; ESTATE OF BEN NAKAMOTO; JOSE OLIVAR, an individual; NANCY OLIVAR, an individual; ROSEMARIE PADULA, an individual; MARION PEPINO, an individual; CARL PYTLINSKI, an individual; VINCENT ROBBINS, an individual; VIRGINIA ROBBINS, an individual; MICHAEL RUSSON, an individual; TONY RUSSON, an individual; VENILE RUSSON, an individual; DOROTHY SAMUELS, an individual; RAYMOND A. SIRSTAD, an individual; REBECCA R. SIRSTAD, an individual; GEORGE WADA, an individual; MARY WADA, an individual; GREGORY K. WADA, an individual; JUDY L. M. WADA, an individual; MONTE G. WADA, an individual; DAVID S. WEIL, an individual; GRACE K. WEIL, an individual; JEFFREY WHITE, an individual; WILLIAM WHITE, an individual; JUDITH WHITE, an individual; ALAN S. WIENER, an individual; NANCY R. WIENER, an individual; EDDIS ALLEN WILLIAMS, an individual; SHIZUKO YOSHIMOTO, an individual; ALICE YOSHIMURA, an individual; WILHELM ZINDRIC, an individual; FRIEDA ZINDRIC, an individual,

///

///

1    hereby demand a trial by jury.

2    ///

3    Dated: June 9, 2011                    **LON B. ISAACSON ASSOCIATES**
                                            An Affiliation Including A
4                                           Professional Law Corporation

5

6                                           By: _____
                                                Lon B. Isaacson
7                                               Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28